**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DIGACOMM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 08-MC-63-JJF |
| v. | ) | |
| | ) | |
| VEHICLE SAFETY & | ) | |
| COMPLIANCE, LLC, | ) | |
| PITTCO CAPITAL PARTNERS, L.P, | ) | |
| PITTCO CAPITAL PARTNERS II, L.P., | ) | |
| ANDREW SEAMONS, J.R., and | ) | |
| J.R. "PITT" HYDE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF CATHY L. REESE, ESQUIRE**

I, Cathy L. Reese, declare as follows:

1.      I am a Principal at Fish & Richardson P.C. ("F&R") and I am based out of F&R's Wilmington, Delaware office.  F&R is an international law firm with over 500 attorneys and eleven offices located throughout the United States and in Europe.  I make this Declaration of my own personal knowledge, and if called upon as a witness would competently testify to the facts set forth in this Declaration.

2.      DigaComm, LLC ("DigaComm") filed suit against the above-referenced defendants in the U.S. District Court for the Northern District of Illinois.  Freeborn & Peters LLP ("Freeborn") represents those defendants in that action.  F&R does not represent those defendants in the litigation pending in the U.S. District Court for the Northern District of Illinois and has not entered an appearance in that action.

3.      DigaComm also filed an arbitration demand against Vehicle IP, LLC ("VIP") and Bradley Larschan ("Larschan") with the American Arbitration Association ("AAA") in Wilmington, Delaware.  Freeborn represents VIP and Larschan in the AAA arbitration.  F&R serves as local counsel to VIP and Larschan in the AAA arbitration.  Since 2005, F&R has also represented VIP and its corporate parent VSAC in the development and commercialization of their patent portfolio.

4.      On February 26, 2008, DigaComm issued two subpoenas to F&R in connection with the Illinois litigation and AAA arbitration.  One of those subpoenas is the subject of DigaComm's petition to show cause filed with this Court on March 31, 2008 (the "Petition").

5.      The subpoena at issue was first served on Friday afternoon, February 29, 2008, on F&R's registered agent in Delaware, The Corporation Trust Company.  The subpoena was routed to F&R's Human Resources Department in Minneapolis, Minnesota on March 4, 2008 and was then forwarded that same day to F&R's Ethics & Conflicts Director and Special Counsel, John Steele ("Steele"), in F&R's Redwood City, California office.

6.      In the Petition, DigaComm claims that prior to issuing the subpoena, DigaComm's counsel requested that I voluntarily accept service of DigaComm's requests for documents.   However, I was in a multi-week trial in San Diego, California and, due to an administrative error, I did not receive that correspondence until after DigaComm filed the Petition.

7.      DigaComm's counsel, however, never served the subpoenas on me or any other F&R attorney involved in the AAA arbitration, and DigaComm never provided a courtesy copy of those subpoenas to me or the other F&R attorneys involved in the AAA arbitration.

8.     Once the subpoena actually reached Steele in F&R's Redwood City, California office on March 4, 2008, through service on F&R's registered agent in Delaware, Steele started the extensive process of responding to DigaComm's subpoena and coordinated with the F&R attorneys that may possess documents responsive to DigaComm's subpoena.  However, F&R was unable to comply with the DigaComm subpoena by March 18, 2008 and, inadvertently, through miscommunication between Steele and the Delaware office of F&R, failed to make DigaComm's counsel aware of this fact prior to March 23, 2008.

9.     On Easter Sunday, March 23, 2008, DigaComm's counsel for the first time contacted Brian M. Rostocki ("Rostocki") and me in an email regarding the subpoena.  Rostocki spoke with DigaComm's counsel that same day, Easter Sunday, and the next day put DigaComm's counsel in contact with Steele.

10.     On March 24, 2008, Steele explained to DigaComm's counsel that he needed to research and coordinate efforts relating to the subpoena.  F&R was attempting to coordinate a response to DigaComm's subpoena and believed it was working with DigaComm's counsel in doing so.  However, on March 31, 2008, DigaComm filed the Petition.

11.     F&R has attempted to resolve this matter with DigaComm's counsel without any motion practice before this Court.  On April 7, 2008, F&R provided DigaComm with its initial objections, responses and document production, and on April 11, 2008 F&R produced and made available for inspection substantially all other relevant, responsive and non-duplicative documents not subject to the attorney-client and work product privileges.

12.     F&R has not sought to deliberately or intentionally circumvent the federal discovery procedures and rules.

13.     DigaComm also served document requests to VIP on February 21, 2008 in connection with the AAA arbitration, and identical document requests to VSAC on February 26, 2008 in connection with the Illinois litigation.  DigaComm's document requests to VIP and VSAC contain substantially the same document requests in the subpoenas served on F&R.  VIP previously provided F&R with a set of documents that are potentially responsive to DigaComm's subpoena.  F&R returned a copy of those documents to VIP so that VIP could forward those documents and any additional potentially responsive documents to Freeborn.  The documents F&R returned to VIP consist of a bulk of the documents in F&R's possession that would be responsive to DigaComm's subpoena.  Freeborn is in the process of reviewing those documents to determine which ones are responsive to DigaComm's requests to VIP and VSAC and are not subject to the attorney-client privilege or work product doctrine.  In fact, Freeborn has started to produce those documents that are responsive and not subject to any privilege or immunity. Further, the court in the Illinois litigation ordered that the defendants in the Illinois litigation produce discoverable information, which includes the non-privileged, responsive documents that VIP forwarded to Freeborn, on a rolling basis and that the production be completed by April 21, 2008.

14.     DigaComm has refused to withdraw the Petition.

15.     Attached as Exhibit A hereto is a true and correct copy of DigaComm's Complaint filed in the U.S. District Court for the Northern District of Illinois.

16.     Attached as Exhibit B hereto is a true and correct copy of the docket in the U.S. District Court for the Northern District of Illinois as of April 14, 2008.

17.     Attached as Exhibit C hereto is a true and correct copy of DigaComm's Arbitration Demand filed with the AAA.

18.     Attached as Exhibit D hereto are true and correct copies of Service of Process Transmittals for The Corporation Trust Company.

19.     Attached as Exhibit E hereto is a true and correct copy of an email from Stephen Hackney, Esquire to myself and Brian M. Rostocki, Esquire, dated March 23, 2008.

20.     Attached as Exhibit F hereto is a true and correct copy of DigaComm's Requests for Production of Documents served on VIP and VSAC.

21.     Attached as Exhibit G hereto is a true and correct copy of a Minute Order from the U.S. District Court for the Northern District of Illinois dated April 9, 2008.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  April 14, 2008

Cathy L. Reese

5

# Exhibit A
# Part 1

EXHIBIT A

FILED

JANUARY 15, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **NOTICE OF REMOVAL** |
| | ) | |
| Vehicle Safety and Compliance, LLC, | ) | |
| Pittco Capital Partners, LP, Pittco Capital | ) | |
| Partners II, LP, J.R. "Pitt" Hyde, III, and | ) | |
| Andrew Seamons, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

PLEASE TAKE NOTICE that Defendants Vehicle Safety and Compliance, LLC ("VSAC"), Pittco Capital Partners, LP, Pittco Capital Partners II, LP (collectively the "Pittco Entities"), J.R. "Pitt" Hyde, III, and Andrew Seamons, give notice of removal and hereby remove the above-captioned action from the Circuit Court of Cook County of the State of Illinois, where it is currently pending, to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. § 1441 et seq. In support of this removal, Defendants state as follows:

1.     DigaComm filed this case against Defendants in the Circuit Court of Cook County of the State of Illinois. The case was assigned number 2007 L 013795. A true copy of the Complaint ("Original Complaint") and First Amended Complaint for Fraud, Tortious Interference, and Unjust Enrichment ("Complaint") are attached hereto as Exhibits A and B respectively.

## AMOUNT IN CONTROVERSY

2.      The amount in controversy, exclusive of interest and costs, exceeds $75,000.

Indeed, DigaComm seeks "not less than $200 million" in damages against Defendants.  (Ex. B,

Cmplt. at Prayer for Relief ¶ (a))

## DIVERSITY OF CITIZENSHIP

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332.  There is complete diversity because all properly joined parties are diverse and the amount

in controversy exceeds $75,000.

## Plaintiff

4.      DigaComm is a Delaware limited liability company with its headquarters located

at 400 North Michigan Avenue, Suite 520, Chicago, Illinois.

## Defendants

5.      Pittco Capital Partners, LP is a limited partnership organized under the laws of the

State of Tennessee with its principal place of business in Memphis, Tennessee.

6.      Pittco Capital Partners II, LP is a limited partnership organized under the laws of

the State of Tennessee with its principal place of business in Memphis, Tennessee.

7.      Pitt Hyde, a limited partner in both of the Pittco Entities, is a citizen of the State

of Tennessee.

8.      Andrew Seamons, a limited partner and Managing Member in both of the Pittco

Entities, is a citizen of the State of Tennessee.

## Fraudulently Joined VSAC

9.      VSAC is a limited liability company organized under the laws of the State of

Delaware with its principal place of business in Memphis, Tennessee.  VSAC is a holding

2

company. One of its subsidiaries, Vehicle IP, LLC ("VIP"), is a company whose principal assets are intellectual property. This Court should ignore VSAC's citizenship in determining diversity, however, because DigaComm joined VSAC solely to defeat diversity under 28 U.S.C. § 1441(b).

10.    Courts should ignore the citizenship of improperly or fraudulently joined parties when analyzing whether the parties are diverse. *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993) ("In determining whether there is diversity of citizenship, parties fraudulently joined are disregarded."). "Fraudulent joinder occurs either when there is no possibility that a plaintiff can state a cause of action against nondiverse defendants in state court, or where there has been outright fraud in plaintiff's pleading of jurisdictional facts." *Hoosier Energy Royal Elec. Corp., Inc. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1315 (7th Cir. 1994) (quoting *Gottlieb*, 990 F.2d at 327); *see also Schwartz v. State Farm Mut. Auto Ins. Co.*, 174 F.3d 875, 878-79 (7th Cir. 1999); *Poulos v. NAAS Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992).

11.    The defendant seeking removal to federal court is entitled to present facts showing that the joinder is fraudulent. *Kocot v. Alliance Mach. Co.*, 651 F. Supp. 226, 227 (S.D. Ill. 1986) ("In support of a removal petition the defendants may submit affidavits and deposition transcripts . . ."); *Bodine's Inc. v. Fed. Ins. Co.*, 601 F. Supp. 47, 49 (N.D. Ill. 1984); *Faucett v. Ingersoll-Rand Mining & Mach. Co.*, 960 F.2d 653, 655 (7th Cir. 1992) (relying on defendant's uncontradicted affidavit to establish fraudulent joinder).

### *DigaComm's Allegations*

12.    DigaComm claims it introduced and facilitated a deal between VIP and General Electric ("GE") whereby GE and VIP would partner to monetize VIP's patent portfolio. (Ex. B, Cmplt. ¶ 1) DigaComm also claims that VIP agreed to compensate DigaComm with a portion of the proceeds GE and VIP would potentially generate under their partnership pursuant to two separate purported contracts between VIP and DigaComm.

3

13.    The first so-called contract is an e-mail exchange between a DigaComm employee, Jonathan Tunick, and VIP's Chief Executive Officer, Brad Larschan. (*Id.* ¶ 36) In that e-mail, dated March 9, 2007, DigaComm asserts, Larschan confirmed his understanding of a prior conversation with Tunick in which he allegedly agreed to pay DigaComm 5% of any transaction arising out of the VIP-GE deal. (*Id.* ¶¶ 33, 36-37)

14.    The second contract on which DigaComm relies to assert its claims is a March 30, 2007 letter agreement (the "Letter Agreement") that attaches a distribution schedule for proceeds to be paid to DigaComm as a percentage of any proceeds VIP potentially would receive from the VIP-GE deal ("Cash Waterfall Proceeds"). The Letter Agreement, which was drafted by DigaComm and signed by Peter Smith, DigaComm's Managing Member, confirmed DigaComm's acknowledgement that any distribution of Cash Waterfall Proceeds was "subject to approval by a majority of VSAC Preferred Holders" and that such approval had not yet been obtained as of the signing of that Agreement. (Ex. B, Cmplt. at Ex. 4 at p. 2)

15.    The Letter Agreement also included an arbitration provision and an integration clause stating that the Letter Agreement represented the entire understanding between VIP and DigaComm. (*Id.* at p. 2)

16.    A majority of the VSAC Preferred Holders voted against approval of distributions to DigaComm as provided in the Letter Agreement. (Ex. B, Cmplt. at Ex. 6) DigaComm claims that by voting down the terms of the Letter Agreement, the Preferred Holders caused VIP to renege on the March 9, 2007 "agreement" and the Letter Agreement. (Ex. B, Cmplt. ¶¶ 2-3)

17.    Claiming the Preferred Holders acted wrongfully by voting down the DigaComm compensation, DigaComm has brought fraud, tortious interference, and unjust enrichment claims

against VSAC, two of its Preferred Holders (the Pittco Entities), and two individuals – Pitt Hyde and Andrew Seamons.

18.     Prior to filing the present lawsuit, DigaComm filed an arbitration demand against VIP before the American Arbitration Association in Delaware based on the arbitration provision in the Letter Agreement. (Ex. B, Cmplt. ¶ 7) The central contentions made by DigaComm in the arbitration are identical to those here, *i.e.*, that DigaComm and VIP had a binding agreement entitling DigaComm to a percentage of any potential proceeds obtained by VIP under the VIP-GE agreement and that DigaComm is entitled to enforce that agreement. However, despite DigaComm's allegations in this case that VSAC and VIP are alter egos and that VIP's actions should be imputed upon VSAC, DigaComm did not name VSAC as a defendant in the arbitration or claim that VIP is a sham corporation.

19.     In light of DigaComm's allegations here that VSAC should be liable for the alleged wrongful conduct of VIP and the binding arbitration provision, VIP has filed a claim in the arbitration seeking a ruling from the arbitrator on whether VIP and VSAC are alter egos. Accordingly, that question will be subject to arbitration.

### *DigaComm Has Not Stated, And Cannot State, A Cause Of Action Against VSAC*

20.     DigaComm's Complaint includes no factual allegations that VSAC itself engaged in any fraudulent or tortious conduct. Indeed, the only allegations directed against VSAC are made "on information and belief." (*See* Ex. B, Cmplt. ¶¶ 38, 53, 68) Such allegations alone are insufficient to state a claim, particularly because DigaComm has provided no "grounds for [its] suspicions." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 974 (7th Cir. 1992) (allegations made upon information and belief "are insufficient, even if the facts are inaccessible to the plaintiff, unless the plaintiff states the grounds for his suspicions").

21.     Conceding it cannot in good faith assert any allegations demonstrating that VSAC acted wrongfully, DigaComm relies on an alter-ego theory. To plead an alter-ego theory, a plaintiff must assert facts demonstrating that "(1) such unity of interest and ownership that the separate personalities of the corporation[s] . . . no longer exist;" and (2) "adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Jones v. Hoosman*, 2006 WL 1302524, at *2 (N.D. Ill. May 9, 2006); *see Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange*, 1997 WL 767290, at *5 (N.D. Ill. Dec. 3, 1997); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271 (D. Del. 1989).

22.     DigaComm's allegations here simply do not meet this pleading requirement. DigaComm claims that "VIP and VSAC share a unity of interest such that their separate personalities no longer exist and VIP is, in reality, a sham for VSAC." (Ex. B, Cmplt. ¶ 73) To support this assertion, DigaComm alleges that: (a) VSAC owns 100% of VIP; (b) there is overlap between the officers and employees of VIP and VSAC; (c) VIP and VSAC share office space; and (d) VSAC's Preferred Holders needed to approve the DigaComm compensation agreement. (*Id.* ¶ 74) These allegations do not demonstrate VIP was a mere instrumentality of VSAC, and they are, accordingly, insufficient as a matter of law. *See Sumner Realty Co. v. Willcott*, 148 Ill.App.3d 497, 502 (5th Dist. 1986); *Hornsby v. Hornsby's Stores, Inc.*, 734 F. Supp. 302, 307-308 (N.D. Ill. 1990).

23.     DigaComm's remaining alter-ego allegations are mere conclusions – "VSAC and VIP have ignored the formalities of separate corporate existence" and "[a]dherence to the fiction that VIP and VSAC are separate entities would sanction a fraud and promote injustice." (Ex. B, Cmplt. ¶¶ 75-76) DigaComm provides no facts to support these allegations. For example,

6

DigaComm does not allege that VIP was created to defraud DigaComm or even hint at what injustice would result if VIP and VSAC are treated as separate entities. Accordingly, these allegations are insufficient. *Lynch Ford v. Ford Motor Co. Inc.*, 934 F. Supp. 1005, 1007 (N.D. Ill. 1996); *Mobil Oil*, 718 F. Supp. at 267.

24.    There is a reason DigaComm cannot provide facts to support its alter-ego allegations: they are utterly unfounded. And DigaComm knows it. DigaComm sued only VIP in the arbitration. If VIP is just a "sham" as DigaComm alleges, and the real party is VSAC, DigaComm presumably would have sued VSAC in the arbitration because VSAC would also be subject to the arbitration provision. It did not.

25.    Moreover, DigaComm makes no allegations in the arbitration that VIP is a mere instrumentality of VSAC or that VIP may be unable to satisfy a judgment. *Poulos*, 959 F.2d at 74. Nor could it make such allegations. VIP was formed in 2005, years before it entered into the DigaComm contract. (Declaration of Bradley Larschan ¶ 3, Ex. C hereto) VIP is adequately capitalized, observes corporate formalities, has functioning officers and directors, holds regular required meetings of its own board of directors, maintains all required corporate records, and maintains separate bank accounts and financial statements from VSAC. (*Id.* ¶¶ 6-17)

26.    Even if VIP and VSAC were alter egos, as DigaComm alleges, VSAC would be the party-in-interest to the contract between VIP and DigaComm. Disputes under that contract, as DigaComm admits, must be brought in arbitration. Thus, even under DigaComm's allegations, VSAC is not a proper party to this case.

27.    In short, DigaComm's allegations are insufficient as a matter of law and inaccurate as a matter of fact. And because there is no possibility that DigaComm can state a cause of action against non-diverse VSAC, VSAC was fraudulently joined as a defendant in this

case. *Hoosier Energy*, 34 F.3d at 1315; *see also Schwartz*, 174 F.3d at 878-79; *Poulos*, 959 F.2d at 73. VSAC's citizenship should not be considered for purposes of determining diversity. *Gottlieb*, 990 F.2d at 327.

## REMOVAL IS PROPER

28. The Court has subject matter over this action pursuant to 28 U.S.C. § 1332. As demonstrated above, Defendant VSAC was fraudulently joined as a defendant in this action and its citizenship should be disregarded. There is complete diversity of citizenship between all of the properly joined parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

29. This action is removable pursuant to 28 U.S.C. § 1441 because it originally could have been brought in this Court.

30. This action is removable pursuant to 28 U.S.C. § 1441(b) because none of the properly joined defendants is a citizen of the same state as DigaComm. As demonstrated above, Defendant VSAC was fraudulently joined as a defendant in this action and its citizenship should be disregarded. There is complete diversity of citizenship between all of the properly joined parties.

31. This Notice of Removal is being filed in the United States District Court for the district in which the action is currently pending, pursuant to 28 U.S.C. § 1441(a).

32. None of the Defendants received DigaComm's Original Complaint. (*See* Declaration of J. Raymond Bilbao ("Bilbao Decl.") ¶ 4, Ex. D hereto; Declaration of Andrew Seamons ("Seamons Decl.") ¶ 4, Ex. E hereto; Declaration of J.R. Hyde, III ("Hyde Decl.") ¶ 3, Ex. F hereto) Defendants VSAC, Andrew Seamons, and Pitt Hyde first received the First Amended Complaint on December 17, 2007. (Ex. D, Bilbao Decl. ¶ 3; Ex. E, Seamons Decl. ¶ 4; Ex. F, Hyde Decl. ¶ 2) The Pittco Entities first received the First Amended Complaint on

8

December 18, 2007. (Ex. E, Seamons Decl. ¶ 6) Accordingly, removal is timely filed within 30 days of receipt of the First Amended Complaint. 28 U.S.C. § 1446(b).

33.    Each of the Defendants has consented to removal. VSAC's consent to removal is not necessary because it was fraudulently joined to this action. *See Jonathan Pepper Co. v. Hartford Cas. Ins. Co.*, 381 F. Supp. 2d 730, 731-32 (N.D. Ill. 2005) (improperly joined defendants need not consent to removal) (citing *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 369 (7th Cir. 1993)). Nevertheless, out of an abundance of caution, VSAC joins this Notice of Removal.

34.    No other papers, pleadings, process or other orders have been served on Defendants in connection with this action. There are no motions currently pending in the Circuit Court of Cook County of the State of Illinois as of the time of the filing of this Notice of Removal.

35.    None of Defendants or their counsel have entered an appearance, filed any responsive pleadings, or filed any papers responding to DigaComm's Original Complaint or First Amended Complaint in the Circuit Court of Cook County of the State of Illinois.

36.    Pursuant to 28 U.S.C. §1446(d), written notice of the filing of this Notice of Removal has been given to all adverse parties and a copy of the Notice of Removal has been filed with the clerk of the Circuit Court of Cook County of the State of Illinois.

37.    Pursuant to 28 U.S.C. § 1446(a), a true copy of all process, pleadings, and orders that have been filed and/or entered with the Circuit Court of Cook County of the State of Illinois, or served upon Defendants in connection with this action, except the Original Complaint and the First Amended Complaint (which are attached as Exs. A and B hereto) is attached hereto as Exhibit G.

WHEREFORE, Defendants respectfully request that this cause proceed in this Court as an action properly removed, pursuant to 28 U.S.C. §§ 1332(a), 1441 and 1446, thereto.

DATED: January 15, 2008                      Respectfully submitted,

                                         /s/ Kellye L. Fabian
                                         Michael D. Freeborn
                                         John Z. Lee
                                         Kellye L. Fabian
                                         FREEBORN & PETERS LLP
                                         311 S. Wacker Drive, Suite 3000
                                         Chicago, Illinois 60606
                                         Ph: (312) 360-6000
                                         Fx: (312) 360-6996

                                         *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Notice of Removal was served via U.S. Mail and

hand delivery on January 15, 2008 upon:

> Reed S. Oslan, P.C.
> Stephen C. Hackney
> Matthew E. Nirider
> KIRKLAND & ELLIS LLP
> 200 E. Randolph Drive
> Chicago, Illinois 60601
> Ph: (312) 861-2157
> Fx: (312) 861-2200

/s/ Kellye L. Fabian

1459460v2

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT A

## Part 1 of 2

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
LAW DIVISION**

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. _____ |
| v. | ) | |
| | ) | 2007L013795 |
| Vehicle Safety and Compliance, LLC, | ) | CALENDAR/ROOM |
| Pittco Capital Partners, LP, | ) | Hon. _____ TIME 00:00 |
| Pittco Capital Partners II, LP, | ) | Fraud |
| J.R. "Pitt" Hyde III, | ) | **JURY TRIAL DEMANDED** |
| Andrew Seamons, and John Does 1 - 10, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR FRAUD, TORTIOUS INTERFERENCE
AND UNJUST ENRICHMENT**

In support of its Complaint, DigaComm, LLC ("DigaComm") states as follows:

1.     Through this complaint, DigaComm seeks compensation it is due for introducing

Vehicle IP, LLC ("VIP"), a wholly-owned subsidiary of Vehicle Safety and Compliance LLC

("VSAC"), to General Electric ("GE") and facilitating a deal in which GE would partner with

VIP and VSAC to monetize a portfolio of valuable patents.  The patents in question are valued at

$4 billion dollars.

2.     After the parties negotiated an agreement to compensate DigaComm with a

portion of the proceeds generated by the GE joint venture, DigaComm went to work.  Its efforts

for the benefit of VIP and VSAC quickly bore fruit.  On August 16, 2007, GE and VIP/VSAC

closed on their joint venture agreement.

3.     Apparently not content with the billions they stood to make from the GE joint

venture, VSAC and its Preferred Holders caused VIP to renege on its agreement to compensate

DigaComm. On September 7, 2007, VIP Chief Executive Officer Brad Larschan informed DigaComm's Managing Member Peter Smith that DigaComm would be paid nothing for procuring the GE joint venture.

4.      DigaComm brings this action against VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 -10 (representing the unknown VSAC Preferred Holders who voted against compensating DigaComm).

## PARTIES

5.      Plaintiff DigaComm is a Delaware limited liability company headquartered in Chicago, Illinois. Its address is 400 North Michigan Avenue, Suite 520, Chicago, Illinois, 60611. DigaComm was founded in 1997 and is a Chicago private investment firm specializing in early stage venture capital rounds. DigaComm's managing members are Peter Smith and Robert Spillane.

6.      Defendant VSAC is a Delaware limited liability company headquartered in Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117. VSAC is the sole member of VIP, and thus, the sole owner of VIP.

7.      Related Party VIP is a Delaware limited liability company headquartered in Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117. VSAC is VIP's sole member. VIP is not a named defendant in this complaint because DigaComm's dispute with VIP is subject to an arbitration clause. DigaComm has initiated arbitration proceedings against VIP, and those proceedings are ongoing.

2

8.      Defendant J.R. "Pitt" Hyde III is a resident of Tennessee. His address is 6058 Shady Grove Road, Memphis, Tennessee, 38103. Mr. Hyde is a prominent Memphis businessman and is the founder of the AutoZone chain of auto parts stores. Upon information and belief, Mr. Hyde is one of the partners of Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

9.      Defendant Pittco Capital Partners, LP is a Tennessee limited partnership with its principal place of business at 6075 Poplar Avenue, Suite 335, Memphis, Tennessee, 38119. Pittco Capital Partners, LP is a Preferred Holder of VSAC.

10.     Defendant Pittco Capital Partners II, LP is a Tennessee limited partnership with its principal place of business at 17 W. Pontotoc, Suite 200, Memphis, Tennessee, 38103. Pittco Capital Partners II, LP is a Preferred Holder of VSAC.

11.     Defendant Andrew Seamons is a resident of Tennessee. His address is 2910 Garden Lane, Memphis, Tennessee, 38111. Upon information and belief, Mr. Seamons is one of the partners of Pittco Capital Partners, LP and Pittco Capital Partners II, LP. Upon information and belief, Mr. Seamons is J.R. "Pitt" Hyde III's agent. Mr. Seamons is also Chairman of the Board of VIP.

12.     John Does 1 - 10 represent the unknown VSAC Preferred Holders who voted to reject DigaComm's compensation. After due inquiry, the proper names of John Does 1 - 10 are unknown. (A copy of the affidavit of DigaComm's counsel to this effect is attached as Exhibit 1.) Upon information and belief, John Does 1 - 10 are residents of Tennessee.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the defendants because they, individually and through agents, transacted business in Illinois by engaging DigaComm, a limited liability company headquartered in Chicago, Illinois, to introduce VIP to John Hall, then a GE executive based in Chicago, Illinois. The introduction and at least two other meetings took place in Chicago, Illinois. In addition, the harm caused to DigaComm by the defendants occurred in Illinois.

14.     This complaint arises out of the defendants' and their agents' transaction of business in Chicago, Illinois.

15.     The exercise of jurisdiction over the defendants in this case is consistent with the requirements of due process.

16.     Venue is proper because all of the portions of the transaction that occurred in Illinois occurred in Cook County. Venue is further proper because all of the defendants are nonresidents of Illinois.

## STATEMENT OF FACTS

17.     VSAC and VIP are patent "trolls" — entities whose principal assets are intellectual property but which do not otherwise operate active businesses. The patents at the center of this lawsuit involve motor vehicle communication technology. VIP and VSAC value these patents at $4 billion.

18.     The patents in question were acquired during the bankruptcy of then-holder
Remote Dynamics, Inc. in 2004. Raymond Bilbao, formerly General Counsel to Remote
Dynamics, Inc., followed the patents to VIP and now serves as VSAC's General Counsel.

19.     The capital used to acquire the patents and develop them was provided to VIP by
VSAC, its sole member. VSAC is believed to have invested approximately $5 million in capital,
by way of loans or capital contributions.

20.     After acquiring the patents, VIP set about its efforts to monetize those patents.
The principal method for a patent troll to monetize intellectual property is to sue patent infringers
for damages. Alternatively, a patent troll can monetize a patent by entering into licensing
agreements with businesses interested in utilizing the technology.

21.     In 2006, VIP entered into discussions regarding its patent portfolio with the
Boston intellectual property firm Fish & Richardson. Under the proposals, Fish & Richardson
agreed to invest between 30 and 100% of its fee in return for participation in any damages or
licensing fees received through its suits against infringers of certain patents.

22.     In December 2006, an attorney at Fish & Richardson named Michael Bunis
contacted DigaComm Principal Jonathan Tunick and encouraged DigaComm to investigate the
VIP portfolio. Mr. Bunis was aware of DigaComm's work on a previous transaction between
SightSound Technologies, Inc. ("SightSound") and GE and believed that DigaComm was well-
positioned to assist VIP to achieve a similar venture with GE.

23.     DigaComm was, indeed, well-positioned to assist VIP. In July 2005, it had
entered into an agreement with SightSound under which it had agreed to assist SightSound to

5

form a joint venture with General Electric. The SightSound/GE joint venture was structured as follows: (a) SightSound would contribute its patents to a special purpose entity; and (b) GE would contribute necessary capital and would use its experience and sophistication to monetize the patents, either by negotiating license agreements or by enforcing SightSound's patents against infringers.

24.    In return for facilitating the SightSound/GE joint venture, DigaComm was to receive 5% of any amounts generated by the joint venture after certain amounts (such as GE's capital investment) were repaid.

25.    The SightSound/GE joint venture closed successfully in mid-2005. Though the patents in that matter are currently under re-examination by the Patent and Trademark Office, DigaComm will receive the 5% owed to it for facilitating the transaction once the patents emerge from the re-examination process.

26.    Aware of DigaComm's experience and success on the SightSound transaction, Fish & Richardson's Mr. Bunis contacted Jonathan Tunick of DigaComm and suggested that DigaComm talk to Bradley Larschan, VIP's CEO.

27.    In January 2007, Mr. Tunick contacted Mr. Larschan in order to explore the possibility of facilitating a joint venture between VIP and GE. Mr. Larschan had been waiting for Mr. Tunick's call and was receptive to the idea. Upon information and belief, VSAC and its Preferred Holders authorized and/or approved all actions taken by VIP in connection with its communications with DigaComm.

6

28.     Mr. Larschan eagerly embraced the idea of a joint venture with GE because GE was a market participant in the very fields encompassed by the VIP patents. Because of GE's status as a market participant, Mr. Larschan believed that GE had a stronger legal footing for enforcing the patents and that GE could do so without being perceived as a patent troll. In fact, Mr. Larschan had previously authored an article in which he explained how a recent intellectual property decision by the United States Supreme Court made a market participant like GE a valuable, if not indispensable, ally in enforcing patents. (A copy of Mr. Larschan's article is attached as Exhibit 2.)

29.     On February 6, DigaComm hosted Mr. Larschan and Mr. Bilbao at its offices in Chicago. During this meeting, DigaComm again raised the idea of working with VIP to secure an agreement with GE similar to the SightSound transaction. Mr. Larschan reiterated his interest in the idea. The next day, Mr. Larschan called from the airport and told Mr. Tunick that VIP "really liked" the idea of pursuing a deal with GE and inquired about the next steps. Mr. Tunick promised to coordinate with John Hall of GE, the executive involved in the SightSound transaction.

30.     On February 13, 2007, Mr. Larschan emailed to Mr. Hall of GE a set of financial projections for each of VIP's three intellectual property groups. Acknowledging DigaComm's role as the facilitator of the transaction, on February 16, 2007, Mr. Larschan asked whether Mr. Tunick would follow up with General Electric. Mr. Tunick agreed to do so the same day.

31.     On February 17, 2007, Mr. Larschan thanked Mr. Tunick for his continued efforts with respect to GE and requested a copy of the SightSound transaction so that he could

7

"advocate for it" with VSAC and the VSAC Preferred Holders.  DigaComm complied with Mr.

Larschan's request.

      32.     On February 27, 2007, Mr. Larschan again thanked Mr. Smith and Mr. Tunick for

"pushing along the GE deal," noting that it "could be a great opportunity."

      33.     On March 7, Mr. Tunick and Mr. Larschan spoke by telephone regarding

DigaComm's compensation.  By this time, DigaComm had scheduled a meeting with John Hall

of GE that was to take place the following day in Chicago.  Mr. Tunick said that DigaComm was

looking for a 10% piece of any transaction in return for bringing the transaction to VIP's

attention.  Mr. Tunick emphasized that if VIP and DigaComm were not able to agree on

DigaComm's compensation, the March 8 meeting with GE would be cancelled.

      34.     Mr. Larschan pushed back.  He said that 10% was not acceptable to VIP or

VSAC, but that 5% was "not a problem" and was the "market rate."  Mr. Tunick agreed that

DigaComm would accept 5%.

      35.     On March 8, 2007, John Hall of General Electric met with Mr. Larschan and

others of VIP and made a power-point presentation reflecting GE's view of how best to monetize

the patents in question.

      36.     At the conclusion of the meeting, Mr. Hall asked what VIP wanted from GE.  Mr.

Larschan said "we want what you did on the SightSound deal."  The meeting ended on a positive

note.  Mr. Hall agreed to speak with Todd Dickinson, GE's head of intellectual property.

37.     On March 9, Mr. Tunick emailed Mr. Larschan to report on a conversation he had

had with John Hall of GE. In his email, he noted the parties agreement with respect to

DigaComm's 5% compensation:

> Brad — I will report to you on John Hall's conversation with Todd Dickenson,
> but before doing so I want to ensure that we have agreement on our own working
> arrangement. As you and I agreed prior to our meeting, the waterfall splits will be
> 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming
> our prior understanding.

38.     Eager to learn of the new development and keep the deal on track, Mr. Larschan

confirmed Mr. Tunick's understanding of the parties' agreement as to DigaComm's

compensation:

> Jonathan, This represents our understanding of the percentage split. I look
> forward to hearing about John's conversation with Todd.

(A copy of this email chain is attached as Exhibit 3.)

39.     With the GE deal progressing smoothly and with VIP having established direct

contacts with GE, VSAC apparently felt free to interfere with VIP's March 9, 2007 promise to

pay DigaComm 5%. On March 29, 2007, VSAC's Mr. Bilbao informed Mr. Tunick during a

telephone call that VIP was no longer willing to pay DigaComm 5%. Mr. Bilbao said that 5%

"did not work optically" and that Mr. Larschan was no longer willing to pay the 5% he had

previously promised. Upon information and belief, VSAC and its Preferred Holders authorized

and/or approved Mr. Bilbao's and Mr. Larschan's actions.

40.     DigaComm viewed Mr. Bilbao's and Mr. Larschan's position as a radical change

from the prior agreement to pay 5%. Rather than allow a complete breakdown in the relationship

that might threaten the GE deal, Mr. Smith and Mr. Tunick proposed a tiered fee schedule. On

March 30, 2007, DigaComm and VIP agreed to a tiered fee agreement under which DigaComm

would receive the following percentages of amounts generated by the GE/VIP joint venture (less

the VSAC and GE capital contributions):

| Amounts generated by the joint venture | DigaComm's share |
|---|---|
| Up to $300 million | 5% |
| Between $300 and $500 million | 4% |
| Between $500 and $750 million | 3.5% |
| Between $750 million and 1 billion | 2.5% |
| Between $1 billion and $1.5 billion | 2.0% |
| Between $1.5 billion and $2 billion | 1.5% |
| Over $2 billion | 1% |

41.     Under the agreed upon compensation schedule, DigaComm stood to earn up to

$76 million for bringing the GE opportunity to VIP's $4 billion patent portfolio.

42.     As Friday, March 30, 2007 wound to a close, VIP insisted for the first time that

the letter agreement be "subject to the approval of a majority of the VSAC Preferred Holders."

DigaComm objected to this change.  Mr. Larschan assured Mr. Smith, however, that the

approval process was a mere formality.  VIP promised to recommend to the VSAC Preferred

Holders that they approve the DigaComm letter agreement "as soon as practicable."

43.     As a further sign that the approval process was nothing to be concerned about,

VIP solicited Andrew Seamons' approval of the DigaComm/VIP letter agreement on March 30,

2007.  That same day, Mr. Seamons approved the deal on behalf of the VSAC Preferred Holders.

VSAC's Mr. Bilbao informed DigaComm of Mr. Seamons' approval.  (A copy of this email is

attached as Exhibit 4.)

10

44.     In addition, Mr. Larschan told Mr. Tunick that the other VSAC Preferred Holders would "follow the lead" of Mr. Seamons. Mr. Larschan emphasized that the approval provision was not a problem because "you already have the votes."

45.     On the basis of Mr. Larschan's, Mr. Bilbao's, and Mr. Seamons' representations, DigaComm entered into a letter agreement with VIP late in the day on March 30, 2007. (A copy of this letter agreement is attached as Exhibit 5.)

46.     At all relevant times, GE approved of and was grateful for DigaComm's efforts in bringing to its attention the VIP opportunity and understood that DigaComm would receive a participation percentage for its efforts.

47.     On April 2, DigaComm coordinated a meeting in Memphis so that VSAC's Preferred Holders could meet Mr. Hall of GE in person. Because of flight delays, Mr. Smith of DigaComm was not able to make the initial meeting. Mr. Hall reported to him that the meeting had gone well. The VSAC Preferred Holders had believed GE to be too good to be true. Mr. Hall's understanding was that the VSAC Preferred Holders were very receptive to a deal with GE, and wanted to advance the deal by meeting with the GE licensing personnel who would also be involved in the joint venture.

48.     At no point during the April 2 meeting did VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, or any John Doe ever disparage DigaComm's role in the GE/VIP transaction or inform DigaComm that the VSAC Preferred Holders had yet to approve its compensation.

11

49.     Mr. Smith's flight arrived in time for dinner in Memphis on April 2. That dinner was attended by Smith, Mr. Hall, Mr. Larschan, and Pitt Hyde's representative Mr. Seamons. At no time during this dinner did Mr. Seamons question DigaComm's participation or inform DigaComm that the VSAC Preferred Holders had not yet approved the DigaComm letter agreement. Mr. Hall also told Mr. Smith that he had informed the VSAC Preferred Holders of the importance of DigaComm to the effort and had received no objections.

50.     On May 8, a second meeting was held in Memphis so that the VSAC Preferred Holders could meet the GE licensing people. Jonathan Tunick attended this meeting on behalf of DigaComm. At no point during this meeting did VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, or any John Doe ever question DigaComm's role in the GE transaction or inform DigaComm that the VSAC Preferred Holders had yet to approve its compensation.

51.     The May 8 meeting was a success — the VSAC Preferred Holders decided to proceed with the GE joint venture.

52.     On June 12, 2007, John Hall contacted Mr. Smith and informed him that GE's law firm, Latham & Watkins, needed a copy of the DigaComm letter agreement so that they could write in DigaComm's compensation to the joint venture agreement. Mr. Smith obliged by sending Mr. Hall a copy of the DigaComm letter agreement with VIP. Mr. Smith's letter states "I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us." (A copy of Mr. Smith's letter is attached as Exhibit 6.)

12

53.     At no time did Mr. Larschan, VSAC, Mr. Seamons, Mr. Hyde, or any of VSAC's Preferred Holders object or inform Mr. Smith that the DigaComm letter agreement was invalid or that it had not yet been approved.

54.     Mr. Larschan did take action, however. Mr. Larschan directed VIP's lawyers to object to any inclusion of DigaComm in the joint venture documents. Upon information and belief, VSAC and its Preferred Holders authorized and/or approved of Mr. Larschan's action. At no point did anyone inform DigaComm that VIP was once again reneging on its promise to pay DigaComm.

55.     As far as DigaComm knew, the joint venture negotiations were proceeding smoothly. On several occasions, Mr. Smith contacted Mr. Larschan to check in. At no time did Mr. Larschan inform Mr. Smith that there was any problem with either DigaComm's contract or the GE deal as a whole.

56.     By mid-August, DigaComm was of the belief that the joint venture closing was imminent. On August 21, 2007, Mr. Smith wrote Mr. Larschan and Mr. Bilbao to congratulate them on closing the GE deal.

57.     On August 27, 2007, Mr. Smith again wrote Mr. Larschan to congratulate him on closing the GE deal.

58.     Mr. Smith received no response to his emails until September 6, 2007. On that day, Mr. Larschan dropped a bombshell: VIP was refusing to pay DigaComm because "a majority of the VSAC Preferred Holders had not approved the deal." He offered to pay

13

DigaComm $250,000 for its efforts in securing a $4 billion opportunity with one of the world's largest companies.

59.     An angered Mr. Smith informed Mr. Larschan that he would contact GE and his litigation counsel about this unfortunate development.

60.     On September 7, 2007, VIP officially reneged on its obligations to DigaComm. In a letter of that day, Mr. Larschan informed Mr. Smith that,

> [o]n August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee. At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein. Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth herein. Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

(A copy of this letter is attached as Exhibit 7.)

61.     At no time prior to September 6, 2007, did anyone from VIP, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, or any John Doe ever inform anyone from DigaComm that the VSAC Preferred Holders had not approved the DigaComm letter agreement. To the contrary, VIP, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 took pains to give DigaComm the illusion that everything was on track.

62.     DigaComm brings this action to recover damages equal to 5% of the value of the joint venture's patent portfolio.

14

## COUNT I
## (FRAUD)

63.     DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 62 above as if fully set forth herein.

64.     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 conspired with and aided and abetted VIP and Bradley Larschan to defraud DigaComm out its compensation for facilitating a $4 billion joint venture between VIP and GE.

65.     VIP and Mr. Larschan made material misrepresentations to DigaComm concerning the status of its compensation in order to induce DigaComm to continue to facilitate the GE transaction.  Upon information and belief, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 authorized and/or approved of VIP's and Mr. Larschan's misrepresentations.

66.     VIP and Mr. Larschan knew their statements were false at the time they made them.

67.     VIP and Mr. Larschan intended that DigaComm would rely on these misrepresentations.

68.     DigaComm relied on those misrepresentations.

69.     Mr. Seamons participated in the fraud and acted in furtherance of the conspiracy by indicating his approval of the DigaComm/VIP letter agreement and causing his approval to be communicated to DigaComm by VSAC's General Counsel, J. Raymond Bilbao.  Upon

15

information and belief, VSAC, its Preferred Holders, and Mr. Hyde authorized and/or approved

Mr. Seamons' action.

70.    In addition, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco

Capital Partners II, LP, and John Does 1 - 10 participated in the fraud and acted in furtherance of

the conspiracy by rejecting DigaComm's compensation in the face of Mr. Seamons' prior

approval.

71.    While complete details of the conspiracy are exclusively within the knowledge

and control of the conspirators, DigaComm is aware of the following facts giving rise to a strong

inference of VSAC's, Mr. Seamons', Mr. Hyde's, Pittco Capital Partners, LP's, Pittco Capital

Partners II, LP's and John Does 1 - 10's participation in a conspiracy to defraud DigaComm:

    (a)    The provision purporting to condition DigaComm's compensation on the
approval of VSAC's Preferred Holders was an eleventh-hour addition to the
DigaComm/VIP letter agreement.

    (b)    VIP's Mr. Larschan and VSAC's General Counsel, J. Raymond Bilbao, told
DigaComm repeatedly that the approval condition "would not be a problem."

    (c)    DigaComm was told that Mr. Seamons, on behalf of the 30% preferred interest
holding in VSAC controlled by Mr. Hyde, approved of its fee and that the
remaining VSAC Preferred Holders would follow Mr. Seamons' lead.

    (d)    VSAC's Preferred Holders attended multiple meetings regarding the GE deal and
at no time did they indicate that DigaComm's compensation should be rejected.

    (e)    VIP claims that it recommended that VSAC's Preferred Holders approve
DigaComm's compensation, demonstrating that DigaComm complied with its
obligations.

    (f)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco
Capital Partners II, LP, and John Does 1 - 10 rejected DigaComm's compensation
only months after Mr. Seamons had communicated their approval and in the face
of repeated assurances that approval "would not be a problem."

(g)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 had no basis upon which to deny DigaComm its compensation.

(h)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $200 million.

72.    Mr. Hyde is liable for Mr. Seamons' actions in furtherance of the conspiracy to defraud DigaComm under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

73.    Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

74.    VIP and VSAC share a unity of interest such that their separate personalities no longer exist and VIP is, in reality, a sham for VSAC.

75.    While the complete details of the relationship between VIP and VSAC are exclusively within their possession and control and unavailable to outsiders like DigaComm, DigaComm is aware of the following facts indicating that VIP is the mere alter ego of VSAC:

(a)    VSAC owns 100% of the membership interests in VIP.

(b)    There is considerable overlap between the officers and employees of VIP and VSAC. DigaComm is aware that J. Raymond Bilbao, VSAC's General Counsel, is also an employee of VIP. In addition, DigaComm is aware that Andrew Seamons is both the Chairman of VIP's Board and a representative of VSAC Preferred Holders Pittco Capital Partners, LP and Pittco Capital Partners II, LP. Upon information and belief, other officers and employees of VSAC are also officers and employees of VIP.

(c)    VIP and VSAC currently share the office space at 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117. Prior to September 2007, both VSAC and VIP maintained offices at 3150 Lenox Park Boulevard, Suite 108, Memphis, Tennessee, 38115

17

(d)     VSAC dominates and controls VIP such that VIP lacks the authority to enter into agreements without approval from VSAC and VSAC's Preferred Holders. For example, VIP claims that it could not undertake the GE transaction without the approval of VSAC and VSAC's Preferred Holders.

(e)     The GE/VIP joint venture was not finalized until after VSAC's Preferred Holders blessed the GE personnel involved.

76.     Adherence to the fiction that VIP and VSAC are separate entities would sanction a fraud and promote injustice.

77.     DigaComm believes that VSAC is liable for VIP's and Mr. Larschan's misrepresentations under the doctrine of alter ego because VSAC and VIP have ignored the formalities of separate corporate existence. But because the full details of VSAC's relationship with VIP are uniquely within the knowledge of VSAC and VIP, DigaComm also alleges that VSAC is liable for VIP's Mr. Larschan's misrepresentations under the doctrine of direct participation.

78.     VIP's failure to compensate DigaComm for its efforts in facilitating a $4 billion transaction between VIP and GE can be traced directly to VSAC through the actions of VSAC's Preferred Holders in rejecting DigaComm's compensation without justification.

79.     VSAC has interfered with VIP's operations in a way that far surpasses the control ordinarily exercised by a parent company as an incident of ownership. While the details of VSAC's interference in VIP's operations are within the exclusive knowledge and control of VSAC and VIP and are unavailable to an outsider like DigaComm, DigaComm is aware of the following facts strongly suggestive of undue interference by VSAC in VIP's operations:

(a)     VSAC and its Preferred Holders rejected DigaComm's compensation in the face of VIP's recommendation that DigaComm's compensation be approved.

18

(b)    VSAC and its Preferred Holders exercised continuous and direct supervision over the VIP/GE joint venture, including by attending meetings with GE representatives.

(c)    VSAC and its Preferred Holders had the ability to veto the GE joint venture at any time, regardless of VIP's desire to continue with the joint venture.

(d)    The GE/VIP joint venture was not finalized until after VSAC's Preferred Holders blessed the GE personnel involved.

80.    DigaComm seeks compensatory and punitive damages.

## <u>COUNT II</u>
**(TORTIOUS INTERFERENCE WITH THE MARCH 9, 2007 CONTRACT)**

81.    DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 62 above as if fully set forth herein.

82.    DigaComm's March 9, 2007 agreement with VIP is a valid and enforceable contract.

83.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 were aware of the March 9, 2007 agreement and were aware that it was a valid and enforceable agreement.

84.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 purposefully interfered with VIP's performance of the March 9, 2007 agreement.

85.    Upon information and belief, Mr. Hyde also used Pittco Capital Partners, LP and Pittco Capital Partners II, LP to interfere with DigaComm's contractual relationship with VIP.

19

86.     Mr. Hyde is liable for Mr. Seamons' interference under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

87.     Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

88.     VSAC's, Andrew Seamons', J.R. "Pitt" Hyde's, Pittco Capital Partners, LP's, Pittco Capital Partners II, LP's, and John Does 1 - 10's interference was done with actual malice. While the complete details surrounding the defendants' state of mind when they interfered with the March 9, 2007 agreement are peculiarly known to them and not to outsiders like DigaComm, DigaComm is aware of the following indicia of actual malice:

(a)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 interfered with the March 9, 2007 agreement even though that interference was opposed to their economic interests. All were aware that reneging on the March 9, 2007 agreement could cause GE to back out of the joint venture, thus upsetting a $4 billion opportunity.

(b)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 interfered with DigaComm's compensation weeks after authorizing and/or approving of their agent Mr. Larschan's agreement to pay DigaComm 5%.

(c)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 had no basis upon which to assert that DigaComm was not entitled to its agreed-upon compensation.

(d)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $200 million.

89.     DigaComm has suffered damages as a result of VSAC's, Andrew Seamons', J.R. "Pitt" Hyde's, Pittco Capital Partners, LP's, Pittco Capital Partners II, LP's, and John Does 1 - 10's interference.

90.     DigaComm seeks damages in the amount of $200 million.

## COUNT III
## (TORTIOUS INTERFERENCE WITH THE MARCH 30, 2007 CONTRACT)

91.     DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 62 above as if fully set forth herein.

92.     DigaComm's March 30, 2007 letter agreement with VIP is a valid and enforceable contract.

93.     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 were aware of the March 30, 2007 letter agreement and were aware that it was a valid and enforceable agreement.

94.     VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 purposefully interfered with VIP's performance of the March 30, 2007 letter agreement.

95.     Upon information and belief, Mr. Hyde also used Pittco Capital Partners, LP and Pittco Capital Partners II, LP to interfere with DigaComm's contractual relationship with VIP.

96.     Mr. Hyde is liable for Mr. Seamons' interference under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

21

97.     Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

98.     VSAC's, Andrew Seamons', J.R. "Pitt" Hyde's, Pittco Capital Partners, LP's, Pittco Capital Partners II, LP's, and John Does 1 - 10's interference was done with actual malice. While the complete details surrounding the defendants' state of mind when they interfered with the March 30, 2007 letter agreement are peculiarly known to them and not to outsiders like DigaComm, DigaComm is aware of the following indicia of actual malice:

(a)    The provision purporting to condition DigaComm's compensation on the approval of VSAC's Preferred Holders was an eleventh-hour addition to the DigaComm/VIP letter agreement.

(b)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 interfered with the March 30, 2007 letter agreement even though that interference was opposed to their economic interests. All were aware that reneging on the March 30, 2007 letter agreement could cause GE to back out of the joint venture, thus upsetting a $4 billion opportunity.

(c)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 attended meetings relating to the GE/VIP joint venture and at no point indicated that they felt that DigaComm's compensation should be rejected.

(d)    VIP claims that it recommended that VSAC's Preferred Holders approve DigaComm's compensation, demonstrating that DigaComm complied with its obligations.

(e)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 rejected DigaComm's compensation only months after Mr. Seamons had communicated their approval and in the face of repeated assurances by their agent Mr. Larschan that approval "would not be a problem."

(f)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 had no basis upon which to deny DigaComm its compensation.

(g)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 stand to profit handsomely off of

22

their rejection of DigaComm's compensation since DigaComm stood to receive as much as $76 million.

99.     DigaComm has suffered damages as a result of VSAC's, Andrew Seamons', J.R. "Pitt" Hyde's, Pittco Capital Partners, LP's, Pittco Capital Partners II, LP's, and John Does 1 - 10's interference.

100.     DigaComm seeks damages in the amount of $76 million.

## COUNT IV
## (UNJUST ENRICHMENT)

101.     DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 62 above as if fully set forth herein.

102.     DigaComm has conferred a benefit on VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 by alerting them to the possibility of a transaction with GE and by facilitating that transaction.

103.     Upon information and belief, the benefit bestowed upon Mr. Hyde flowed to him via his partnership interest in Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

104.     Upon information and belief, the benefit bestowed upon Mr. Seamons flowed to him via his partnership interest in Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

105.     Instead of paying DigaComm its fair share of this windfall, VSAC, Andrew Seamons, J.R. "Pitt" Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 seek to retain the benefits of the GE joint venture for themselves.

23

106.    VSAC's, Andrew Seamons', J.R. "Pitt" Hyde's, Pittco Capital Partners, LP's, Pittco Capital Partners II, LP's, and John Does 1 - 10's retention of these benefits will result in an injustice.

107.    DigaComm seeks damages equal to 5% of the value of the joint venture's patent portfolio.

24

## PRAYER FOR RELIEF

WHEREFORE, DigaComm prays that it be awarded the following relief:

(a)    Damages against VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and John Does 1 - 10 in an amount to be determined at trial, but not less than $200 million;

(b)    A declaration that VSAC and VIP are alter egos and that VSAC is liable to DigaComm for VIP's conduct on alter ego grounds, or, in the alternative, that VSAC is liable for VIP's conduct under a direct participation theory;

(c)    Attorneys' fees and other costs of collection;

(d)    Prejudgment and postjudgment interest;

(e)    Punitive damages;

(f)    Such other relief as the Court deems appropriate.

## JURY DEMAND

DigaComm demands a jury trial for all issues so triable.

Respectfully submitted,

DigaComm, LLC

By:    _____
One of its attorneys

Reed S. Oslan, P.C.
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Tel: 312/861-2157
Fac: 312/861-2200

25

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**LAW DIVISION**

| | |
|---|---|
| DigaComm, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | )    No. _____ |
| v. | ) |
| | ) |
| Vehicle Safety and Compliance, LLC, | )    Hon. _____ |
| Pittco Capital Partners, LP, | ) |
| Pittco Capital Partners II, LP, | ) |
| J.R. "Pitt" Hyde III, | ) |
| Andrew Seamons, and John Does 1 - 10, | ) |
| | ) |
| Defendants. | ) |

---

**AFFIDAVIT OF MATTHEW E. NIRIDER**

I, Matthew E. Nirider, being duly sworn, depose and state as follows:

1.    I am an attorney with the law firm of Kirkland & Ellis LLP. I am one of the attorneys representing DigaComm, LLC ("DigaComm").

2.    DigaComm's Complaint names John Does 1 - 10, representing the unknown Preferred Holders of Vehicle Safety & Compliance, LLC ("VSAC") who voted to reject DigaComm's compensation.

3.    After due inquiry, the proper names of John Does 1 - 10 are unknown.

I, Matthew E. Nirider, hereby affirm that the foregoing representations are true under the penalties for perjury.

December 10, 2007

_____
Matthew E. Nirider

# Exhibit A
# Part 2

08 C 338

# EXHIBIT A

## Part 2 of 2

*eBay v. MercExchange*: **More Than A Century of Precedent Casually Overturned**

> "*[A]n inventor receives from a patent the right to exclude others from its use . . . . [T]he right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee.*"
> - Continental Paper Bag Co. v. E. Paper Bag Co. (1908)

> "*[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts . . . . [S]uch discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases . . . .*"
> - eBay v. MercExchange (2006)

*By*
Bradley R. Larschan

## I.    INTRODUCTION

Some call it cryptic and sweeping. Others find it unremarkable. Many still wonder to what degree it will change the property rights of inventors and patent owners facing willful, recalcitrant and well-funded defendants.

Almost one year after the Supreme Court's terse decision in *eBay Inc. and Half.com, v. MercExchange, L.L.C.,*[1] more questions have been asked than answered about the role of injunctive relief in patent infringement litigation, and whether the Court casually overturned more than 100 years of precedent.

This paper begins with a discussion of the historical development of the issuance of permanent injunctions in patent infringement cases. It then goes on to review *eBay* and the Supreme Court's holding that the four-factor test must be met for a permanent injunction to issue. Next, the discussion turns to two theories of the *eBay* decision – whether the Court (1) was correct that the four-factor test has been historically applied and the Federal Circuit Court of Appeals strayed or (2) overturned more than a century of precedent. The discussion then turns to argue that, as a result of *eBay*, district must engage in a subjective analysis of whether a patent owner is 'good' or 'bad' before applying the four-factor test, after which it considers the significant public policy implications of *eBay*. This paper concludes that *eBay* has profoundly altered the time-tested balance of intellectual property rights established by the courts and the free market with significant unintended consequences for a broad swath of patent owners.

---

[1] — U.S. —, 126 S. Ct. 1837 (2006).

## II.    SETTING THE STAGE

U.S. "patent law is the execution of a policy having its first expression in the Constitution"[2] which gives Congress the power and responsibility "to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries."[3]  Congress promulgated the first patent law in 1790 and then, as today, "patents are contracts between the United States and the patentee".[4]  Patent rights are granted as consideration for the invention disclosure, not for the patentee's use of the invention.[5]  There is no requirement that the patentee make, use or sell a patented invention.[6]

Over time, a body of common law evolved[7] – guided in no small part by the Supreme Court – finding that a patent provides the patent owner the right to exclude others and, therefore, ordinarily affords plaintiffs the right to enjoin a defendant found to be willfully infringing one or more claims of a valid patent.[8]  Prior to *eBay*, "whenever

---

[2]  *Continental Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 424 (1908).

[3]  U.S. CONST., art. I, § 8, cl. 8. The Patent and Copyright Clause appears to have been first proposed in 1787 by James Madison and Charles Pinckney. In THE FEDERALIST NO. 43, Madison wrote:

> The utility of this power will scarcely be questioned. The copy right of authors has been solemnly adjudged in Great Britain to be a right at common law. The right to useful inventions, seems with equal reason to belong to the inventors. The public good fully coincides in both cases, with the claims of the individuals.

THE FEDERALIST NO. 43, at 217 (Madison) (Bantam Books ed., 1982).

The Patent and Copyright Clause appears to have been included in the Constitution without debate. *See* James Madison, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787 580-81 (1987).

[4]  *Rubbermaid Inc. v. Contico Intern., Inc.*, 381 F. Supp. 666, 671 (D. Mo. 1974). *See also US v. Marifarms, Inc.*, 345 F. Supp. 858, 861 (D. Del. 1972) ("a patent is a contract between the inventor and the Government."); *Davis Airfoils v. US*, 124 F. Supp. 350, 351 (Ct. Cl. 1954) ("A patent is a contract between the inventor and the public . ...").

[5]  *Woofter v. Carlson*, 367 F.2d 436 (Cust. & Pat. App. 1966), *quoting Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520 (2nd Cir. 1946) (L. Hand, J.).

[6]  *Continental* at 424-30. *See also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) ("There is no requirement in this country that a patentee make, use, or sell its patented invention.").

[7]  "But what are the rights of ownership? They are substantially the same as those incident to possession. Within the limits prescribed by policy, the owner is allowed to exercise his natural powers over the subject-matter uninterfered with, and is more or less protected in excluding other people from such interference. The owner is allowed to exclude all, and is accountable to no one." Oliver Wendel Holmes, THE COMMON LAW 246 (1881).

[8]  *See, e.g., Rite-Hite Corp., Id.* ("courts have in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest.").

There are public policy and equitable limitations to the grant of a permanent injunction. *See, e.g.*, note 54, *infra*. Moreover, the courts will not grant a permanent injunction where there is a plain and adequate

---

© 2007 by Bradley R. Larschan                                                              2

this court has had occasion to speak, it has decided that an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[9]  As Chief Justice Marshall observed, "for his exclusive enjoyment of [the patent right] during that time, the public faith is pledged."[10]

But what precisely is the nature of a plaintiff's "right" to "exclude others" and exclusively enjoy a patent during its life?

This was at the heart of *Continental*, where the Court addressed the question of whether the plaintiff was entitled to an injunction where for 17 years it never put the invention into "effect or use" because it was more profitably used as a tool to block competition.  The defendant argued

> it is contrary to equity to suppress a useful and established business, like that which the defendant is prosecuting with its paper bag machines, at the request of a complainant which simply owns one paper bag machine patent that has never been employed by that complainant in any way in any paper bag machinery, and because the complainant in this case has a plain, adequate, and complete remedy at law for any infringement which may have been done . . . .[11]

The defendant further argued that the district court lacked authority to issue the injunction because the statutory basis[12] for equitable relief was not met.[13]  Continental countered that it had the absolute right to use or not use its patent.

The Court began with an exploration of the nature of the right conferred upon patent owners, finding the Constitution and patent laws intended "to provide for an exclusive right to inventors to make, use, and vend their inventions."[14]  The Court noted that at the entry into force of the Constitution, only a remedy at law existed for patent infringement, but this was expanded in 1819 to encompass equitable relief.[15]  After a

---

remedy at law, such as where a patent has expired and "damages in money will afford complete relief". *American Safety Device Co. v. Kurland Chemical Co.*, 68 F.2d 734, 735 (2nd Cir. 1934).

[9]  *Continental* at 425.

[10]  *Id.*, *citing with approval Grant v. Raymond*, 6 Pet. 242, 243, 31 U.S. 218, 219 (1832).

[11]  *Continental* at 407.

[12]  The statute provided: "The several courts vested with jurisdiction of cases arising under the patent law shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent, . . . ." *Id.* at 423 (*citing* § 4921 (U. S. Comp. Stat. 1901, p. 3395)).

[13]  *Continental* at 423.

[14]  *Id.* at 424.

[15]  *Id.* at 424-25.

© 2007 by Bradley R. Larschan

3

consistent series of cases,[16] by the time of *United States v. American Bell Telephone Co.*,[17] the Court found "the only effect of the patent is to restrain others from manufacturing and using that which he has invented."[18] The

> inventor could have kept his discovery to himself; but, to induce a disclosure of it, Congress has, by its legislation, made in pursuance of the Constitution, guaranteed to him an exclusive right to it for a limited time, and the purpose of the patent is to protect him in this monopoly . . . . And it was pointed out that the monopoly which he receives is only for a few years. The court further said: 'Counsel seem to argue that one who has made an invention and thereupon applies for a patent therefor occupies, as it were, the position of a quasi trustee for the public; that he is under a sort of moral obligation to see that the public acquires the right to the free use of that invention as soon as is conveniently possible. We dissent entirely from the thought thus urged. The inventor is one who has discovered something of value. It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention.'[19]

In *Continental*, the plaintiff chose not to use the invention disclosed in its patent because it was more profitable to use its existing machinery than to build one covered by its patent rights. The Court found this not to be "unreasonable",[20] adding, "[a]s to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question

---

[16] *See, e.g., Grant v. Raymond*, 6 Pet. 242, 243, 31 U.S. 218, 8 L. ed. 384, 385 (1832) (Marshall, C.J.) ("The great object and intention of the [patent law] is to secure to the public the advantages to be derived from the discoveries of individuals; and the means it employs are the compensation made . . . by the exclusive right to make up and sell the things discovered for a limited time."); *Bloomer v. McQuewan*, 14 How. 539, 55 U.S. 539, 14 L. ed. 532 (1852) (Taney, C.J.) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."); *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878) ("It is true that letters-patent, pursuing the words of the statute, do, in terms, grant to the inventor, his heirs and assigns, the exclusive right to make, use, and vend to others his invention or discovery, throughout the United States and the Territories thereof."); *E. Bement & Sons v. National Harrow Co.*, 186 US 70, 91, 46 S. L. ed. 1058, 1068, 22 Sup. Ct. Rep. 747, 755 (1902) ("the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly . . . .").

[17] 167 U.S. 224 (1897).

[18] *Continental* at 424.

[19] *Id.*, quoting *American Bell.*

[20] *Continental* at 429.

© 2007 by Bradley R. Larschan                                                    4

of motive."[21]  The Court went on to observe that "[i]t is manifest . . . that Congress has
not 'overlooked the subject of nonuser of patented inventions.'"[22]  In finding the Plaintiff
was entitled to an injunction, the Court held:

> It hardly needs to be pointed out that the right can only retain its attribute
> of exclusiveness by a prevention of its violation. Anything but prevention
> takes away the privilege which the law confers upon the patentee. If the
> conception of the law that a judgment in an action at law is reparation for
> the trespass, it is only for the particular trespass that is the ground of the
> action. There may be other trespasses and continuing wrongs and the
> vexation of many actions. These are well-recognized grounds of equity
> jurisdiction, especially in patent cases . . . .[23]

Until *eBay*, the Court has not questioned the presumption that an injunction
should issue against willful infringers absent special circumstances.[24]

III.   THE EBAY DECISION

MercExchange successfully prosecuted a patent infringement suit in the US
District Court for the Eastern District of Virginia against online auction giant eBay and
its wholly-owned subsidiary, Half.com.[25]  The district court, however, denied
MercExchange a permanent injunction barring the defendants from continuing to infringe
the patent[26] and, instead, awarded a compulsory license to eBay, relying heavily on

---

[21] *Id., citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 46 L. ed. 684, 22 Sup. Ct. Rep. 431 (1902).

[22] *Continental* at 429.

[23] *Id.* at 430.

[24] *See, e.g., Dawson Chemical Co. v. Rohm & Hass Chemical Co.*, 448 U.S. 176, 215 (1980) ("the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ("The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."); *Sears Roebuck Co. v. Stiffel Co.*, 376 U.S. 225, 229-30 (1964) ("The grant of a patent is the grant of a statutory monopoly; indeed, the grant of patents in England was an explicit exception to the statute of James I prohibiting monopolies. Patents are not given as favors, . . . but are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention. During that period of time no one may make use, or sell the patented product without the patentee's authority."); *United Shoe Machinery Corporation v. U.S.*, 258 U.S. 451, 463 (1922) ("From an early day it has been held by this court that the franchise secured by a patent consists only in the right to exclude others from making, using, or vending the thing patented without the permission of the patentee. This definition of the rights of the patentee has been the subject of frequent recent decisions of this court, and has been approved and applied in [numerous cases]." (Internal citations omitted))

[25] 275 F. Supp. 2d 695 (2003).

[26] It should be observed that in refusing to grant injunctive relief, the district court failed to cite, much less distinguish, *Continental*. This is remarkable because, in explaining why MercExchange would not be irreparably harmed, the opinion stresses that the "plaintiff does not practice its inventions and exists merely

© 2007 by Bradley R. Larschan                                                    5

MercExchange's demonstrated willingness to license and lack of commercial activity using the patent. MercExchange appealed and the Federal Circuit Court of Appeals reversed, applying the "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances".[27]

In writing for a supposedly unanimous[28] Court, Justice Thomas not altogether correctly interprets the *Continental* case and breathtakingly all but ignores a long line of Supreme Court decisions consistent with the presumption that an injunction should issue absent special circumstances. Instead, the terse opinion begins by – *petitio principii* – citing 35 USC § 283,[29] under which district courts "may grant injunctions in accordance with the principles of equity" and then plows into a recitation of the well-settled four-factor test a plaintiff must ordinarily satisfy to receive a permanent injunction,[30] concluding that "[t]hese familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, 'a major departure from the long tradition of equity practice should not be lightly implied.'"[31]

---

to license its patented technology to others." *Id.* at 712. Instead, the trial court relied heavily on *Foster v. American Machine & Foundry Co.*, 492 F.2d 1317 (2d Cir. 1974) in confining MercExchange to a legal remedy. *Id.* at 713. *Foster*, too, failed to distinguish – or even cite – *Continental* in concluding that "[t]o grant [the patentee] a compulsory royalty is to give him half a loaf. In the circumstance of his utter failure to exploit the patent on his own, that seems fair." *Foster*, 492 F.2d at 1324. It is difficult to reconcile this conclusion with *Continental*.

The Court addressed this issue more than a century ago. In *Hoe v. Knap*, 27 Fed. 204, 212 (N.D. Ill. 1886), the question was "whether the court will grant an injunction in favor of the owner of a patent who has not, after a reasonable time, put it into use, against another who is using it." It held that "under a patent which gives a patentee a monopoly, he is bound either to use the patent himself or allow others to use it on reasonable or equitable terms . . .." The *Continental* Court expressly rejected *Hoe's* dictum, stating: "If he [a patentee] see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own . . . his title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it." 210 U.S. at 425, *quoting Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. 288, 294–95 (6th Cir. 1896) ("The dictum found in [*Hoe*] is not supported by reason or authority.")

[27] 401 F. 3d 1323, 1339 (2005).

[28] Justice Alito did not participate.

[29] Section 283 of the Patent Act provides that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

[30] Justice Thomas wrote for the Court: "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 126 Sup. Ct. at 1838.

[31] *Id.*

© 2007 by Bradley R. Larschan    6

Once the Court assumed away more than a century of precedent, its holding is straight forward.[32] The courts below did not "fairly" apply the four-factor test so the case was remanded to the district court with the instruction that in determining whether or not an injunction should be issued "that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[33]

Complicating matters were two concurring opinions. The Chief Justice, joined by Justices Ginsburg and Scalia, observes that injunctive relief has been historically granted upon a finding of patent infringement "in the vast majority of patent cases" because of the "difficulty of protecting a right to exclude through monetary remedies."[34]

Justice Kennedy, joined by Justices Breyer, Stevens and Souter, suggests that patent cases should not fall outside the norm: "the lesson of the historical practice, therefore, is most helpful and instructive when the circumstances of a case bear substantial parallels to litigation the courts have confronted before."[35] But Justice Kennedy notes that the "nature of the patent being enforced and the economic function of the patent holder present considerations quite unlike earlier cases", taking a swipe at business method patents (which he criticizes for their "potential vagueness and suspect validity") and patent licensing and enforcement companies (that acquire patents merely to assert them).[36]

Thus, the unanimous opinion in *eBay* is also a 3-2-3 split, and one would be hard pressed to draw any broad, lasting conclusion … or even whether *Continental* is overturned.

IV.    DIFFERING INTERPRETATIONS

Since *eBay*, at least two principal interpretations have arisen with respect to the meaning and effect of the Court's holding.

---

[32] Justice Thomas also attempts to analogize patent and copyright law. While a critical analysis of this statement deserves academic scrutiny, it is beyond the scope of this paper. *See, generally,* Robert E. Thomas, *Vanquishing Copyright Pirates and Patent Trolls: The Divergent Evolution of Copyright and Patent Laws,* 43 AM. BUS. L.J. 689 (2006).

[33] 126 Sup. Ct. at 1841.

[34] *Id.* (Roberts, C.J., concurring).

[35] *Id.* at 1842 (Kennedy, J., concurring).

[36] *Id.*

© 2007 by Bradley R. Larschan                                                                 7

## A. The Four-Factor Test Has Been Applied All Along

The Court's opinion can be read to stand for the proposition that the four-factor test has historically been applied to justify the grant of a permanent injunction.

> These familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, "a major departure from the long tradition of equity practice should not be lightly implied." Nothing in the Patent Act indicates that Congress intended such a departure. To the contrary, the Patent Act expressly provides that injunctions "may" issue "in accordance with the principles of equity."[37]

So, it is the Federal Circuit Court of Appeals that strayed by routinely granting injunctive relief under a supposed

> "general rule," unique to patent disputes, "that a permanent injunction will issue once infringement and validity have been adjudged." The court further indicated that injunctions should be denied only in the "unusual" case, under "exceptional circumstances" and "'in rare instances . . . to protect the public interest.'" . . . [T]he Court of Appeals erred in its categorical grant of such relief.[38]

This interpretation is also urged by Justice Kennedy, who suggests in his concurring opinion that "[t]o the extent earlier cases establish a pattern of granting an injunction against patent infringers almost as a matter of course, this pattern simply illustrates the result of the four-factor test in the contexts then prevalent."[39]

But it is difficult to reconcile this position with precedent.[40]

_____

[37] 126 Sup. Ct. at 1839 (internal citations omitted).

[38] *Id.* at 1841 (internal citations omitted).

[39] *Id.* at 1842 (Kennedy, J., concurring).

[40] It is interesting how consistently the Federal Circuit and other courts have applied this standard prior to eBay. In *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1247 (Fed. Cir. 1989), the court noted

> Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property. "[T]he right to exclude recognized in a patent is but the essence of the concept of property". It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it . . . This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm."

In *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1564 (Fed. Cir. 1984) the court stated:

© 2007 by Bradley R. Larschan

At the time of *Continental*, the patent law provided: "The several courts vested with jurisdiction of cases arising under the patent law shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent . . . ."[41] The language is similar to today's law,[42] so it might be expected that the *Continental* Court would analyze a request for injunctive relief similarly to the *eBay* Court, although applying (as Justice Kennedy observed) then prevailing values and standards. In *Continental*, however, the Court stated:

> It may be well . . . to consider what rights are conferred upon [the patent owner]. The source of the right is, of course, the law, and we are admonished at the outset that we must look for the policy of a statute, not in matters outside of it, not to circumstances of expediency and to supposed purposes not expressed by the words. The patent law . . . provide[s] for an exclusive right to inventors to make, use, and vend their inventions. In other words, the language of complete monopoly has been employed; . . . [It is] a right so explicitly given and so complete that it would seem to need no further explanation than the word of the statute. . . . [T]he only effect of the patent is to restrain others from manufacturing and using that which he has invented . . . and the purpose of the patent is to protect him in this monopoly . . . . It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention.[43]

---

Since Nyman neither makes nor sells the infringing display racks, the district court's injunction gives Trans-World no meaningful relief. [The Patent Law] authorizes district courts to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." Although a district court has discretion whether to enter an injunction, the exercise of this discretion cannot be arbitrary. A patent gives "the right to exclude others from making, using or selling the invention." (Internal citations omitted.)

*See also* Connell v. Sears Roebuck & Co., 722 F.2d 1542 (Fed. Cir. 1983) ("the right to exclude recognized in a patent is but the essence of the concept of property."); Smith Intern., Inc. v. Hughes Tool Co., 718 F.2d 1573 (Fed. Cir. 1983) (grant of patent is grant of right to invoke the state's power to order to exclude others from utilizing patentee's discovery without his consent).

[Cite other cases from Federal Circuit and its predecessor.]

[41] *Continental* at 423.

[42] 35 U.S.C. § 283, which provides: "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

[43] *Continental* at 424.

© 2007 by Bradley R. Larschan

9

In *Continental*, the defendant pointed out that the plaintiff held the patent for 17 years and did not use it in its business, even though it could have, arguing that

> it is contrary to equity to suppress a useful and established business, like that which the defendant is prosecuting with its paper bag machines, at the request of a complainant which simply owns one paper bag machine patent that has never been employed by that complainant in any way in any paper bag machinery . . . .[44]

The Court flatly rejected this contention. Even if the patent owner held the patent for its full life and never put it into "use or effect", this was its absolute right. "As to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."[45]

The *Continental* Court found the remedy for willful violation of a patent owner's rights lies in equity, not law, and that an injunction should issue as a matter of course unless equity demands otherwise – for example, if outweighed by the public interest.[46]

There is no hint – not even a morsel – the *Continental* Court believed the nature of the patent right is anything other than a "complete monopoly".[47] The Court noted the competitive relationship between the parties but did not rely upon it to declare the patent owner's right is "to restrain others from manufacturing and using that which he has invented." The patent is its "absolute property" and "the purpose of the patent is to protect him in this monopoly . . .." The Court expressly rejected the defendant's argument that the plaintiff "has a plain, adequate, and complete remedy at law for any infringement which may have been done . . .."[48] Even though monetary damages are available, the Court would not withhold issuing an injunction because "an inventor receives from a patent the right to exclude others from its use . . . . [T]he right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee."[49]

---

[44] *Id.* at 407.

[45] *Id.* at 429.

[46] Another ground might be that the infringement is too "trifling". *Condenser Corp. of America v. Micamold Radio Corp.*, 145 F.2d 878, 880 (2nd Cir. 1944).

[47] The monopoly created by a patent is an exception to the general rule against monopolies. *Commissioner of Patents v. Deutsche Goldund-Silber-Scheideanstalt Vormals Roessler*, 397 F.2d 656, 663 (D.C. Cir. 1968).

[48] *Continental* at 407.

[49] *Id.* at 430.

© 2007 by Bradley R. Larschan

10

### B. Only Plaintiffs That Make Or Sell Something Are Entitled To An Injunction

Perhaps the most widely held interpretation of *eBay* is that it requires a plaintiff – as a threshold equitable consideration – must make or sell a directly competitive product or service to be entitled to an injunction upon a district court's finding of willful infringement.

The *eBay* opinion observes that "the Patent Act also declares that 'patents shall have . . . the right to exclude others from making, using, offering for sale, or selling the invention'."[50] But this right is overarched by the application of equitable principles. The Court rebukes the district court, which

> adopt[ed] certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases. Most notably, it concluded that a "plaintiff's willingness to license its patents" and "its lack of commercial activity in practicing the patents" would be sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue.[51]

In criticizing the district court's exclusion of a "broad swath of cases" because "some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves",[52] the Court appears to be signaling that it is not only acceptable but required that the district courts engage in a subjective inquiry into the identity and nature of the patent owner. 'Good' "patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so."[53] 'Bad' patent owners, presumably, cannot. This is a sharp break with precedent. Courts have historically questioned whether patents have been asserted unreasonably[54] but no Court has

---

[50] 126 Sup. Ct. at 1840 (internal citations omitted).

[51] *Id.* The district court also relied principally on *Foster* with regard to the balance of hardships when it wrote: "Any harm suffered by the plaintiff, by the defendants' infringement of the patents, can be recovered by way of damages." *Foster*, 275 F. Supp. 2d at 714. Thus, the first three factors relevant to equitable relief seem ultimately to have collapsed into one.

[52] 126 Sup. Ct. at 1840.

[53] *Id.*

[54] *See, e.g., Continental*, 210 U.S. at 429, *passim*. Courts have also held that patent misuse may result in forfeiture of all rights. *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488 (1942) (conditioning patent use on purchase of unpatented supplies); *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) (conditioning use on agreement to pay royalties beyond patent term). In some circumstances, compulsory licensing may be ordered. *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 59 (1973) (compulsory licensing is a "well

© 2007 by Bradley R. Larschan                                                          11

previously distinguished between socially acceptable (*e.g.*, university researchers) and socially unacceptable patent owners (*e.g.*, the poor and most of the middle class).[55] Indeed, the *Continental* Court expressly stated that "exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, *without question of motive*."[56]

Notwithstanding the Court's statement that "a major departure from the long tradition of equity practice should not be lightly implied" – the Court does precisely this by breaking with precedent in finding that remedies at law (rather than equity) are henceforward the norm. This is where the Court's opinion begins and ends – that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[57]

Since *eBay*, at least 14 patent infringement decisions have been rendered and the district courts have granted injunctive relief only where plaintiffs make or sell a directly competitive product or service.

1. Denial of Injunction

District courts have denied plaintiff's motion for injunction in the following four cases where plaintiffs did not make or sell a product or service in direct competition with the defendant.

In *z4 Technologies v. Microsoft Corporation and Autodesk, Inc.*,[58] after the jury found that the patents were willfully infringed by Microsoft, the court was the first after *eBay* to apply the four-factor test, and it denied z4's motion for a permanent injunction finding z4 failed to meet each prong of the four-factor test.

---

established form[ ] of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation adjudicated.").

[55] Consider, for example, the situation of a widow whose inventor-husband was issued a patent ten years before his death. Because of lack of the financial wherewithal to engage in patent litigation – which by any standard is very expensive – certain companies willfully and widely infringed the patent, knowing that it would be unlikely the patent would be enforced against them. If the widow attempts to enforce the patent, she will face deep-pocketed defendants who have profited from infringing her patent – without her ability to obtain an injunction – are able to raise the financial stakes, delay the proceedings and engage in appeals to stretch out the process.

[56] 210 U.S. at 429 (emphasis supplied), *citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540 (1902).

[57] 126 Sup. Ct. at 1841.

[58] 434 F. Supp.2d 437 (E.D. Tex. Jun 14, 2006).

© 2007 by Bradley R. Larschan

The patentee argued that infringement of a patent created a rebuttable presumption of irreparable harm. The district court dismissed this argument as lacking precedential foundation, citing the Supreme Court's decision in *Amoco Production Co. v. Village of Gambell*[59] for the proposition that a presumption of irreparable harm in the context of an injunction hearing is "contrary to traditional equitable principles." Since z4 did not create any products, the court found that the first factor weighed in favor of the willful infringer.

The court looked to Justice Kennedy, whose concurring opinion in *eBay* contemplated the situation where a "patented invention is but a small component of the product the companies seek to produce". In such a situation, "legal damages may well be sufficient to compensate for the infringement . . . ." Here, product activation is a very small component of the Microsoft Windows and Office software products that the jury found to infringe z4's patents. It did not relate to the software's core functionality. Moreover, Microsoft argued that its new Vista software will not utilize the infringing components. Thus, any ongoing royalty would only last for a couple of years. The court found that monetary damages were sufficient to compensate for any future infringement.

Microsoft argued that it would be enormously difficult and expensive to redesign even a small component of Microsoft office, and such an effort would delay release of its non-infringing Vista product. The court found that the balance of the hardships weigh in favor of Microsoft.

Microsoft's infringing products are widely used by individuals, businesses, institutions and the government. The court found that "any minor disruption to the distribution of the products in question . . . would have an effect on the public due to the public's undisputed and enormous reliance on these products. . . . Although these negative effects are somewhat speculative, such potential negative effects on the public weigh, even if only slightly, against granting an injunction."

In *Finisar Corp. v. The DirecTV Group, et al.,*[60] after finding willful infringement, the court denied Finisar's motion for a permanent injunction. The court found there was no irreparable harm because Finisar never sold the rights to the patent or made an attempt to practice the patented technology. The court held that a compulsory license would adequately compensate Finisar for DirecTV's future infringement. Weighing the balance of hardships and the public interest, the court noted that consumer satellite television is a two-competitor market. An injunction could have put DirecTV out of business and created a monopoly. Furthermore, the court noted that an injunction would negatively affect thousands of DirecTV employees, and 15 million DirecTV subscribers could lose their television service. The court concluded the balance of the hardships favored DirecTV and the public was best served by denying an injunction.

---

[59] 480 U.S. 531 (1987).

[60] 2006 WL 2699732 (E.D. Tex. Aug 04, 2006).

© 2007 by Bradley R. Larschan

13

In *Voda v. Cordis Corp.*,[61] after a jury found willful infringement of the plaintiff/inventor's patents concerning an angioplasty guide catheter and technique for using it,[62] the court denied plaintiff's request for a permanent injunction. The court found that the plaintiff failed to establish either irreparable injury or that monetary damages were inadequate. In rejecting the argument that irreparable harm is presumed upon establishing validity and infringement, the court observed that this argument "runs afoul of the Court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief."[63] The court characterized the alleged harm to plaintiff's exclusive licensee, non-party Scimed, as "irrelevant because Scimed elected not to sue to enforce the patent rights."[64] Finally, the Court held the damage to plaintiff's relationship with his exclusive licensee was insufficient to establish that money damages were inadequate.

In *Paice, LLC v. Toyota Motor Corp.*,[65] the court denied the plaintiff's motion for a permanent injunction after a jury found three of the defendant's hybrid vehicles infringed (but not willfully) three patents. The court applied the four-factor test, finding that the plaintiff failed to establish irreparable harm, that no presumption of such harm follows automatically from a finding of infringement, and that plaintiff's losses can be remedied by money damages in accordance with the reasonable royalty rate found by the jury.

The plaintiff unsuccessfully argued that lack of an injunction caused the failure of its licensing program. The court found no evidence to support this in the record, but that other reasons, such as plaintiff's "misrepresentations and improper business tactics," might have been factors.[66] Additionally, "because Plaintiff does not compete for market share with the accused vehicles, concerns regarding loss of brand name recognition and market share ... are not implicated."[67]

The plaintiff failed to show the inadequacy of monetary damages because it (a) did not demonstrate why other potential licensees would be less likely to take a license absent an injunction; (b) the infringed claims relate only to a small part of the overall vehicle; and (c) the defendant was offered a license throughout the post-trial motions stage of the case.

---

[61] 2006 WL 2570614 (W.D. Okl., Sept. 5, 2006).

[62] The jury awarded "a reasonable royalty of 7.5% of defendant's gross sales of the infringing catheters." *Id.* at 1.

[63] *Id.* at 5.

[64] *Id.*

[65] 2007 WL 2385139 (E.D. Tex. Jan 22, 2007).

[66] *Id.*

[67] *Id.*

© 2007 by Bradley R. Larschan

The balance of hardships weighed against an injunction because the impact an injunction would have on defendant's business and reputation, and that of related businesses (*e.g.*, dealers and suppliers). On the other hand, the lack of an injunction would have little impact on plaintiff's licensing program.

2.   Granting of Injunction

District courts have granted plaintiff's motion for injunction in the following 10 cases where plaintiffs did make or sell a product or service in direct competition with the defendant.

In *Wald v. Mudhopper Oilfield Services, Inc.,*[68] the court issued a permanent injunction, following the jury's finding that the defendant's products willfully infringed plaintiff's patented oil well treatment technology. The court found irreparable harm and inadequate remedies at law because, in addition to lost sales, plaintiff lost market share and the opportunity to maintain its own product as the industry standard. Moreover, the plaintiff alleged that because of the infringement, its "reputation for innovation" was damaged.[69] The balance of hardships and public interest both favored the plaintiff, as the plaintiff bore "the risk of future infringement, while there appears to be no harm to Defendants or the public's interest resulting from an injunction."[70]

In *TiVo, Inc. v. Echostar Communications Corp.,*[71] the court granted TiVo a permanent injunction.[72] At issue were Echostar's digital video recorders (DVRs), which the jury found willfully infringed TiVo's patents.

Applying the four-factor test, the court found a permanent injunction was appropriate, holding that TiVo established both irreparable harm and its remedy at law was inadequate because Echostar competes directly with TiVo. Because of this direct competition, TiVo could suffer a loss of market share at a critical time in the development of the nascent DVR market and it may not have the opportunity to recapture market share later. Since TiVo is a relatively new company with only one primary product, that loss of market share would cause severe injury that could not be remedied by monetary damages. The court found irreparable harm because "[t]he availability of the infringing products leads to loss of market share for Plaintiff's products."[73] The court

---

[68] 2006 WL 2128851 (W.D. Okl. July 27, 2006).

[69] *Id.* at 5.

[70] *Id.*

[71] 446 F. Supp. 2d 664 (E.D. Tex. 2006).

[72] The Federal Circuit has since entered an order staying the injunction pending resolution of Echostar's appeal.

[73] *Id.* at 669.

© 2007 by Bradley R. Larschan

found the balance of hardships weighed in favor of an injunction because the impact on TiVo of Echostar's infringement would be proportionately greater than the impact of an injunction on Echostar's business (satellite transmission), the core of which was not DVR-based. Finally, the public interest "would not be disserved by a permanent injunction" since the public "has an interest in maintaining a strong patent system";[74] moreover, the infringing products are used for entertainment, not public health or a similar key interest.

In *3M Innovative Properties Co. v. Avery Dennison Corp.*,[75] the court granted 3M's request for a permanent injunction. At issue was Avery's EZ Series Fleet Marketing Film used for advertising on vehicles. The court previously granted and modified a permanent injunction against Avery before the *eBay* decision. After *eBay*, the court vacated its earlier orders and again granted a permanent injunction. The court held 3M suffered irreparable injury and money damages were inadequate based on 3M's longstanding litigation and refusal to license the patents to Avery.[76] The court also held the balance of hardships favored an injunction "its right to exclude ... for more than 20 percent of the limited lifetime of this patent."[77] The court found the public interest would not be disserved by a permanent injunction because the case involved commercial graphics used for advertising, and did not present concerns about public health or safety.

## NEED TO DETERMINE WHETHER (1) INFRINGEMENT WAS WILLFUL AND (2) 3M MADE A COMPETITIVE PRODUCT. ASK FISH.

In *Rosco, Inc. v. Mirror Lite Co.*,[78] the court granted an injunction following a finding that Rosco infringed Mirror Lite's patented mirror technology. The court rejected Rosco's argument an injunction was unnecessary because Rosco had stopped manufacturing the infringing products, noting that an injunction should be denied only when "the evidence is very persuasive" that there will never be any future infringement. A defendant's promise to cease is not enough. The court noted that because the parties were direct competitors and Mirror Lite manufactured a mirror covered by its patent, a mandatory licensing scheme would not adequately compensate Mirror Lite.[79] The court found there would be no harm to the public, which could purchase mirrors from Mirror Lite instead of Rosco.

---

[74] *Id.* at 670.

[75] 2006 WL 2735499 (D. Minn. Sept. 25, 2006).

[76] "3M has spent nearly five years litigating to protect its interest in this patent and has consistently refused to execute a licensing agreement with Avery. Having lost at trial, Avery wants to force 3M to grant a license that 3M refused to grant before trial. The Court will not disturb 3M's determination that its business interests will not be served by the licensing of this product." *Id.* at 1.

[77] *Id.* at 2.

[78] 2006 WL 2844400 (E.D.N.Y. Sept. 29, 2006).

[79] *Id.* at 5.

© 2007 by Bradley R. Larschan                                                  16

In *Visto Corp. v. Seven Networks, Inc.*,[80] the court granted Visto's motion for permanent injunction.[81] Three products were found to willfully infringe each of the three patents at issue.

The court noted that the parties are direct competitors in the mobile email market and, even though other companies also competed in the same market space, "this fact weighs heavily in the court's analysis. Intellectual property enjoys its highest value when it is asserted against a direct competitor in the plaintiff's market."[82]

Visto demonstrated the inadequacy of legal remedies, even though the jury made a large damage award. While "[t]hose damages . . . are designed to compensate Visto fairly and reasonably for its past injury . . . future damages may compensate Visto [only] for an *approximate* loss . . . ."[83] A royalty based on future sales is not "adequate in the sense that they are a suitable proxy for injunctive relief. What makes legal remedies inadequate under the circumstances of this case is the inability to calculate the plaintiff's future losses with precision. An injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement."[84] Thus, an injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement.

In *Smith & Nephew, Inc. v. Synthes (U.S.A.)*[85] the court issued a permanent injunction after finding infringement by two of Synthes' products used to treat orthopedic fractures. The court found that Smith & Nephew proved irreparable harm by showing flattening sales growth "attributable to a decreased ability to compete in the market",[86] significant sales of Synthes' infringing products,[87] competition between the two companies' products that inhibits the plaintiff's ability to develop customer relationships and new products, and loss of market share and brand recognition. The court held remedies at law were inadequate because of the inherent uncertainty in proving lost sales damages in a multiple-supplier market, because intangible damage to goodwill and brand

---

[80] 2006 WL 3741891 (Dec. 19, 2006).

[81] The court, however, stayed the injunction pending appeal because "Visto's attorneys violated the Protective Order in this case and then attempted to conceal those violations." *Id.* at 1.

[82] *Id.* at 4 (*citing Tivo* at 669).

[83] *Id.* at 4.

[84] *Id.*

[85] 466 F. Supp. 2d 978 (W.D. Tenn. 2006).

[86] *Id.* at 983.

[87] The court found no support for "Synthes' assertions that Smith & Nephew has not been irreparably harmed because of the limited competition between the primary Smith & Nephew product covered by the ... [patents] and the infringing products made by Synthes." *Id.*

© 2007 by Bradley R. Larschan
17

recognition "can never be ascertained accurately," and because future damages would not adequately remedy against future infringement of the right to exclude.[88] The court held the balance of hardships favored an injunction because the only hardship Synthes showed was its inability to continue infringing. The court held the public interest in protecting patent rights favored an injunction because other sources of similar products exist, and because the court found no evidence of "undisputed and enormous public reliance on [the infringing] products."[89]

In *Sundance, Inc. v. DeMonte Fabricating Ltd.*,[90] the patentee relied on the harm to its non-exclusive licensees that directly competed with the infringer. The court denied the injunction and used the patentee's licenses as a basis for finding monetary damages were adequate compensation.

In *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*,[91] the court found that the structure on the Development Driller rigs infringed the apparatus claims of Transocean's patents, that Transocean makes and markets deep water drill rigs equipped with the patented structure, that the customer base for deep water drill rigs is small and that GSF has not only used the Development Driller rigs equipped with the infringing structure to compete for the same customers and contracts as Transocean, but also to win contracts over competing bids from Transocean.

In finding the plaintiff would be irreparably harmed, the court observed that "[s]ince a patent grants the right to exclude others from practicing the invention, the right to exclude remains a relevant issue for courts to consider when weighing the equities for and against an application for permanent injunction."[92] Here, the parties competed for the same customers in the deepwater rig market. In a clear indication of its reasoning, the court noted that "GSF has not cited any case in which a continuing infringer in direct competition with a patent holder has not been permanently enjoined from using the patented invention to compete against the patent holder."[93]

The court found that the infringement was "not small components of those rigs but, instead, structures that are related to the rigs' core functionality."[94] The court went on to state that this was not a case where

---

[88] "The loss of market share and the resulting lost profits and loss of brand name recognition which Smith & Nephew suffered because of Synthes' continued sale of the infringing products constitute injuries that are both incalculable and irreparable." *Id.*

[89] *Id.* at 985.

[90] 2007 WL 37742 (E.D. Mich. Jan. 4, 2007).

[91] 2006 WL 3813778 (S.D.Tex. Dec. 27, 2006).

[92] *Id.* at 3.

[93] *Id.*

[94] *Id.* at 5.

© 2007 by Bradley R. Larschan

monetary damages would be sufficient to compensate Transocean for GSF's future infringement because that infringement relates only to a "small component" of the Development Driller rigs. Nor is the court persuaded that the mere fact that Transocean is willing to consider licensing its invention to GSF and others on "fair grounds" [ ] sufficient to defeat Transocean's request for a permanent injunction.[95]

In *MPT, Inc v. Marathon Labels, Inc.*,[96] the court found that the patented invention "has broad patent protection that reads directly upon" the infringing product.[97] In its analysis of the four-factor test, the court found that

monetary damages are not adequate to compensate for MPT's injury. Royalties will not stop the erosion of [plaintiff's] market. Another market entrant is likely to lead to a drop in prices, thus reducing MPT's royalties from Defendants and . . . profits. Allowing Marathon to sell the Smart Surface Placard in the United States market will also damage MPT in that all placards have previously been provided by MPT. This implicates a significant impact on MPT's commercial reputation.[98]

In granting a permanent injunction, the court found irreparable injury because the plaintiff had "established a strong market position and customer goodwill" and that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."[99]

In *Verizon Services Corp. v. Vonage Holdings Corp.*, the court granted a permanent injunction where Vonage was found to infringe seven Verizon patents at issue cover several technologies that are essential for successfully implementing a commercial Voice over Internet Protocol ("VoIP") telephone service. The patents were in three general categories: (1) two network patents (commercial scale VoIP telephony), (2) a public wireless/cordless handset patent and (3) four feature patents (*e.g.*, voicemail in VoIP).

---

[95] *Id.*

[96] 2007 WL 184747 (N.D. Ohio Jan. 19, 2007).

[97] *Id.* at 14.

[98] *Id.* at 15.

[99] *Id.* at 14, quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992).

© 2007 by Bradley R. Larschan                                              19

### 3. Reading the Tea Leaves

In the post-*eBay* cases in which an injunction has been sought after a finding of willful infringement, the injunction has been issued in at least 10 cases. Although the four-factor test weighs facts specific to each case, in every instance where the plaintiff had a directly competitive product or service to that which was found to willfully infringe, the courts have issued an injunction; conversely, if the plaintiff did not have a directly competitive product or service, no injunction was issued. In the only case in which a self-made inventor was the plaintiff, he inexplicably failed to cite this as a basis for seeking a permanent injunction.[100] Thus, the district courts appear to believe that *eBay* requires that a patent owner must make, use or sell a directly competitive product or service in order to be eligible for the grant of a permanent injunction. Whether and under what circumstances 'good' plaintiffs such as "university researchers and self-made inventors"[101] may be granted permanent injunctions has not yet been settled.

### V.    PUBLIC POLICY CONCERNS

In rejecting the time-tested balance of intellectual property rights, the *eBay* decision is likely to have significant, long-lasting unintended consequences.

As a threshold matter, in determining whether a plaintiff is eligible for a permanent injunction, the district courts must consider the *owner* of a patent rather than the *right the patent confers*. District courts must now ascertain whether the plaintiff is 'good' or 'bad', with the result that the latter are no longer eligible to be granted permanent injunctions whereas the former may be. A corollary of this is that a broad swath of plaintiffs' economic rights have been diminished – perhaps greatly – as a consequence of *eBay*. It is also likely that *eBay* will encourage willful infringement, since permanent injunctions will no longer issue unless, at a minimum, the patent owner is either (1) 'good' *or* (2) not 'bad' *and* makes, uses or sells a directly competitive product or service. Further, this broad swath of plaintiffs have lost their right to decide whether or not to license their property, or to whom to grant a license.[102] Finally, *eBay*

---

[100] *Voda*, 2006 WL 2570614 at 5. The court rejected the plaintiff's argument that "irreparable harm is presumed whenever validity and continuing infringement have been established" noting that it "runs afoul of the court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief." *Id*. Perhaps with *eBay* in mind, the court went on to note that "plaintiff identifies no harm to himself; rather, he relies on alleged harm to a non-party, Scimed." Perhaps critically to the case's outcome, this third party, who was the plaintiff's exclusive licensee, "elected not to sue to enforce the patent rights. As patents have 'the attributes of personal property', the person seeking a permanent injunction must demonstrate harm from infringement of those rights that is personal as well." *Id*.

[101] *eBay*, 126 Sup. Ct. at 1840.

[102] In this sense, patents have been carved out as a unique type of property. Consider, for example, the result if *eBay* were applied to real property. Instead of a willful trespasser being enjoined from further trespassing, the courts would limit a broad swath of land owners to money damages. In other words, the very notion of the exclusive use of real property would be substantially altered.

© 2007 by Bradley R. Larschan

will encourage many patent owners to consider bringing § 337 cases before the United States International Trade Commission instead of or in addition to initiating patent infringement actions in a U.S. District Court, further burdening litigants and causing societal inefficiencies.

### 'Good' and 'Bad' Plaintiffs

Prior to *eBay*, an owner whose patent rights were willfully infringed was generally entitled to a permanent injunction notwithstanding the availability of monetary damages. "[W]henever this court has had occasion to speak, it has decided that an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[103] This is because "[t]he heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."[104]

Over more than a century, the free market achieved an equilibrium balancing (however imperfectly) the rights of the plaintiff and a willfully infringing defendant. The defendant gained profits from intentionally infringing a patent. The plaintiff had the right to prevent others from using his invention during the life of the patent or to negotiate a license agreement with whomever he so desired under whatever terms he could negotiate. Because of the possibility of an injunction, the more (1) fundamental the patent was to the defendant's business and (2) willful an infringement, the more motivated the defendant was to enter into a license agreement.

As a means of thwarting so-called 'patent trolls' ('bad' plaintiffs), the *eBay* Court recast this balance. The "economic function of the patent holder"[105] must now be taken into account by the district court when considering whether a permanent injunction should issue: "some patent holders, such as university researchers or self-made inventors . . . may be able to satisfy the traditional four-factor test . . . ."[106] These are among the 'good' plaintiffs. But, lower courts, beware, "[a]n industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent."[107]

Here the Court is engaging in social engineering by changing the focus of legal analysis from a property right to drawing a distinction between 'good' and 'bad' property

---

[103] *Continental* at 425.

[104] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. at 135; 89 S.Ct. at 1583.

[105] 126 Sup. Ct. at 1842 (Kennedy, J. concurring).

[106] *Id.* at 1840.

[107] *Id.* at 1842 (Kennedy, J. concurring).

© 2007 by Bradley R. Larschan

right owners,[108] turning U.S. patent law on its head. Consider the case of the university researcher who is granted a patent and the patent is willfully infringed by Company A. The Court suggests that this patent owner may be eligible to obtain a permanent injunction. However, rather than endure the distraction and bear the expense of protracted patent litigation, our university researcher exclusively assigns (for 50% of the royalties) the patent to an individual whose sole interest is to enforce the patent right. This patent owner brings the suit the university researcher could not afford. This new patent owner is probably not eligible to obtain a permanent injunction. Before the district court renders a decision, this individual sells the patent to Company B, which makes a directly competitive product to Company A. Company B obtains a judgment for damages and seeks a permanent injunction, which is granted. Company C, which is a patent troll, then purchases the patent from Company B, whereupon Company A appeals the permanent injunction. Does the Federal Circuit vacate the injunction?

Where does *eBay* leave the typical inventor, whom the patent law is meant to encourage and protect in his innovation? The Court clearly views "self-made inventors" as 'good' patent owners who could be entitled to permanent injunctions if they elect to prevent others from infringing their property rights.[109] 'Self-made' inventors are, by definition,[110] financially successful. But is it because they have sufficient funds to bring a very costly patent infringement suit that they are eligible for a permanent injunction? What of the vast majority of inventors who (in this author's experience) typically deplete whatever financial resources they had available to perfect and patent an invention? By definition, this inventor is not 'self-made', nor is he capable of financing a patent infringement suit. If this inventor assigns his patent to a patent troll to enforce his rights, it appears under *eBay* the patent troll may no longer be eligible for an injunction.[111] Does *eBay* mean that "self-made inventors" like Alexander Graham Bell, Thomas Edison, Henry Ford and others are eligible for permanent injunctions because of their wealth, but

---

[108] Query whether the Court will seek to distinguish between families that own land to farm and land speculators or investors who own stock in a company and those who own derivatives? Where does the Court's analysis take us if district courts are to examine who owns a property right rather than what the property right confers?

[109] These "self-made inventors[ ] might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test . . . ." 126 Sup. Ct. at 1840. *But cf. Voda* (where an apparently self-made inventor was denied a permanent injunction). As discussed previously, *eBay* and *Voda* can be reconciled because the plaintiff/inventor did not attempt to assert irreparable harm to himself but, rather, to his exclusive licensee; however, the licensee never asserted its claims to damages. *Voda*, 2006 WL 2570614 at 5. Nevertheless, the district court's reasoning does not appear to indicate the plaintiff/inventor would have prevailed had he pleaded personal irreparable injury.

[110] Self-made is defined as: "having achieved success or recognition by your own efforts; 'a self-made millionaire'". *WordNet® 2.1*, Princeton University (2005); "Having achieved success or recognition by one's own efforts: *a self-made millionaire*. THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

[111] What if the patent troll merely finances the inventors patent infringement suit in exchange for 99% of the inventor's recovery? Would the inventor be eligible for a permanent injunction?

© 2007 by Bradley R. Larschan

the great main stream of inventors – the nameless *hoi polloi* who are the majority of inventors – are not?

By focusing on the *owner* of the patent rather than the *right the patent confers* the Court has opened up Pandora's box.

### The Economic Rights of Most Patent Owners Have Been Diminished

The *eBay* decision has diminished the economic rights of many – perhaps most – patent owners.

In its attempt to thwart patent trolls,[112] the Court altered the balance of rights between a broad swath of patent owners and patent infringers. Absent a permanent injunction, a willful infringer now has little motivation to enter into a license agreement with a patent owner. The more fundamental the nature of the invention, the more core it is to the willful infringer's product and the greater profit the infringer derives from the invention, after *eBay* the less motivation it has to settle. After all, the infringer's damages are limited to a "reasonable royalty" (under *Georgia Pacific*[113]). Why would a defendant pay a reasonable royalty if its downside risk is to pay the same royalty after an adverse decision, exhaustion of appeals and the passage of several years (during which the infringer might wear down the plaintiff sufficiently to settle for less than a reasonable royalty)?[114]

A corollary of this is that *eBay* will embolden companies to infringe patent rights of the poor, most of the middle class,[115] 'bad' and non-competitor patent owners because permanent injunctions are likely not to issue. Willful infringers can readily assume that poor and many middle class patent owners do not possess the financial means to engage in very costly patent litigation and appeals. Heretofore, these patent owners could have assigned their patents to individuals or companies with the means to enforce their rights (including patent trolls); however, these individuals and companies are now 'bad' patent

---

[112] "An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent." 126 Sup. Ct. at 1842 (Roberts, J., concurring).

[113] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971) (setting forth 15 historical factors which have been repeatedly invoked in subsequent cases to determine "suppositious" licenses).

[114] In reality, a large company will look at the cost of litigation and conclude it is cheaper to pay $1-$2 million a year to keep a patent suit going rather than pay the reasonable royalty.

[115] These patent owners typically do not have the financial wherewithal to enforce their rights through litigation – which, by all accounts, is among the most expensive civil litigation brought in the courts today – because of the defendants' ability to increase costs and drag out the appeals process. In practice, the less financially able a patent owner, the more motivated the defendant is to exhaust its legal options.

© 2007 by Bradley R. Larschan

owners and no longer eligible for permanent injunctions. Thus, poor and many middle class patent owners are at an even greater disadvantage.

Additionally, non-competitor patent owners' "absolute property" is no longer absolute.[116] Formerly, the Court observed that "an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[117] Until *eBay*, the right to "exclusion may be said to [be] the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."[118] The Court does not attempt to reconcile *eBay* with *Continental's* holding that "the Constitution and patent laws intended to provide for an exclusive right to inventors to make, use, and vend their inventions."[119]

Similarly, this broad swath of patent owners appear to have lost their right to refuse to license a patent or to license a patent right selectively. Under *eBay*, a third party can simply infringe and pay a reasonable royalty despite the wishes of the patent owner.[120] This is starkly at odds with the Court's previous holding that "[t]he franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."[121] Indeed, prior to *eBay* the Court has consistently held that should "[a patentee] see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own . . . his title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it."[122] Not so after *eBay*.

---

[116] Compare, for example, the district courts' decisions in *Z4* (where monetary damages were sufficient to compensate for any future infringement) and *Visto* (where A royalty based on future sales is not "adequate in the sense that they are a suitable proxy for injunctive relief. What makes legal remedies inadequate under the circumstances of this case is the inability to calculate the plaintiff's future losses with precision. An injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement."). The principal distinction appears to be that in *Visto* the parties were direct competitors where they were not direct competitors in *Z4*.

[117] *Continental* at 425.

[118] *Id., citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540 (1902).

[119] *Id.* at 424.

[120] Unless, at a minimum, the patent owner is either (1) 'good' or (2) not 'bad' *and* makes, sells or uses a directly competitive product or service.

[121] *Bloomer v. McQuewan*, 14 How. at 549, 55 U.S. at 549 (Taney, C.J.).

[122] 210 U.S. at 425, *quoting Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. at 294-95.

© 2007 by Bradley R. Larschan

*Encouraging Trade Law Remedies As A Substitute for Enforcing the Patent Law in Federal Courts*

Section 337[123] has long been available for U.S. patent holders to prevent importation of infringing imports through exclusion orders.[124] It is an Article II proceeding administered by the ITC, initiated upon the filing of a complaint alleging unfair acts (such as patent infringement[125]). The ITC's final determinations are subject to Presidential review for policy reasons and ultimately can be appealed to the United States Court of Appeals for the Federal Circuit. Since *eBay*, there has been an increase in the number of §337 complaints brought before the United States International Trade Commission (ITC).[126]

Section 337 was enacted to protect U.S. domestic industries from unfair competition in the importation of goods made by foreign companies. Although the ITC does not award damages in § 337 cases, in some cases it is an attractive option because of the remedy of exclusion[127] and the relative swiftness of obtaining a decision.[128] On the other hand, a § 337 complaint is typically more detailed than district court actions and "is typically more expensive and requires a greater commitment of resources than the preparation of a district court complaint."[129]

---

[123] Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.

[124] For an overview of § 337, see Robert A. Caplen, *Recent Trends Underscoring International Trade Commission Review of Initial Determinations and Federal Circuit Appeals From Final Commission Determinations Under Section 337 of the Tariff Act of 1930*, 17 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 337 (2007).

[125] Over 90% of the cases brought under § 337 are based on alleged infringement of a U.S. patent.

[126] The number of § 337 patent-based proceedings as risen in recent Federal Government fiscal years: 2002 (11), 2003 (14), 2004 (22), 2005 (21) and 2006 (34). In the first five months of 2007, 14 proceedings were initiated.

[127] If the ITC finds that § 337 has been violated, two remedies are available. The first is an exclusion order barring infringing imports from entering the U.S. A limited exclusion order applies to goods manufactured, imported or sold by the respondents. A general exclusion order is also available and prevents any infringing articles from entering the U.S., regardless of origin. The exclusion orders are enforced by U.S. Customs and Border Protection, which has the power to inspect and deny entry of goods within the scope of the order. The second remedy is an order directing named respondents to "cease and desist from engaging in the unfair methods or acts involved."

[128] The ITC must conclude each investigation and make its determination "at the earliest practicable time." Moreover, the ITC rules of practice state that all investigations and related proceedings shall be conducted "expeditiously". To promote expeditious adjudication, § 337 directs the ITC to establish a target date for its final determination. ITC target dates are set shortly after publication of the *Federal Register* notice that the ITC has instituted a § 337 investigation. The typical target date is between 12 and 15 months. ITC target dates are rarely extended.

[129] William P. Atkins, *Appreciating 337 Actions at the ITC: A Primer on Intellectual Property Issues and Procedures at the U.S. International Trade Commission*, 5 U. BALT. INTELL. PROP. L.J. 103, 108 (1997).

© 2007 by Bradley R. Larschan

Section 337 cases are independent of patent infringement suits in the Federal courts; thus, they may run in parallel (although the litigation cost would almost double). One consequence of *eBay* is that patent owners are likely to resort to § 337 to restore a balance in negotiations with non-U.S. infringers of their intellectual property rights. *eBay* can be seen to discourage plaintiffs' resort to the Federal courts to adjudicate certain types of patent infringement disputes, and to heighten both litigation and societal costs in others.

It is difficult to see how the public interest is served by depriving litigants of the remedy of a permanent injunction when the remedy of an exclusion order is available through the ITC.

## VI. CONCLUSION

The *eBay* decision has significantly altered the balance between willful infringers and a great many patent owners. In an effort to limit the rights of a class of patent owners (patent trolls), the Court has greatly limited the legal monopoly a patent grants. Now, only those patent owners who make or sell a directly competitive product are eligible for permanent injunctions. In so holding, the Court engaged in social engineering that is likely to have substantial unintended consequences for a broad swath of patent owners.

For more than a century the courts have consistently looked to the nature of the right a patent confers – that is, a legal monopoly with the right to exclude others – to determine whether or not a permanent injunction should issue, creating a presumption that an injunction should issue absent special circumstances. In a sweeping – and largely unreasoned – decision, the Court shifted the legal focus from the nature of the right to the nature of the patent owner. In so doing, the Court has implicitly overruled *Continental*, its predecessors (*Bloomer*, *E. Bement & Son*) and progeny, altering the balance of rights between patent owners and infringers to the material detriment of a broad swath of patent owners.

Henceforward, following a finding of willful infringement, to determine whether a permanent injunction should issue, *eBay* requires as a threshold matter that district courts examine whether a patent owner is 'good' or 'bad'. 'Bad' patent owners will no longer be eligible for permanent injunctions. 'Good' patent owners may be eligible for a permanent injunction, provided they make, use or sell a directly competitive product or service. Only then will courts apply the four-factor test. Although the Court appears to believe it straight forward to distinguish 'good' from 'bad' patent owners, the district courts have been and almost certainly will continue to struggle with shades of gray.

While the Court created the 'good'-'bad' distinction to thwart patent trolls, the unintended consequences are likely to be profound. To begin with, the balance of power has radically shifted in favor of willful infringers. Absent the possibility of an injunction, a willful infringer's downside is limited to paying a reasonable royalty. The more fundamental the invention and the greater profit generated from it, the more attractive it

© 2007 by Bradley R. Larschan

26

becomes to the infringer to prolong the litigation to wear down the plaintiff and settle for a less than reasonable royalty.

Next, *eBay* is likely to embolden companies to infringe patent rights of the poor, most of the middle class, 'bad' or non-competitor patent owners. Poor and middle-class patent owners (by definition, not "self-made inventors"[130]) typically cannot afford to enforce their patent rights, even though they might be eligible for a permanent injunction; if they assign their patents to individuals or companies to enforce their patents, they are now no longer eligible for a permanent injunction because the patent owner is 'bad' or a non-competitor.

*eBay* also eviscerates the monopoly – the very essence of the property right the patent confers. No longer is "the purpose of the patent … to protect him in this monopoly."[131] 'Bad' patent owners have largely lost their historic absolute right to refuse to license a patent, or to license a patent right to companies of its choice. Under *eBay*, a third party can simply infringe and, at worst, pay a reasonable royalty despite the patent owner's wishes. Compulsory licensing has replaced monopoly.

Finally, *eBay* has encouraged patent owners no longer eligible for a permanent injunction to seek exclusion orders through § 337 proceedings before the ITC, substituting Article II for Article III actions. If the aggrieved patent owner wishes to recover monetary damages, he must still file a patent infringement suit in the district court, needlessly doubling his costs and imposing societal inefficiencies.

It is difficult to imagine that *eBay* will be the last word on the nature of U.S. patent rights.

---

[130] 126 Sup. Ct. 1840.

[131] *Continental* at 424.

© 2007 by Bradley R. Larschan                                                    27

From: Brad larschan [mailto:blarschan@comcast.net]
Sent: Friday, March 09, 2007 10:32 AM
To: jonathan_tunick@hotmail.com
Subject: RE: Follow Up to Meeting Yesterday

Jonathan,

This represents our understanding of the percentage split.

I look forward to hearing about John's conversation with Todd.

Thanks again to you and Peter for yesterday's meeting and a delicious lunch.

Brad

---

From: Jonathan Tunick [mailto:jonathan_tunick@hotmail.com]
Sent: Friday, March 09, 2007 10:21 AM
To: 'Brad larschan'
Subject: Follow Up to Meeting Yesterday

Brad-

I will report to you on John Hall's conversation with Todd Dickenson, but before
doing so I want to ensure that we have agreement on our own working
arrangement. As you and I agreed prior to our meeting, the waterfall splits will
be 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming
our prior understanding.

Best,

Jonathan

Jonathan L. Tunick
DigaComm, LLC
Principal
w: 312 222 0003
m: 415 828 3696
tunick@digacomm.com <mailto:tunick@digacomm.com>
im: jtunick2000

**Thu, Oct 25, 2007 11:06**

**Subject:** RE: Letter Agreement
**Date:** Friday, March 30, 2007 14:14
**From:** Jonathan Tunick <jonathan_tunick@hotmail.com>
**Reply-To:** <jonathan_tunick@hotmail.com>
**To:** 'Ray Bilbao' <rbilbao@reportonboard.com>
**Cc:** 'Bradley Larschan' <blarschan@reportonboard.com>, <smith@digacomm.com>
**Conversation:** Letter Agreement

Ray-

One small change... I believe you inadvertently left out in the 4th paragraph to reference DigaComm or its designated assignee. Please make this change and we can fax over the final version for Brad's signature.

We are pleased to hear that Andrew is in accord of this basic understanding which gives us comfort to proceed.

Best,

Jonathan

---

**From:** Ray Bilbao [mailto:rbilbao@reportonboard.com]
**Sent:** Friday, March 30, 2007 11:21 AM
**To:** jonathan_tunick@hotmail.com
**Cc:** Bradley Larschan
**Subject:** Letter Agreement

Jonathan:

We have spoken with Andrew. He is okay in principle with the fees and has given approval for VIP to execute the Letter Agreement. I have attached your agreement which I revised to tighten it up a bit. Please review and if appropriate present to Peter for execution.

If you have any questions, please do not hesitate to contact me. I am stepping out for lunch and will be back shortly.

Sincerely,

J. Raymond Bilbao
Vice President & General Counsel
Vehicle Safety & Compliance, LLC

3150 Lenox Park Blvd, Suite 108
Memphis, TN 38115
(901) 546-7676 Telephone
(901) 546-7677 Facsimile

CONFIDENTIALITY NOTICE: This Electronic Mail, and any attachments thereto, is intended only for use by the addressee(s) named therein. The information contained in this e-mail, and any attachments thereto, is the confidential, proprietary information of Vehicle Safety and Compliance, LLC, its affiliates and/or subsidiaries (collectively, VSAC). If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and/or any attachments thereto, is strictly prohibited without the express written permission of VSAC. If you received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003   fax 312/222-0006
www.digacomm.com

March 30, 2007

Mr. Bradley Larschan
Chief Executive Officer
Vehicle IP, LLC
3150 Lenox Park Blvd., Suite 108
Memphis, TN 38115

Re: Asset Purchase of VIP's Patents ("Letter")

Dear Brad:

This Letter confirms the understanding of DigaComm, L.L.C. ("DigaComm") with Vehicle IP, LLC ("VIP"), the holder of a portfolio of U.S. patents, foreign patents and foreign pending patent applications. DigaComm is providing assistance to VIP in negotiating an asset purchase agreement under which General Electric ("GE"), through a special purpose entity ("SPE"), would acquire the following patents (the "Contemplated Transaction") in VIP's patent portfolio (the "Assigned Patents") as described below herein:

1. U.S. Patent No. 5,966,658 entitled "Automated Selection of a Communication Path"
2. U.S. Patent No. 5,699,275 entitled "System and Method for Remote Patching of Operating Code Located in a Mobile Unit"
3. U.S. Patent No. 5,983,108 entitled "Method and Apparatus for a Nationwide Cellular Telephone Network"
4. U.S. Patent No. 6,018,657 entitled "System and Method for Communicating a Message Using a Cellular Telephone Network"
5. U.S. Patent No. 6,148,202 entitled "Vehicle Locating and Communicating Method and Apparatus"
6. Other VIP Patents to the extent GE requires (and VIP agrees) that any other patent from VIP's portfolio be included in the Contemplated Transaction.

The Contemplated Transaction proposes that the GE-owned SPE would provide approximately $25 million to the SPE to enforce the Assigned Patents either through licensing and/or litigation, and that the SPE would distribute the proceeds recovered from enforcement of the Assigned Patents (the "Cash Waterfall Proceeds") as follows:

Initially, it has been proposed that the Cash Waterfall Proceeds would be utilized to: (a) reimburse the SPE for expenses advanced to fund the enforcement of the Assigned Patents (projected at $25 million); (b) repay certain loans (approximately $1.8 million) made to VIP by the Preferred Membership Interest Holders of Vehicle Safety and Compliance LLC ("VSAC Preferred Holders"), the sole member of VIP; and (c) allow the Preferred Holders to recoup their invested capital of approximately $1.1 million (the "Initial Distributions"). VIP and DigaComm acknowledge that the priority of payment of the Initial Distributions out of the Cash Waterfall Proceeds have not yet been agreed between GE and VIP. It is proposed that following the Initial Distributions, the SPE would retain 50% of Cash Waterfall Proceeds and distribute the remaining 50% of the Cash Waterfall Proceeds to VIP.

In the event that VIP and GE finally consummate the Contemplated Transaction on substantially the terms and conditions described above with such other commercially reasonable and customary terms

and conditions as may be negotiated between GE and VIP. VIP will instruct the SPE to distribute directly to DigaComm or its designated assignee such portions of VIP's 50% of the Cash Waterfall Proceeds as set forth in the Distribution Schedule attached hereto as **Exhibit A**.

DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.

VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

In the unlikely event any dispute should arise between us relating to this Letter such may only be resolved by a single arbitrator in accordance with the commercial arbitration rules of the American Arbitration Association in Wilmington, Delaware with the internal laws of that State applying. Injunctive relief, should such be required, may be obtained in any Court of competent jurisdiction.

This Letter contains the entire understanding between DigaComm and VIP with respect to this subject matter. In the event that GE and VIP fail to finally consummate the Contemplated Transaction, this Agreement shall be null and void.

We have enjoyed the working relationship we have developed with VIP and are confident that our efforts will be productive.

Sincerely,

Peter W. Smith
Managing Member

PWS/glb

Confirmed and Agreed
Signature

Bradley Langham, Chief Executive Officer

Date    March 30, 2007

**Exhibit A**

| Tier | Cash Waterfall Amount | Percentage of Cash Waterfall Distributed to DigaComm | Dollar Amount of Percentage of Cash Waterfall Distributed to DigaComm |
|---|---|---|---|
| Tier 1 | $300,000,000 | 5.00% | $15,000,000 |
| Tier 2 (Additional) | $200,000,000 | 4.00% | $8,000,000 |
| Tier 3 (Additional) | $250,000,000 | 3.50% | $8,750,000 |
| Tier 4 (Additional) | $250,000,000 | 2.50% | $6,250,000 |
| Tier 5 (Additional) | $500,000,000 | 2.00% | $10,000,000 |
| Tier 6 (Additional) | $500,000,000 | 1.50% | $7,500,000 |
| Tier 7 (Additional) | $500,000,000 | 1.00% | $5,000,000 |

*Exhibit A above has been retyped for clarity.

Thu, Oct 25, 2007 15:47

**Subject: Digacomm Agreement with VIP**
**Date: Thursday, June 14, 2007 15:48**
**From: Peter Smith <smith@digacomm.com>**
**To: John Hall <john.b.hall@ge.com>**
**Cc: Brad Larschan <blarschan@comcast.net>**
**Conversation: Digacomm Agreement with VIP**

John,

Enclosed please find the documents as promised.  Best,
Peter

**Page 1 of 5**

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003   fax 312/222-0008
www.digacomm.com

June 13, 2007

Mr. John B. Hall
Senior Vice President, Technology Group
GE Commercial Finance
500 West Monroe
Chicago, Illinois 60661

RE: DigaComm Agreement with Vehicle IP, LLC

Dear John,

Following our conversation with you this morning, I am sending you a copy of DigaComm LLC ("DigaComm") executed agreement with Vehicle IP, LLC ("VIP").

I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us.

All of us associated with the VIP opportunity greatly appreciate your lead role in initiating the highly productive collaborative working relationship which has evolved between your GE colleagues and Brad's team.

With best wishes.

Sincerely yours,

Peter W. Smith
Managing Member

Cc: Brad Larscham, CEO
    Vehicle IP, LLC

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0005  fax 312/222-0008
www.digacomm.com

March 30, 2007

Mr. Bradley Lamphan
Chief Executive Officer
Vehicle IP, LLC
3150 Lenox Park Blvd., Suite 108
Memphis, TN 38115

Re: Asset Purchase of VIP's Patents ("Letter")

Dear Brad:

    This Letter confirms the understanding of DigaComm, L.L.C. ("DigaComm") with Vehicle IP, LLC ("VIP"), the holder of a portfolio of U.S. patents, foreign patents and foreign pending patent applications. DigaComm is providing assistance to VIP in negotiating an asset purchase agreement under which General Electric ("GE"), through a special purpose entity ("SPE"), would acquire the following patents (the "Contemplated Transaction") in VIP's patent portfolio (the "Assigned Patents" as described below herein:

1. U.S. Patent No. 5,966,658 entitled "Automated Selection of a Communication Path"
2. U.S. Patent No. 5,699,275 entitled "System and Method for Remote Patching of Operating Code Located in a Mobile Unit"
3. U.S. Patent No. 5,983,108 entitled "Method and Apparatus for a Nationwide Cellular Telephone Network"
4. U.S. Patent No. 6,018,657 entitled "System and Method for Communicating a Message Using a Cellular Telephone Network"
5. U.S. Patent No. 6,148,202 entitled "Vehicle Locating and Communicating Method and Apparatus"
6. Other VIP Patents to the extent GE requires (and VIP agrees) that any other patent from VIP's portfolio be included in the Contemplated Transaction

    The Contemplated Transaction proposes that the GE-owned SPE would provide approximately $25 million to the SPE to enforce the Assigned Patents either through licensing and/or litigation, and that the SPE would distribute the proceeds recovered from enforcement of the Assigned Patents (the "Cash Waterfall Proceeds") as follows:

    Initially, it has been proposed that the Cash Waterfall Proceeds would be utilized to: (a) reimburse the SPE for expenses advanced to fund the enforcement of the Assigned Patents (projected at $25 million); (b) repay certain loans (approximately $1.8 million) made to VIP by the Preferred Membership Interest Holders of Vehicle Safety and Compliance LLC ("VSAC Preferred Holders"), the sole member of VIP; and (c) allow the Preferred Holders to recoup their invested capital of approximately $3.1 million (the "Initial Distributions"). VIP and DigaComm acknowledge that the priority of payment of the Initial Distributions out of the Cash Waterfall Proceeds have not yet been agreed between GE and VIP. It is proposed that following the Initial Distributions, the SPE would retain 50% of Cash Waterfall Proceeds and distribute the remaining 50% of the Cash Waterfall Proceeds to VIP.

    In the event that VIP and GE finally consummate the Contemplated Transaction on substantially the terms and conditions described above with such other commercially reasonable and customary terms

and conditions as may be negotiated between GE and VIP, VIP will instruct the SPE to distribute directly to DigaComm or its designated assignee such portions of VIP's 50% of the Cash Waterfall Proceeds as set forth in the Distribution Schedule attached hereto as **Exhibit A**.

DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.

VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

In the unlikely event any dispute should arise between us relating to this Letter such may only be resolved by a single arbitrator in accordance with the commercial arbitration rules of the American Arbitration Association in Wilmington, Delaware with the internal laws of that State applying. Injunctive relief, should such be required, may be obtained in any Court of competent jurisdiction.

This Letter contains the entire understanding between DigaComm and VIP with respect to this subject matter. In the event that GE and VIP fail to finally consummate the Contemplated Transaction, this Agreement shall be null and void.

We have enjoyed the working relationship we have developed with VIP and are confident that our efforts will be productive.

Sincerely,

Peter W. Smith
Managing Member

PWS/glb

Confirmed and Agreed
Signature

Bradley Langdon, Chief Executive Officer

Date    March 30, 2007

**Exhibit A**

| Tier | Cash Waterfall Amount | Percentage of Cash Waterfall Distributed to DigaComm | Dollar Amount of Percentage of Cash Waterfall Distributed to DigaComm |
|------|------------------------|------------------------------------------------------|------------------------------------------------------------------------|
| Tier 1 | $300,000,000 | 5.00% | $15,000,000 |
| Tier 2 (Additional) | $200,000,000 | 4.00% | $8,000,000 |
| Tier 3 (Additional) | $250,000,000 | 3.50% | $8,750,000 |
| Tier 4 (Additional) | $250,000,000 | 2.50% | $6,250,000 |
| Tier 5 (Additional) | $500,000,000 | 2.00% | $10,000,000 |
| Tier 6 (Additional) | $500,000,000 | 1.50% | $7,500,000 |
| Tier 7 (Additional) | $500,000,000 | 1.00% | $5,000,000 |

*Exhibit A above has been retyped for clarity.

# VEHICLE IP, LLC

5101 WHEELIS DRIVE, SUITE 100
MEMPHIS, TN 38117
(901) 546-7676 TELEPHONE
(901) 546-7677 FACSIMILE

September 7, 2007

**VIA OVERNIGHT EXPRESS**

Mr. Peter W. Smith
Managing Member
DigaComm L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611

RE:    Letter Agreement between Vehicle IP, LLC ("VIP") and DigaComm
L.L.C. ("DigaComm") dated March 30, 2007 (the "Letter
Agreement")

Dear Peter:

As you are aware, the above-referenced Letter Agreement, as per its terms and conditions, was made expressly contingent upon approval by a majority of the holders of the Preferred Interests of VIP's sole member, Vehicle Safety & Compliance, LLC ("VSAC"). On August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee. At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein.

Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein. Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

If you have any questions, please do not hesitate to contact me to discuss.

Sincerely,

Bradley Larschan
Chief Executive Officer

cc:    J. Raymond Bilbao, Esq.
Andrew Seamons
Lee Piovarcy, Esq.

# Exhibit A
# Part 3

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT B

## Part 1 of 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
LAW DIVISION

DigaComm, LLC,                                    )
                                                  )
            Plaintiff,                            )
                                                  )        No. 2007L013795
      v.                                          )
                                                  )
Vehicle Safety and Compliance, LLC,               )        Hon. Daniel J. Kelley
Pittco Capital Partners, LP,                      )
Pittco Capital Partners II, LP,                   )
J.R. "Pitt" Hyde III, and Andrew Seamons,         )        JURY TRIAL DEMANDED
                                                  )
            Defendants.                           )
_____ )

FILED
Law Div. - 2304
DEC 1 3 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**FIRST AMENDED COMPLAINT FOR FRAUD,
TORTIOUS INTERFERENCE, AND UNJUST ENRICHMENT**

In support of its Complaint, DigaComm, LLC ("DigaComm") states as follows:

1.      Through this complaint, DigaComm seeks compensation it is due for introducing

Vehicle IP, LLC ("VIP"), a wholly-owned subsidiary of Vehicle Safety and Compliance, LLC

("VSAC"), to General Electric ("GE") and facilitating a deal in which GE would partner with

VIP and VSAC to monetize a portfolio of valuable patents.  The patents in question are valued at

$4 billion dollars.

2.      After the parties negotiated an agreement to compensate DigaComm with a

portion of the proceeds generated by the GE joint venture, DigaComm went to work.  Its efforts

for the benefit of VIP and VSAC quickly bore fruit.  On August 16, 2007, GE and VIP/VSAC

closed on their joint venture agreement.

3.      Apparently not content with the billions they stood to make from the GE joint

venture, VSAC and its Preferred Holders caused VIP to renege on its agreement to compensate

DigaComm. On September 7, 2007, VIP Chief Executive Officer Brad Larschan informed DigaComm's Managing Member Peter Smith that DigaComm would be paid nothing for procuring the GE joint venture.

4.    DigaComm brings this action against VSAC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, J.R. "Pitt" Hyde III, and Andrew Seamons.

## PARTIES

5.    Plaintiff DigaComm is a Delaware limited liability company headquartered in Chicago, Illinois. Its address is 400 North Michigan Avenue, Suite 520, Chicago, Illinois, 60611. DigaComm was founded in 1997 and is a Chicago private investment firm specializing in early stage venture capital rounds. DigaComm's managing members are Peter Smith and Robert Spillane.

6.    Defendant VSAC is a Delaware limited liability company headquartered in Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117. VSAC is the sole member of VIP, and thus, the sole owner of VIP.

7.    Related Party VIP is a Delaware limited liability company headquartered in Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117. VSAC is VIP's sole member. VIP is not a named defendant in this complaint because DigaComm's dispute with VIP is subject to an arbitration clause. DigaComm has initiated arbitration proceedings against VIP, and those proceedings are ongoing.

8.    Defendant J.R. "Pitt" Hyde III is a resident of Tennessee. His address is 6058 Shady Grove Road, Memphis, Tennessee, 38103. Mr. Hyde is a prominent Memphis

businessman and is the founder of the AutoZone chain of auto parts stores. Upon information and belief, Mr. Hyde is one of the partners of Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

9.     Defendant Pittco Capital Partners, LP is a Tennessee limited partnership with its principal place of business at 6075 Poplar Avenue, Suite 335, Memphis, Tennessee, 38119. Pittco Capital Partners, LP is a Preferred Holder of VSAC.

10.     Defendant Pittco Capital Partners II, LP is a Tennessee limited partnership with its principal place of business at 17 W. Pontotoc, Suite 200, Memphis, Tennessee, 38103. Pittco Capital Partners II, LP is a Preferred Holder of VSAC.

11.     Defendant Andrew Seamons is a resident of Tennessee. His address is 2910 Garden Lane, Memphis, Tennessee, 38111. Upon information and belief, Mr. Seamons is one of the partners of Pittco Capital Partners, LP and Pittco Capital Partners II, LP. Upon information and belief, Mr. Seamons is J.R. "Pitt" Hyde III's agent. Mr. Seamons is also Chairman of the Board of VIP.

<u>**JURISDICTION AND VENUE**</u>

12.     This Court has personal jurisdiction over the defendants because they, individually and through agents, transacted business in Illinois by engaging DigaComm, a limited liability company headquartered in Chicago, Illinois, to introduce VIP to John Hall, then a GE executive based in Chicago, Illinois. The introduction and at least two other meetings took place in Chicago, Illinois. In addition, the harm caused to DigaComm by the defendants occurred in Illinois.

3

13.    This complaint arises out of the defendants' and their agents' transaction of business in Chicago, Illinois.

14.    The exercise of jurisdiction over the defendants in this case is consistent with the requirements of due process.

15.    Venue is proper because all of the portions of the transaction that occurred in Illinois occurred in Cook County.  Venue is further proper because all of the defendants are nonresidents of Illinois.

## STATEMENT OF FACTS

16.    VSAC and VIP are patent "trolls" — entities whose principal assets are intellectual property but which do not otherwise operate active businesses.  The patents at the center of this lawsuit involve motor vehicle communication technology.  VIP and VSAC value these patents at $4 billion.

17.    The patents in question were acquired during the bankruptcy of then-holder Remote Dynamics, Inc. in 2004.  Raymond Bilbao, formerly General Counsel to Remote Dynamics, Inc., followed the patents to VIP and now serves as VSAC's General Counsel.

18.    The capital used to acquire the patents and develop them was provided to VIP by VSAC, its sole member.  VSAC is believed to have invested approximately $5 million in capital, by way of loans or capital contributions.

19.    After acquiring the patents, VIP set about its efforts to monetize those patents.  The principal method for a patent troll to monetize intellectual property is to sue patent infringers

4

for damages. Alternatively, a patent troll can monetize a patent by entering into licensing agreements with businesses interested in utilizing the technology.

20.    In 2006, VIP entered into discussions regarding its patent portfolio with the Boston intellectual property firm Fish & Richardson. Under the proposals, Fish & Richardson agreed to invest between 30 and 100% of its fee in return for participation in any damages or licensing fees received through its suits against infringers of certain patents.

21.    In December 2006, an attorney at Fish & Richardson named Michael Bunis contacted DigaComm Principal Jonathan Tunick and encouraged DigaComm to investigate the VIP portfolio. Mr. Bunis was aware of DigaComm's work on a previous transaction between SightSound Technologies, Inc. ("SightSound") and GE and believed that DigaComm was well-positioned to assist VIP to achieve a similar venture with GE.

22.    DigaComm was, indeed, well-positioned to assist VIP. In July 2005, it had entered into an agreement with SightSound under which it had agreed to assist SightSound to form a joint venture with General Electric. The SightSound/GE joint venture was structured as follows: (a) SightSound would contribute its patents to a special purpose entity; and (b) GE would contribute necessary capital and would use its experience and sophistication to monetize the patents, either by negotiating license agreements or by enforcing SightSound's patents against infringers.

23.    In return for facilitating the SightSound/GE joint venture, DigaComm was to receive 5% of any amounts generated by the joint venture after certain amounts (such as GE's capital investment) were repaid.

5

24.     The SightSound/GE joint venture closed successfully in mid-2005. Though the patents in that matter are currently under re-examination by the Patent and Trademark Office, DigaComm will receive the 5% owed to it for facilitating the transaction once the patents emerge from the re-examination process.

25.     Aware of DigaComm's experience and success on the SightSound transaction, Fish & Richardson's Mr. Bunis contacted Jonathan Tunick of DigaComm and suggested that DigaComm talk to Bradley Larschan, VIP's CEO.

26.     In January 2007, Mr. Tunick contacted Mr. Larschan in order to explore the possibility of facilitating a joint venture between VIP and GE. Mr. Larschan had been waiting for Mr. Tunick's call and was receptive to the idea. Upon information and belief, VSAC and its Preferred Holders authorized and/or approved all actions taken by VIP in connection with its communications with DigaComm.

27.     Mr. Larschan eagerly embraced the idea of a joint venture with GE because GE was a market participant in the very fields encompassed by the VIP patents. Because of GE's status as a market participant, Mr. Larschan believed that GE had a stronger legal footing for enforcing the patents and that GE could do so without being perceived as a patent troll. In fact, Mr. Larschan had previously authored an article in which he explained how a recent intellectual property decision by the United States Supreme Court made a market participant like GE a valuable, if not indispensable, ally in enforcing patents. (A copy of Mr. Larschan's article is attached as Exhibit 1.)

28.     On February 6, DigaComm hosted Mr. Larschan and Mr. Bilbao at its offices in Chicago. During this meeting, DigaComm again raised the idea of working with VIP to secure

6

an agreement with GE similar to the SightSound transaction. Mr. Larschan reiterated his interest in the idea. The next day, Mr. Larschan called from the airport and told Mr. Tunick that VIP "really liked" the idea of pursuing a deal with GE and inquired about the next steps. Mr. Tunick promised to coordinate with John Hall of GE, the executive involved in the SightSound transaction.

29.    On February 13, 2007, Mr. Larschan emailed to Mr. Hall of GE a set of financial projections for each of VIP's three intellectual property groups. Acknowledging DigaComm's role as the facilitator of the transaction, on February 16, 2007, Mr. Larschan asked whether Mr. Tunick would follow up with General Electric. Mr. Tunick agreed to do so the same day.

30.    On February 17, 2007, Mr. Larschan thanked Mr. Tunick for his continued efforts with respect to GE and requested a copy of the SightSound transaction so that he could "advocate for it" with VSAC and the VSAC Preferred Holders. DigaComm complied with Mr. Larschan's request.

31.    On February 27, 2007, Mr. Larschan again thanked Mr. Smith and Mr. Tunick for "pushing along the GE deal," noting that it "could be a great opportunity."

32.    On March 7, Mr. Tunick and Mr. Larschan spoke by telephone regarding DigaComm's compensation. By this time, DigaComm had scheduled a meeting with John Hall of GE that was to take place the following day in Chicago. Mr. Tunick said that DigaComm was looking for a 10% piece of any transaction in return for bringing the transaction to VIP's attention. Mr. Tunick emphasized that if VIP and DigaComm were not able to agree on DigaComm's compensation, the March 8 meeting with GE would be cancelled.

33.    Mr. Larschan pushed back. He said that 10% was not acceptable to VIP or VSAC, but that 5% was "not a problem" and was the "market rate." Mr. Tunick agreed that DigaComm would accept 5%.

34.    On March 8, 2007, John Hall of General Electric met with Mr. Larschan and others of VIP and made a power-point presentation reflecting GE's view of how best to monetize the patents in question.

35.    At the conclusion of the meeting, Mr. Hall asked what VIP wanted from GE. Mr. Larschan said "we want what you did on the SightSound deal." The meeting ended on a positive note. Mr. Hall agreed to speak with Todd Dickinson, GE's head of intellectual property.

36.    On March 9, Mr. Tunick emailed Mr. Larschan to report on a conversation he had had with John Hall of GE. In his email, he noted the parties agreement with respect to DigaComm's 5% compensation:

> Brad — I will report to you on John Hall's conversation with Todd Dickenson, but before doing so I want to ensure that we have agreement on our own working arrangement. As you and I agreed prior to our meeting, the waterfall splits will be 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming our prior understanding.

37.    Eager to learn of the new development and keep the deal on track, Mr. Larschan confirmed Mr. Tunick's understanding of the parties' agreement as to DigaComm's compensation:

> Jonathan, This represents our understanding of the percentage split. I look forward to hearing about John's conversation with Todd.

(A copy of this email chain is attached as Exhibit 2.)

38.    With the GE deal progressing smoothly and with VIP having established direct
contacts with GE, VSAC apparently felt free to interfere with VIP's March 9, 2007 promise to
pay DigaComm 5%. On March 29, 2007, VSAC's Mr. Bilbao informed Mr. Tunick during a
telephone call that VIP was no longer willing to pay DigaComm 5%. Mr. Bilbao said that 5%
"did not work optically" and that Mr. Larschan was no longer willing to pay the 5% he had
previously promised. Upon information and belief, VSAC and its Preferred Holders authorized
and/or approved Mr. Bilbao's and Mr. Larschan's actions.

39.    DigaComm viewed Mr. Bilbao's and Mr. Larschan's position as a radical change
from the prior agreement to pay 5%. Rather than allow a complete breakdown in the relationship
that might threaten the GE deal, Mr. Smith and Mr. Tunick proposed a tiered fee schedule. On
March 30, 2007, DigaComm and VIP agreed to a tiered fee agreement under which DigaComm
would receive the following percentages of amounts generated by the GE/VIP joint venture (less
the VSAC and GE capital contributions):

| Amounts generated by the joint venture | DigaComm's share |
|---|---|
| Up to $300 million | 5% |
| Between $300 and $500 million | 4% |
| Between $500 and $750 million | 3.5% |
| Between $750 million and 1 billion | 2.5% |
| Between $1 billion and $1.5 billion | 2.0% |
| Between $1.5 billion and $2 billion | 1.5% |
| Over $2 billion | 1% |

40.    Under the agreed upon compensation schedule, DigaComm stood to earn up to
$76 million for bringing the GE opportunity to VIP's $4 billion patent portfolio.

9

41.    As Friday, March 30, 2007 wound to a close, VIP insisted for the first time that

the letter agreement be "subject to the approval of a majority of the VSAC Preferred Holders."

DigaComm objected to this change. Mr. Larschan assured Mr. Smith, however, that the

approval process was a mere formality. VIP promised to recommend to the VSAC Preferred

Holders that they approve the DigaComm letter agreement "as soon as practicable."

42.    As a further sign that the approval process was nothing to be concerned about,

VIP solicited Andrew Seamons' approval of the DigaComm/VIP letter agreement on March 30,

2007. That same day, Mr. Seamons approved the deal on behalf of the VSAC Preferred Holders.

VSAC's Mr. Bilbao informed DigaComm of Mr. Seamons' approval. (A copy of this email is

attached as Exhibit 3.)

43.    In addition, Mr. Larschan told Mr. Tunick that the other VSAC Preferred Holders

would "follow the lead" of Mr. Seamons. Mr. Larschan emphasized that the approval provision

was not a problem because "you already have the votes."

44.    On the basis of Mr. Larschan's, Mr. Bilbao's, and Mr. Seamons' representations,

DigaComm entered into a letter agreement with VIP late in the day on March 30, 2007. (A copy

of this letter agreement is attached as Exhibit 4.)

45.    At all relevant times, GE approved of and was grateful for DigaComm's efforts in

bringing to its attention the VIP opportunity and understood that DigaComm would receive a

participation percentage for its efforts.

46.    On April 2, DigaComm coordinated a meeting in Memphis so that VSAC's

Preferred Holders could meet Mr. Hall of GE in person. Because of flight delays, Mr. Smith of

DigaComm was not able to make the initial meeting. Mr. Hall reported to him that the meeting had gone well. The VSAC Preferred Holders had believed GE to be too good to be true. Mr. Hall's understanding was that the VSAC Preferred Holders were very receptive to a deal with GE, and wanted to advance the deal by meeting with the GE licensing personnel who would also be involved in the joint venture.

47.    At no point during the April 2 meeting did VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, or Pittco Capital Partners II, LP, or any VSAC Preferred Holder ever disparage DigaComm's role in the GE/VIP transaction or inform DigaComm that the VSAC Preferred Holders had yet to approve its compensation.

48.    Mr. Smith's flight arrived in time for dinner in Memphis on April 2. That dinner was attended by Smith, Mr. Hall, Mr. Larschan, and J.R. "Pitt" Hyde III's representative Mr. Seamons. At no time during this dinner did Mr. Seamons question DigaComm's participation or inform DigaComm that the VSAC Preferred Holders had not yet approved the DigaComm letter agreement. Mr. Hall also told Mr. Smith that he had informed the VSAC Preferred Holders of the importance of DigaComm to the effort and had received no objections.

49.    On May 8, a second meeting was held in Memphis so that the VSAC Preferred Holders could meet the GE licensing people. Jonathan Tunick attended this meeting on behalf of DigaComm. At no point during this meeting did VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, or Pittco Capital Partners II, LP, or any VSAC Preferred Holder ever question DigaComm's role in the GE transaction or inform DigaComm that the VSAC Preferred Holders had yet to approve its compensation.

50.    The May 8 meeting was a success — the VSAC Preferred Holders decided to proceed with the GE joint venture.

51.    On June 12, 2007, John Hall contacted Mr. Smith and informed him that GE's law firm, Latham & Watkins, needed a copy of the DigaComm letter agreement so that they could write in DigaComm's compensation to the joint venture agreement. Mr. Smith obliged by sending Mr. Hall a copy of the DigaComm letter agreement with VIP. Mr. Smith's letter states "I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us." (A copy of Mr. Smith's letter is attached as Exhibit 5.)

52.    At no time did Mr. Larschan, VSAC, Mr. Seamons, Mr. Hyde, or any of VSAC's Preferred Holders object or inform Mr. Smith that the DigaComm letter agreement was invalid or that it had not yet been approved.

53.    Mr. Larschan did take action, however. Mr. Larschan directed VIP's lawyers to object to any inclusion of DigaComm in the joint venture documents. Upon information and belief, VSAC and its Preferred Holders authorized and/or approved of Mr. Larschan's action. At no point did anyone inform DigaComm that VIP was once again reneging on its promise to pay DigaComm.

54.    As far as DigaComm knew, the joint venture negotiations were proceeding smoothly. On several occasions, Mr. Smith contacted Mr. Larschan to check in. At no time did Mr. Larschan inform Mr. Smith that there was any problem with either DigaComm's contract or the GE deal as a whole.

12

55.   By mid-August, DigaComm was of the belief that the joint venture closing was imminent. On August 21, 2007, Mr. Smith wrote Mr. Larschan and Mr. Bilbao to congratulate them on closing the GE deal.

56.   On August 27, 2007, Mr. Smith again wrote Mr. Larschan to congratulate him on closing the GE deal.

57.   Mr. Smith received no response to his emails until September 6, 2007. On that day, Mr. Larschan dropped a bombshell: VIP was refusing to pay DigaComm because "a majority of the VSAC Preferred Holders had not approved the deal." He offered to pay DigaComm $250,000 for its efforts in securing a $4 billion opportunity with one of the world's largest companies.

58.   An angered Mr. Smith informed Mr. Larschan that he would contact GE and his litigation counsel about this unfortunate development.

59.   On September 7, 2007, VIP officially reneged on its obligations to DigaComm. In a letter of that day, Mr. Larschan informed Mr. Smith that,

> [o]n August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee. At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein. Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth herein. Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

(A copy of this letter is attached as Exhibit 6.)

13

60.    At no time prior to September 6, 2007, did anyone from VIP, VSAC, Mr.

Seamons, Mr. Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, or any VSAC

Preferred Holders ever inform anyone from DigaComm that the VSAC Preferred Holders had

not approved the DigaComm letter agreement.  To the contrary, VIP, VSAC, Mr. Seamons, Mr.

Hyde, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, and the other VSAC Preferred

Holders took pains to give DigaComm the illusion that everything was on track.

61.    DigaComm brings this action to recover damages equal to 5% of the value of the

joint venture's patent portfolio.

**COUNT I**
**(FRAUD)**

62.    DigaComm realleges and incorporates the allegations contained in paragraphs 1

through 61 above as if fully set forth herein.

63.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and

Pittco Capital Partners II, LP conspired with and aided and abetted VIP and Bradley Larschan to

defraud DigaComm out its compensation for facilitating a $4 billion joint venture between VIP

and GE.

64.    VIP and Mr. Larschan made material misrepresentations to DigaComm

concerning the status of its compensation in order to induce DigaComm to continue to facilitate

the GE transaction.  Upon information and belief, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital

Partners, LP, and Pittco Capital Partners II, LP authorized and/or approved of VIP's and Mr.

Larschan's misrepresentations.

14

65.    VIP and Mr. Larschan knew their statements were false at the time they made them.

66.    VIP and Mr. Larschan intended that DigaComm would rely on these misrepresentations.

67.    DigaComm relied on those misrepresentations.

68.    Mr. Seamons participated in the fraud and acted in furtherance of the conspiracy by indicating his approval of the DigaComm/VIP letter agreement and causing his approval to be communicated to DigaComm by VSAC's General Counsel, J. Raymond Bilbao. Upon information and belief, VSAC, its Preferred Holders, and Mr. Hyde authorized and/or approved Mr. Seamons' action.

69.    In addition, VSAC, Mr. Seamons, Mr. Hyde, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP participated in the fraud and acted in furtherance of the conspiracy by rejecting DigaComm's compensation in the face of Mr. Seamons' prior approval.

70.    While complete details of the conspiracy are exclusively within the knowledge and control of the conspirators, DigaComm is aware of the following facts giving rise to a strong inference of VSAC's, Mr. Seamons', Mr. Hyde's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's participation in a conspiracy to defraud DigaComm:

   (a)    The provision purporting to condition DigaComm's compensation on the approval of VSAC's Preferred Holders was an eleventh-hour addition to the DigaComm/VIP letter agreement.

   (b)    VIP's Mr. Larschan and VSAC's General Counsel, J. Raymond Bilbao, told DigaComm repeatedly that the approval condition "would not be a problem."

15

(c)     DigaComm was told that Mr. Seamons, on behalf of the 30% preferred interest holding in VSAC controlled by Mr. Hyde, approved of its fee and that the remaining VSAC Preferred Holders would follow Mr. Seamons' lead.

(d)     VSAC's Preferred Holders attended multiple meetings regarding the GE deal and at no time did they indicate that DigaComm's compensation should be rejected.

(e)     VIP claims that it recommended that VSAC's Preferred Holders approve DigaComm's compensation, demonstrating that DigaComm complied with its obligations.

(f)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP rejected DigaComm's compensation only months after Mr. Seamons had communicated their approval and in the face of repeated assurances that approval "would not be a problem."

(g)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP had no basis upon which to deny DigaComm its compensation.

(h)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $200 million.

71.     Mr. Hyde is liable for Mr. Seamons' actions in furtherance of the conspiracy to defraud DigaComm under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

72.     Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

73.     VIP and VSAC share a unity of interest such that their separate personalities no longer exist and VIP is, in reality, a sham for VSAC.

74.     While the complete details of the relationship between VIP and VSAC are exclusively within their possession and control and unavailable to outsiders like DigaComm, DigaComm is aware of the following facts indicating that VIP is the mere alter ego of VSAC:

16

(a)     VSAC owns 100% of the membership interests in VIP.

(b)     There is considerable overlap between the officers and employees of VIP and
VSAC. DigaComm is aware that J. Raymond Bilbao, VSAC's General Counsel,
is also an employee of VIP. In addition, DigaComm is aware that Andrew
Seamons is both the Chairman of VIP's Board and a representative of VSAC
Preferred Holders Pittco Capital Partners, LP and Pittco Capital Partners II, LP.
Upon information and belief, other officers and employees of VSAC are also
officers and employees of VIP.

(c)     VIP and VSAC currently share the office space at 5101 Wheelis Drive, Suite 100,
Memphis, Tennessee, 38117. Prior to September 2007, both VSAC and VIP
maintained offices at 3150 Lenox Park Boulevard, Suite 108, Memphis,
Tennessee, 38115.

(d)     VSAC dominates and controls VIP such that VIP lacks the authority to enter into
agreements without approval from VSAC and VSAC's Preferred Holders. For
example, VIP claims that it could not undertake the GE transaction without the
approval of VSAC and VSAC's Preferred Holders.

(e)     The GE/VIP joint venture was not finalized until after VSAC's Preferred Holders
blessed the GE personnel involved.

75.     Adherence to the fiction that VIP and VSAC are separate entities would sanction

a fraud and promote injustice.

76.     DigaComm believes that VSAC is liable for VIP's and Mr. Larschan's

misrepresentations under the doctrine of alter ego because VSAC and VIP have ignored the

formalities of separate corporate existence. But because the full details of VSAC's relationship

with VIP are uniquely within the knowledge of VSAC and VIP, DigaComm also alleges that

VSAC is liable for VIP's and Mr. Larschan's misrepresentations under the doctrine of direct

participation.

77.     VIP's failure to compensate DigaComm for its efforts in facilitating a $4 billion

transaction between VIP and GE can be traced directly to VSAC through the actions of VSAC's

Preferred Holders in rejecting DigaComm's compensation without justification.

17

78.     VSAC has interfered with VIP's operations in a way that far surpasses the control ordinarily exercised by a parent company as an incident of ownership. While the details of VSAC's interference in VIP's operations are within the exclusive knowledge and control of VSAC and VIP and are unavailable to an outsider like DigaComm, DigaComm is aware of the following facts strongly suggestive of undue interference by VSAC in VIP's operations:

(a)     VSAC and its Preferred Holders rejected DigaComm's compensation in the face of VIP's recommendation that DigaComm's compensation be approved.

(b)     VSAC and its Preferred Holders exercised continuous and direct supervision over the VIP/GE joint venture, including by attending meetings with GE representatives.

(c)     VSAC and its Preferred Holders had the ability to veto the GE joint venture at any time, regardless of VIP's desire to continue with the joint venture.

(d)     The GE/VIP joint venture was not finalized until after VSAC's Preferred Holders blessed the GE personnel involved.

79.     DigaComm seeks compensatory and punitive damages.

## COUNT II
## (TORTIOUS INTERFERENCE WITH THE MARCH 9, 2007 CONTRACT)

80.     DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

81.     DigaComm's March 9, 2007 agreement with VIP is a valid and enforceable contract.

82.     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP were aware of the March 9, 2007 agreement and were aware that it was a valid and enforceable agreement.

83.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP purposefully interfered with VIP's performance of the March 9, 2007 agreement.

84.    Upon information and belief, Mr. Hyde also used Pittco Capital Partners, LP and Pittco Capital Partners II, LP to interfere with DigaComm's contractual relationship with VIP.

85.    Mr. Hyde is liable for Mr. Seamons' interference under the theory of *respondeat superior*. Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

86.    Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

87.    VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference was done with actual malice. While the complete details surrounding the defendants' state of mind when they interfered with the March 9, 2007 agreement are peculiarly known to them and not to outsiders like DigaComm, DigaComm is aware of the following indicia of actual malice:

(a)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP interfered with the March 9, 2007 agreement even though that interference was opposed to their economic interests. All were aware that reneging on the March 9, 2007 agreement could cause GE to back out of the joint venture, thus upsetting a $4 billion opportunity.

(b)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP interfered with DigaComm's compensation weeks after authorizing and/or approving of their agent Mr. Larschan's agreement to pay DigaComm 5%.

19

(c)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP had no basis upon which to assert that DigaComm was not entitled to its agreed-upon compensation.

(d)    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $200 million.

88.    DigaComm has suffered damages as a result of VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference.

89.    DigaComm seeks damages in the amount of $200 million.

## COUNT III
## (TORTIOUS INTERFERENCE WITH THE MARCH 30, 2007 CONTRACT)

90.    DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

91.    DigaComm's March 30, 2007 letter agreement with VIP is a valid and enforceable contract.

92.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP were aware of the March 30, 2007 letter agreement and were aware that it was a valid and enforceable agreement.

93.    VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP purposefully interfered with VIP's performance of the March 30, 2007 letter agreement.

94.    Upon information and belief, Mr. Hyde also used Pittco Capital Partners, LP and Pittco Capital Partners II, LP to interfere with DigaComm's contractual relationship with VIP.

20

95.     Mr. Hyde is liable for Mr. Seamons' interference under the theory of *respondeat superior*.  Upon information and belief, Mr. Hyde is also liable as one of the partners of the Pittco entities.

96.     Upon information and belief, Mr. Seamons is liable as one of the partners of the Pittco entities.

97.     VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference was done with actual malice.  While the complete details surrounding the defendants' state of mind when they interfered with the March 30, 2007 letter agreement are peculiarly known to them and not to outsiders like DigaComm, DigaComm is aware of the following indicia of actual malice:

(a)     The provision purporting to condition DigaComm's compensation on the approval of VSAC's Preferred Holders was an eleventh-hour addition to the DigaComm/VIP letter agreement.

(b)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP interfered with the March 30, 2007 letter agreement even though that interference was opposed to their economic interests.  All were aware that reneging on the March 30, 2007 letter agreement could cause GE to back out of the joint venture, thus upsetting a $4 billion opportunity.

(c)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP attended meetings relating to the GE/VIP joint venture and at no point indicated that they felt that DigaComm's compensation should be rejected.

(d)     VIP claims that it recommended that VSAC's Preferred Holders approve DigaComm's compensation, demonstrating that DigaComm complied with its obligations.

(e)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP rejected DigaComm's compensation only months after Mr. Seamons had communicated their approval and in the face of repeated assurances by their agent Mr. Larschan that approval "would not be a problem."

(f)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP had no basis upon which to deny DigaComm its compensation.

(g)     VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP stand to profit handsomely off of their rejection of DigaComm's compensation since DigaComm stood to receive as much as $76 million.

98.     DigaComm has suffered damages as a result of VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's interference.

99.     DigaComm seeks damages in the amount of $76 million.

## COUNT IV
## (UNJUST ENRICHMENT)

100.     DigaComm realleges and incorporates the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

101.     DigaComm has conferred a benefit on VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP by alerting them to the possibility of a transaction with GE and by facilitating that transaction.

102.     Upon information and belief, the benefit bestowed upon Mr. Hyde flowed to him via his partnership interest in Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

103.     Upon information and belief, the benefit bestowed upon Mr. Seamons flowed to him via his partnership interest in Pittco Capital Partners, LP and Pittco Capital Partners II, LP.

104.     Instead of paying DigaComm its fair share of this windfall, VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital Partners, LP, and Pittco Capital Partners II, LP seek to retain the benefits of the GE joint venture for themselves.

105.    VSAC's, Andrew Seamons', J.R. "Pitt" Hyde III's, Pittco Capital Partners, LP's, and Pittco Capital Partners II, LP's retention of these benefits will result in an injustice.

106.    DigaComm seeks damages equal to 5% of the value of the joint venture's patent portfolio.

## PRAYER FOR RELIEF

WHEREFORE, DigaComm prays that it be awarded the following relief:

(a)     Damages against VSAC, Andrew Seamons, J.R. "Pitt" Hyde III, Pittco Capital
         Partners, LP, and Pittco Capital Partners II, LP in an amount to be determined at
         trial, but not less than $200 million;

(b)     A declaration that VSAC and VIP are alter egos and that VSAC is liable to
         DigaComm for VIP's conduct on alter ego grounds, or, in the alternative, that
         VSAC is liable for VIP's conduct under a direct participation theory;

(c)     Attorneys' fees and other costs of collection;

(d)     Prejudgment and postjudgment interest;

(e)     Punitive damages;

(f)     Such other relief as the Court deems appropriate.

## JURY DEMAND

DigaComm demands a jury trial for all issues so triable.

Respectfully submitted,

DigaComm, LLC

By: _____

One of its attorneys

Reed S. Oslan, P.C.
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Tel: 312/861-2157
Fac: 312/861-2200

08 C 338
JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT B

## Part 2 of 2

*eBay v. MercExchange:* More Than A Century of Precedent Casually Overturned

> "*[A]n inventor receives from a patent the right to
> exclude others from its use . . . . [T]he right can only
> retain its attribute of exclusiveness by a prevention of
> its violation. Anything but prevention takes away the
> privilege which the law confers upon the patentee.*"
> - Continental Paper Bag Co. v. E. Paper Bag Co. (1908)

> "*[T]he decision whether to grant or deny injunctive
> relief rests within the equitable discretion of the district
> courts. . . . [S]uch discretion must be exercised
> consistent with traditional principles of equity, in patent
> disputes no less than in other cases . . . .*"
> – eBay v. MercExchange (2006)

*By*
Bradley R. Larschan

## I.    INTRODUCTION

Some call it cryptic and sweeping.  Others find it unremarkable.  Many still
wonder to what degree it will change the property rights of inventors and patent owners
facing willful, recalcitrant and well-funded defendants.

Almost one year after the Supreme Court's terse decision in *eBay Inc. and
Half.com, v. MercExchange, L.L.C,*[1] more questions have been asked than answered
about the role of injunctive relief in patent infringement litigation, and whether the Court
casually overturned more than 100 years of precedent.

This paper begins with a discussion of the historical development of the issuance
of permanent injunctions in patent infringement cases.  It then goes on to review *eBay*
and the Supreme Court's holding that the four-factor test must be met for a permanent
injunction to issue.  Next, the discussion turns to two theories of the *eBay* decision –
whether the Court (1) was correct that the four-factor test has been historically applied
and the Federal Circuit Court of Appeals strayed or (2) overturned more than a century of
precedent.  The discussion then turns to argue that, as a result of *eBay*, district must
engage in a subjective analysis of whether a patent owner is 'good' or 'bad' before
applying the four-factor test, after which it considers the significant public policy
implications of *eBay*.  This paper concludes that *eBay* has profoundly altered the time-
tested balance of intellectual property rights established by the courts and the free market
with significant unintended consequences for a broad swath of patent owners.

---

[1] — U.S. —, 126 S. Ct. 1837 (2006).



## II.    SETTING THE STAGE

U.S. "patent law is the execution of a policy having its first expression in the Constitution"[2] which gives Congress the power and responsibility "to promote the progress of science and useful arts by securing for limited times to inventors the exclusive right to their respective discoveries."[3]  Congress promulgated the first patent law in 1790 and then, as today, "patents are contracts between the United States and the patentee".[4]  Patent rights are granted as consideration for the invention disclosure, not for the patentee's use of the invention.[5]  There is no requirement that the patentee make, use or sell a patented invention.[6]

Over time, a body of common law evolved[7] – guided in no small part by the Supreme Court – finding that a patent provides the patent owner the right to exclude others and, therefore, ordinarily affords plaintiffs the right to enjoin a defendant found to be willfully infringing one or more claims of a valid patent.[8]  Prior to *eBay*, "whenever

---

[2]  *Continental Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 424 (1908).

[3]  U.S. CONST., art. I, § 8, cl. 8. The Patent and Copyright Clause appears to have been first proposed in 1787 by James Madison and Charles Pinckney. In THE FEDERALIST NO. 43, Madison wrote:

> The utility of this power will scarcely be questioned. The copy right of authors has been solemnly adjudged in Great Britain to be a right at common law. The right to useful inventions, seems with equal reason to belong to the inventors. The public good fully coincides in both cases, with the claims of the individuals.

THE FEDERALIST NO. 43, at 217 (Madison) (Bantam Books ed., 1982).

The Patent and Copyright Clause appears to have been included in the Constitution without debate. *See* James Madison, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787 580-81 (1987).

[4]  *Rubbermaid Inc. v. Conitec Intern., Inc.*, 381 F. Supp. 666, 671 (D. Mo. 1974). *See also US v. Marifarms, Inc.*, 345 F. Supp. 858, 861 (D. Del. 1972) ("a patent is a contract between the inventor and the Government."); *Davis Airfoils v. US*, 124 F. Supp. 350, 351 (Ct. Cl. 1954) ("A patent is a contract between the inventor and the public . . . .").

[5]  *Woofter v. Carlson*, 367 F.2d 436 (Cust. & Pat. App. 1966), *quoting Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520 (2nd Cir. 1946) (L. Hand, J.).

[6]  *Continental* at 424-30. *See also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) ("There is no requirement in this country that a patentee make, use, or sell its patented invention.").

[7]  "But what are the rights of ownership? They are substantially the same as those incident to possession. Within the limits prescribed by policy, the owner is allowed to exercise his natural powers over the subject-matter uninterfered with, and is more or less protected in excluding other people from such interference. The owner is allowed to exclude all, and is accountable to no one." Oliver Wendel Holmes, THE COMMON LAW 246 (1881).

[8]  *See, e.g., Rite-Hite Corp., Id.* ("courts have in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest.").

There are public policy and equitable limitations to the grant of a permanent injunction. *See, e.g.,* note 54, *infra*. Moreover, the courts will not grant a permanent injunction where there is a plain and adequate

© 2007 by Bradley R. Larschan

this court has had occasion to speak, it has decided that an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[9]  As Chief Justice Marshall observed, "for his exclusive enjoyment of [the patent right] during that time, the public faith is pledged."[10]

But what precisely is the nature of a plaintiff's "right" to "exclude others" and exclusively enjoy a patent during its life?

This was at the heart of *Continental*, where the Court addressed the question of whether the plaintiff was entitled to an injunction where for 17 years it never put the invention into "effect or use" because it was more profitably used as a tool to block competition.  The defendant argued

it is contrary to equity to suppress a useful and established business, like that which the defendant is prosecuting with its paper bag machines, at the request of a complainant which simply owns one paper bag machine patent that has never been employed by that complainant in any way in any paper bag machinery, and because the complainant in this case has a plain, adequate, and complete remedy at law for any infringement which may have been done . . . .[11]

The defendant further argued that the district court lacked authority to issue the injunction because the statutory basis[12] for equitable relief was not met.[13]  Continental countered that it had the absolute right to use or not use its patent.

The Court began with an exploration of the nature of the right conferred upon patent owners, finding the Constitution and patent laws intended "to provide for an exclusive right to inventors to make, use, and vend their inventions."[14]  The Court noted that at the entry into force of the Constitution, only a remedy at law existed for patent infringement, but this was expanded in 1819 to encompass equitable relief.[15]  After a

---

remedy at law, such as where a patent has expired and "damages in money will afford complete relief". *American Safety Device Co. v. Kurland Chemical Co.*, 68 F.2d 734, 735 (2nd Cir. 1934).

[9]  *Continental* at 425.

[10]  *Id.*, citing with approval *Grant v. Raymond*, 6 Pet. 242, 243, 31 U.S. 218, 219 (1832).

[11]  *Continental* at 407.

[12]  The statute provided: "The several courts vested with jurisdiction of cases arising under the patent law shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent, . . . ." *Id.* at 423 (citing § 4921 (U. S. Comp. Stat. 1901, p. 3395)).

[13]  *Continental* at 423.

[14]  *Id.* at 424.

[15]  *Id.* at 424-25.

© 2007 by Bradley R. Larschan                                                    3

consistent series of cases,[16] by the time of *United States v. American Bell Telephone Co.*,[17] the Court found "the only effect of the patent is to restrain others from manufacturing and using that which he has invented."[18] The

> inventor could have kept his discovery to himself; but, to induce a disclosure of it, Congress has, by its legislation, made in pursuance of the Constitution, guaranteed to him an exclusive right to it for a limited time, and the purpose of the patent is to protect him in this monopoly ..... And it was pointed out that the monopoly which he receives is only for a few years. The court further said: 'Counsel seem to argue that one who has made an invention and thereupon applies for a patent therefor occupies, as it were, the position of a quasi trustee for the public; that he is under a sort of moral obligation to see that the public acquires the right to the free use of that invention as soon as is conveniently possible. We dissent entirely from the thought thus urged. The inventor is one who has discovered something of value. It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention.'[19]

In *Continental*, the plaintiff chose not to use the invention disclosed in its patent because it was more profitable to use its existing machinery than to build one covered by its patent rights. The Court found this not to be "unreasonable",[20] adding, "[a]s to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question

---

[16] *See, e.g., Grant v. Raymond*, 6 Pet. 242, 243, 31 U.S. 218, 8 L. ed. 384, 385 (1832) (Marshall, C.J.) ("The great object and intention of the [patent law] is to secure to the public the advantages to be derived from the discoveries of individuals; and the means it employs are the compensation made . . . by the exclusive right to make up and sell the things discovered for a limited time."); *Bloomer v. McQuewan*, 14 How. 539, 55 U.S. 539, 14 L. ed. 532 (1852) (Taney, C.J.) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."); *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878) ("It is true that letters-patent, pursuing the words of the statute, do, in terms, grant to the inventor, his heirs and assigns, the exclusive right to make, use, and vend to others his invention or discovery, throughout the United States and the Territories thereof."); *E. Bement & Sons v. National Harrow Co.*, 186 US 70, 91, 46 S. L. ed. 1058, 1068, 22 Sup. Ct. Rep. 747, 755 (1902) ("the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly . . . .").

[17] 167 U.S. 224 (1897).

[18] *Continental* at 424.

[19] *Id.*, quoting *American Bell*.

[20] *Continental* at 429.

of motive."[21]  The Court went on to observe that "[i]t is manifest . . . that Congress has not 'overlooked the subject of nonuser of patented inventions.'"[22]  In finding the Plaintiff was entitled to an injunction, the Court held:

> It hardly needs to be pointed out that the right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee. If the conception of the law that a judgment in an action at law is reparation for the trespass, it is only for the particular trespass that is the ground of the action. There may be other trespasses and continuing wrongs and the vexation of many actions. These are well-recognized grounds of equity jurisdiction, especially in patent cases . . . .[23]

Until *eBay*, the Court has not questioned the presumption that an injunction should issue against willful infringers absent special circumstances.[24]

### III.    THE EBAY DECISION

MercExchange successfully prosecuted a patent infringement suit in the US District Court for the Eastern District of Virginia against online auction giant eBay and its wholly-owned subsidiary, Half.com.[25]  The district court, however, denied MercExchange a permanent injunction barring the defendants from continuing to infringe the patent[26] and, instead, awarded a compulsory license to eBay, relying heavily on

---

[21]  *Id., citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 46 L. ed. 684, 22 Sup. Ct. Rep. 431 (1902).

[22]  *Continental* at 429.

[23]  *Id.* at 430.

[24]  *See, e.g., Dawson Chemical Co. v. Rohm & Hass Chemical Co.*, 448 U.S. 176, 215 (1980) ("the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ("The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent."); *Sears Roebuck Co. v. Stiffel Co.*, 376 U.S. 225, 229-30 (1964) ("The grant of a patent is the grant of a statutory monopoly; indeed, the grant of patents in England was an explicit exception to the statute of James I prohibiting monopolies. Patents are not given as favors . . . but are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention. During that period of time no one may make use, or sell the patented product without the patentee's authority."); *United Shoe Machinery Corporation v. U.S.*, 258 U.S. 451, 463 (1922) ("From an early day it has been held by this court that the franchise secured by a patent consists only in the right to exclude others from making, using, or vending the thing patented without the permission of the patentee. This definition of the rights of the patentee has been the subject of frequent recent decisions of this court, and has been approved and applied in [numerous cases]." (Internal citations omitted.))

[25]  275 F. Supp. 2d 695 (2003).

[26]  It should be observed that in refusing to grant injunctive relief, the district court failed to cite, much less distinguish, *Continental*. This is remarkable because, in explaining why MercExchange would not be irreparably harmed, the opinion stresses that the "plaintiff does not practice its inventions and exists merely

---

© 2007 by Bradley R. Larschan                                                    5

MercExchange's demonstrated willingness to license and lack of commercial activity using the patent. MercExchange appealed and the Federal Circuit Court of Appeals reversed, applying the "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances".[27]

In writing for a supposedly unanimous[28] Court, Justice Thomas not altogether correctly interprets the *Continental* case and breathtakingly all but ignores a long line of Supreme Court decisions consistent with the presumption that an injunction should issue absent special circumstances. Instead, the terse opinion begins by — *petitio principii* — citing 35 USC § 283,[29] under which district courts "may grant injunctions in accordance with the principles of equity" and then plows into a recitation of the well-settled four-factor test a plaintiff must ordinarily satisfy to receive a permanent injunction,[30] concluding that "[t]hese familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, 'a major departure from the long tradition of equity practice should not be lightly implied.'"[31]

_____

to license its patented technology to others." *Id.* at 712. Instead, the trial court relied heavily on *Foster v. American Machine & Foundry Co.*, 492 F.2d 1317 (2d Cir. 1974) in confining MercExchange to a legal remedy. *Id.* at 713. *Foster*, too, failed to distinguish – or even cite – *Continental* in concluding that "[t]o grant [the patentee] a compulsory royalty is to give him half a loaf. In the circumstance of his utter failure to exploit the patent on his own, that seems fair." *Foster*, 492 F.2d at 1324. It is difficult to reconcile this conclusion with *Continental*.

The Court addressed this issue more than a century ago. In *Hoe v. Knop*, 27 Fed. 204, 212 (N.D. Ill. 1886), the question was "whether the court will grant an injunction in favor of the owner of a patent who has not, after a reasonable time, put it into use, against another who is using it." It held that "under a patent which gives a patentee a monopoly, he is bound either to use the patent himself or allow others to use it on reasonable or equitable terms . . .." The *Continental* Court expressly rejected *Hoe's* dictum, stating: "If he [a patentee] see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own . . . his title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it." 210 U.S. at 425, *quoting Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. 288, 294-95 (6th Cir. 1896) ("The dictum found in [*Hoe*] is not supported by reason or authority.")

[27] 401 F. 3d 1323, 1339 (2005).

[28] Justice Alito did not participate.

[29] Section 283 of the Patent Act provides that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

[30] Justice Thomas wrote for the Court: "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 126 Sup. Ct. at 1838.

[31] *Id.*

© 2007 by Bradley R. Larschan

Once the Court assumed away more than a century of precedent, its holding is straight forward.[32] The courts below did not "fairly" apply the four-factor test so the case was remanded to the district court with the instruction that in determining whether or not an injunction should be issued "that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[33]

Complicating matters were two concurring opinions. The Chief Justice, joined by Justices Ginsburg and Scalia, observes that injunctive relief has been historically granted upon a finding of patent infringement "in the vast majority of patent cases" because of the "difficulty of protecting a right to exclude through monetary remedies."[34]

Justice Kennedy, joined by Justices Breyer, Stevens and Souter, suggests that patent cases should not fall outside the norm: "the lesson of the historical practice, therefore, is most helpful and instructive when the circumstances of a case bear substantial parallels to litigation the courts have confronted before."[35] But Justice Kennedy notes that the "nature of the patent being enforced and the economic function of the patent holder present considerations quite unlike earlier cases", taking a swipe at business method patents (which he criticizes for their "potential vagueness and suspect validity") and patent licensing and enforcement companies (that acquire patents merely to assert them).[36]

Thus, the unanimous opinion in *eBay* is also a 3-2-3 split, and one would be hard pressed to draw any broad, lasting conclusion … or even whether *Continental* is overturned.

IV.    DIFFERING INTERPRETATIONS

Since *eBay*, at least two principal interpretations have arisen with respect to the meaning and effect of the Court's holding.

---

[32] Justice Thomas also attempts to analogize patent and copyright law. While a critical analysis of this statement deserves academic scrutiny, it is beyond the scope of this paper. *See, generally,* Robert E. Thomas, *Vanquishing Copyright Pirates and Patent Trolls: The Divergent Evolution of Copyright and Patent Laws,* 43 AM. BUS. L.J. 689 (2006).

[33] 126 Sup. Ct. at 1841.

[34] *Id.* (Roberts, C.J., concurring).

[35] *Id.* at 1842 (Kennedy, J., concurring).

[36] *Id.*

© 2007 by Bradley R. Larschan

### A. The Four-Factor Test Has Been Applied All Along

The Court's opinion can be read to stand for the proposition that the four-factor test has historically been applied to justify the grant of a permanent injunction.

> These familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, "a major departure from the long tradition of equity practice should not be lightly implied." Nothing in the Patent Act indicates that Congress intended such a departure. To the contrary, the Patent Act expressly provides that injunctions "may" issue "in accordance with the principles of equity."[37]

So, it is the Federal Circuit Court of Appeals that strayed by routinely granting injunctive relief under a supposed

> "general rule," unique to patent disputes, "that a permanent injunction will issue once infringement and validity have been adjudged." The court further indicated that injunctions should be denied only in the "unusual" case, under "exceptional circumstances" and "'in rare instances . . . to protect the public interest.'" . . . [T]he Court of Appeals erred in its categorical grant of such relief.[38]

This interpretation is also urged by Justice Kennedy, who suggests in his concurring opinion that "[t]o the extent earlier cases establish a pattern of granting an injunction against patent infringers almost as a matter of course, this pattern simply illustrates the result of the four-factor test in the contexts then prevalent."[39]

But it is difficult to reconcile this position with precedent.[40]

---

[37] 126 Sup. Ct. at 1839 (internal citations omitted).

[38] *Id.* at 1841 (internal citations omitted).

[39] *Id.* at 1842 (Kennedy, J., concurring).

[40] It is interesting how consistently the Federal Circuit and other courts have applied this standard prior to *eBay*. In *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226. 1247 (Fed. Cir. 1989), the court noted

> Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property. "[T]he right to exclude recognized in a patent is but the essence of the concept of property". It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it. . . . This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm."

In *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1564 (Fed. Cir. 1984) the court stated:

© 2007 by Bradley R. Larschan

At the time of *Continental*, the patent law provided: "The several courts vested with jurisdiction of cases arising under the patent law shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent . . . ."[41]  The language is similar to today's law,[42] so it might be expected that the *Continental* Court would analyze a request for injunctive relief similarly to the *eBay* Court, although applying (as Justice Kennedy observed) then prevailing values and standards.  In *Continental*, however, the Court stated:

> It may be well . . . to consider what rights are conferred upon [the patent owner]. The source of the right is, of course, the law, and we are admonished at the outset that we must look for the policy of a statute, not in matters outside of it,-not to circumstances of expediency and to supposed purposes not expressed by the words. The patent law . . . provide[s] for an exclusive right to inventors to make, use, and vend their inventions. In other words, the language of complete monopoly has been employed; . . . [It is] a right so explicitly given and so complete that it would seem to need no further explanation than the word of the statute. . . . [T]he only effect of the patent is to restrain others from manufacturing and using that which he has invented. . . . and the purpose of the patent is to protect him in this monopoly . . . . It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention."[43]

---

Since Nyman neither makes nor sells the infringing display racks, the district court's injunction gives Trans-World no meaningful relief. [The Patent Law] authorizes district courts to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." Although a district court has discretion whether to enter an injunction, the exercise of this discretion cannot be arbitrary. A patent gives "the right to exclude others from making, using or selling the invention." (Internal citations omitted.)

*See also Connell v. Sears Roebuck & Co.*, 722 F.2d 1542 (Fed. Cir. 1983) ("the right to exclude recognized in a patent is but the essence of the concept of property."); *Smith Intern., Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed. Cir. 1983) (grant of patent is grant of right to invoke the state's power to order to exclude others from utilizing patentee's discovery without his consent).

[Cite other cases from Federal Circuit and its predecessor.]

[41] *Continental* at 423.

[42] 35 U.S.C. § 283, which provides: "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

[43] *Continental* at 424.

© 2007 by Bradley R. Larschan                                                      9

In *Continental*, the defendant pointed out that the plaintiff held the patent for 17 years and did not use it in its business, even though it could have, arguing that

> it is contrary to equity to suppress a useful and established business, like that which the defendant is prosecuting with its paper bag machines, at the request of a complainant which simply owns one paper bag machine patent that has never been employed by that complainant in any way in any paper bag machinery . . . .[44]

The Court flatly rejected this contention. Even if the patent owner held the patent for its full life and never put it into "use or effect", this was its absolute right. "As to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."[45]

The *Continental* Court found the remedy for willful violation of a patent owner's rights lies in equity, not law, and that an injunction should issue as a matter of course unless equity demands otherwise – for example, if outweighed by the public interest.[46]

There is no hint – not even a morsel – the *Continental* Court believed the nature of the patent right is anything other than a "complete monopoly".[47] The Court noted the competitive relationship between the parties but did not rely upon it to declare the patent owner's right is "to restrain others from manufacturing and using that which he has invented." The patent is its "absolute property" and "the purpose of the patent is to protect him in this monopoly . . . ." The Court expressly rejected the defendant's argument that the plaintiff "has a plain, adequate, and complete remedy at law for any infringement which may have been done . . . ."[48] Even though monetary damages are available, the Court would not withhold issuing an injunction because "an inventor receives from a patent the right to exclude others from its use . . . . [T]he right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee."[49]

---

[44] *Id.* at 407.

[45] *Id.* at 429.

[46] Another ground might be that the infringement is too "trifling". *Condenser Corp. of America v. Micamold Radio Corp.*, 145 F.2d 878, 880 (2nd Cir. 1944).

[47] The monopoly created by a patent is an exception to the general rule against monopolies. *Commissioner of Patents v. Deutsche Goldund-Silber-Scheideanstalt Vormals Roessler*, 397 F.2d 656, 663 (D.C. Cir. 1968).

[48] *Continental* at 407.

[49] *Id.* at 430.

© 2007 by Bradley R. Larschan                                    10

B. Only Plaintiffs That Make Or Sell Something Are Entitled To An Injunction

Perhaps the most widely held interpretation of *eBay* is that it requires a plaintiff — as a threshold equitable consideration — must make or sell a directly competitive product or service to be entitled to an injunction upon a district court's finding of willful infringement.

The *eBay* opinion observes that "the Patent Act also declares that 'patents shall have . . . the right to exclude others from making, using, offering for sale, or selling the invention'."[50] But this right is overarched by the application of equitable principles. The Court rebukes the district court, which

> adopt[ed] certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases. Most notably, it concluded that a "plaintiff's willingness to license its patents" and "its lack of commercial activity in practicing the patents" would be sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue.[51]

In criticizing the district court's exclusion of a "broad swath of cases" because "some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves",[52] the Court appears to be signaling that it is not only acceptable but required that the district courts engage in a subjective inquiry into the identity and nature of the patent owner. 'Good' "patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so."[53] 'Bad' patent owners, presumably, cannot. This is a sharp break with precedent. Courts have historically questioned whether patents have been asserted unreasonably[54] but no Court has

---

[50] 126 Sup. Ct. at 1840 (internal citations omitted).

[51] *Id.* The district court also relied principally on *Foster* with regard to the balance of hardships when it wrote: "Any harm suffered by the plaintiff, by the defendants' infringement of the patents, can be recovered by way of damages." *Foster*, 275 F. Supp. 2d at 714. Thus, the first three factors relevant to equitable relief seem ultimately to have collapsed into one.

[52] 126 Sup. Ct. at 1840.

[53] *Id.*

[54] *See, e.g., Continental,* 210 U.S. at 429, *passim.* Courts have also held that patent misuse may result in forfeiture of all rights. *Morton Salt Co. v. G. S. Suppiger Co.,* 314 U.S. 488 (1942) (conditioning patent use on purchase of unpatented supplies); *Brulotte v. Thys Co.,* 379 U.S. 29 (1964) (conditioning use on agreement to pay royalties beyond patent term). In some circumstances, compulsory licensing may be ordered. *United States v. Glaxo Group Ltd.,* 410 U.S. 52, 59 (1973) (compulsory licensing is a "well

© 2007 by Bradley R. Larschan

11

previously distinguished between socially acceptable (*e.g.*, university researchers) and socially unacceptable patent owners (*e.g.*, the poor and most of the middle class).[55] Indeed, the *Continental* Court expressly stated that "exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, *without question of motive.*"[56]

Notwithstanding the Court's statement that "a major departure from the long tradition of equity practice should not be lightly implied" – the Court does precisely this by breaking with precedent in finding that remedies at law (rather than equity) are henceforward the norm. This is where the Court's opinion begins and ends – that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[57]

Since *eBay*, at least 14 patent infringement decisions have been rendered and the district courts have granted injunctive relief only where plaintiffs make or sell a directly competitive product or service.

1.  Denial of Injunction

District courts have denied plaintiff's motion for injunction in the following four cases where plaintiffs did not make or sell a product or service in direct competition with the defendant.

In *z4 Technologies v. Microsoft Corporation and Autodesk, Inc.*,[58] after the jury found that the patents were willfully infringed by Microsoft, the court was the first after *eBay* to apply the four-factor test, and it denied z4's motion for a permanent injunction finding z4 failed to meet each prong of the four-factor test.

---

established form[] of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation adjudicated.").

[55]  Consider, for example, the situation of a widow whose inventor-husband was issued a patent ten years before his death. Because of lack of the financial wherewithal to engage in patent litigation – which by any standard is very expensive – certain companies willfully and widely infringed the patent, knowing that it would be unlikely the patent would be enforced against them. If the widow attempts to enforce the patent, she will face deep-pocketed defendants who have profited from infringing her patent – without her ability to obtain an injunction – are able to raise the financial stakes, delay the proceedings and engage in appeals to stretch out the process.

[56]  210 U.S. at 429 (emphasis supplied), *citing Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540 (1902).

[57]  126 Sup. Ct. at 1841.

[58]  434 F. Supp.2d 437 (E.D. Tex. Jun 14, 2006).

© 2007 by Bradley R. Larschan

The patentee argued that infringement of a patent created a rebuttable presumption of irreparable harm. The district court dismissed this argument as lacking precedential foundation, citing the Supreme Court's decision in *Amoco Production Co. v. Village of Gambell*[59] for the proposition that a presumption of irreparable harm in the context of an injunction hearing is "contrary to traditional equitable principles." Since z4 did not create any products, the court found that the first factor weighed in favor of the willful infringer.

The court looked to Justice Kennedy, whose concurring opinion in *eBay* contemplated the situation where a "patented invention is but a small component of the product the companies seek to produce". In such a situation, "legal damages may well be sufficient to compensate for the infringement . . . ." Here, product activation is a very small component of the Microsoft Windows and Office software products that the jury found to infringe z4's patents. It did not relate to the software's core functionality. Moreover, Microsoft argued that its new Vista software will not utilize the infringing components. Thus, any ongoing royalty would only last for a couple of years. The court found that monetary damages were sufficient to compensate for any future infringement.

Microsoft argued that it would be enormously difficult and expensive to redesign even a small component of Microsoft office, and such an effort would delay release of its non-infringing Vista product. The court found that the balance of the hardships weigh in favor of Microsoft.

Microsoft's infringing products are widely used by individuals, businesses, institutions and the government. The court found that "any minor disruption to the distribution of the products in question . . . would have an effect on the public due to the public's undisputed and enormous reliance on these products. . . . Although these negative effects are somewhat speculative, such potential negative effects on the public weigh, even if only slightly, against granting an injunction."

In *Finisar Corp. v. The DirecTV Group, et al.*,[60] after finding willful infringement, the court denied Finisar's motion for a permanent injunction. The court found there was no irreparable harm because Finisar never sold the rights to the patent or made an attempt to practice the patented technology. The court held that a compulsory license would adequately compensate Finisar for DirecTV's future infringement. Weighing the balance of hardships and the public interest, the court noted that consumer satellite television is a two-competitor market. An injunction could have put DirecTV out of business and created a monopoly. Furthermore, the court noted that an injunction would negatively affect thousands of DirecTV employees, and 15 million DirecTV subscribers could lose their television service. The court concluded the balance of the hardships favored DirecTV and the public was best served by denying an injunction.

---

[59] 480 U.S. 531 (1987).

[60] 2006 WL 2699732 (E.D. Tex. Aug 04, 2006).

© 2007 by Bradley R. Larschan

13

In *Voda v. Cordis Corp.*,[61] after a jury found willful infringement of the plaintiff/inventor's patents concerning an angioplasty guide catheter and technique for using it,[62] the court denied plaintiff's request for a permanent injunction. The court found that the plaintiff failed to establish either irreparable injury or that monetary damages were inadequate. In rejecting the argument that irreparable harm is presumed upon establishing validity and infringement, the court observed that this argument "runs afoul of the Court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief."[63] The court characterized the alleged harm to plaintiff's exclusive licensee, non-party Scimed, as "irrelevant because Scimed elected not to sue to enforce the patent rights."[64] Finally, the Court held the damage to plaintiff's relationship with his exclusive licensee was insufficient to establish that money damages were inadequate.

In *Paice, LLC v. Toyota Motor Corp.*,[65] the court denied the plaintiff's motion for a permanent injunction after a jury found three of the defendant's hybrid vehicles infringed (but not willfully) three patents. The court applied the four-factor test, finding that the plaintiff failed to establish irreparable harm, that no presumption of such harm follows automatically from a finding of infringement, and that plaintiff's losses can be remedied by money damages in accordance with the reasonable royalty rate found by the jury.

The plaintiff unsuccessfully argued that lack of an injunction caused the failure of its licensing program. The court found no evidence to support this in the record, but that other reasons, such as plaintiff's "misrepresentations and improper business tactics," might have been factors.[66] Additionally, "because Plaintiff does not compete for market share with the accused vehicles, concerns regarding loss of brand name recognition and market share … are not implicated."[67]

The plaintiff failed to show the inadequacy of monetary damages because it (a) did not demonstrate why other potential licensees would be less likely to take a license absent an injunction; (b) the infringed claims relate only to a small part of the overall vehicle; and (c) the defendant was offered a license throughout the post-trial motions stage of the case.

---

[61] 2006 WL 2570614 (W.D. Okl., Sept. 5, 2006).

[62] The jury awarded "a reasonable royalty of 7.5% of defendant's gross sales of the infringing catheters." *Id.* at 1.

[63] *Id.* at 5.

[64] *Id.*

[65] 2007 WL 2385139 (E.D. Tex. Jan 22, 2007).

[66] *Id.*

[67] *Id.*

© 2007 by Bradley R. Larschan

The balance of hardships weighed against an injunction because the impact an injunction would have on defendant's business and reputation, and that of related businesses (*e.g.*, dealers and suppliers). On the other hand, the lack of an injunction would have little impact on plaintiff's licensing program.

### 2.   Granting of Injunction

District courts have granted plaintiff's motion for injunction in the following 10 cases where plaintiffs did make or sell a product or service in direct competition with the defendant.

In *Wald v. Mudhopper Oilfield Services, Inc.*,[68] the court issued a permanent injunction, following the jury's finding that the defendant's products willfully infringed plaintiff's patented oil well treatment technology. The court found irreparable harm and inadequate remedies at law because, in addition to lost sales, plaintiff lost market share and the opportunity to maintain its own product as the industry standard. Moreover, the plaintiff alleged that because of the infringement, its "reputation for innovation" was damaged.[69] The balance of hardships and public interest both favored the plaintiff, as the plaintiff bore "the risk of future infringement, while there appears to be no harm to Defendants or the public's interest resulting from an injunction."[70]

In *TiVo, Inc. v. Echostar Communications Corp.*,[71] the court granted TiVo a permanent injunction.[72] At issue were Echostar's digital video recorders (DVRs), which the jury found willfully infringed TiVo's patents.

Applying the four-factor test, the court found a permanent injunction was appropriate, holding that TiVo established both irreparable harm and its remedy at law was inadequate because Echostar competes directly with TiVo. Because of this direct competition, TiVo could suffer a loss of market share at a critical time in the development of the nascent DVR market and it may not have the opportunity to recapture market share later. Since TiVo is a relatively new company with only one primary product, that loss of market share would cause severe injury that could not be remedied by monetary damages. The court found irreparable harm because "[t]he availability of the infringing products leads to loss of market share for Plaintiff's products."[73] The court

---

[68] 2006 WL 2128851 (W.D. Okl. July 27, 2006).

[69] *Id.* at 5.

[70] *Id.*

[71] 446 F. Supp. 2d 664 (E.D. Tex. 2006).

[72] The Federal Circuit has since entered an order staying the injunction pending resolution of Echostar's appeal.

[73] *Id.* at 669.

© 2007 by Bradley R. Larschan

found the balance of hardships weighed in favor of an injunction because the impact on TiVo of Echostar's infringement would be proportionately greater than the impact of an injunction on Echostar's business (satellite transmission), the core of which was not DVR-based. Finally, the public interest "would not be disserved by a permanent injunction" since the public "has an interest in maintaining a strong patent system";[74] moreover, the infringing products are used for entertainment, not public health or a similar key interest.

In *3M Innovative Properties Co. v. Avery Dennison Corp.*,[75] the court granted 3M's request for a permanent injunction. At issue was Avery's EZ Series Fleet Marketing Film used for advertising on vehicles. The court previously granted and modified a permanent injunction against Avery before the *eBay* decision. After *eBay*, the court vacated its earlier orders and again granted a permanent injunction. The court held 3M suffered irreparable injury and money damages were inadequate based on 3M's longstanding litigation and refusal to license the patents to Avery.[76] The court also held the balance of hardships favored an injunction "its right to exclude … for more than 20 percent of the limited lifetime of this patent."[77] The court found the public interest would not be disserved by a permanent injunction because the case involved commercial graphics used for advertising, and did not present concerns about public health or safety.

## NEED TO DETERMINE WHETHER (1) INFRINGEMENT WAS WILLFUL AND (2) 3M MADE A COMPETITIVE PRODUCT. ASK FISH.

In *Rosco, Inc. v. Mirror Lite Co.*,[78] the court granted an injunction following a finding that Rosco infringed Mirror Lite's patented mirror technology. The court rejected Rosco's argument an injunction was unnecessary because Rosco had stopped manufacturing the infringing products, noting that an injunction should be denied only when "the evidence is very persuasive" that there will never be any future infringement. A defendant's promise to cease is not enough. The court noted that because the parties were direct competitors and Mirror Lite manufactured a mirror covered by its patent, a mandatory licensing scheme would not adequately compensate Mirror Lite.[79] The court found there would be no harm to the public, which could purchase mirrors from Mirror Lite instead of Rosco.

---

[74] *Id.* at 670.

[75] 2006 WL 2735499 (D. Minn. Sept. 25, 2006).

[76] "3M has spent nearly five years litigating to protect its interest in this patent and has consistently refused to execute a licensing agreement with Avery. Having lost at trial, Avery wants to force 3M to grant a license that 3M refused to grant before trial. The Court will not disturb 3M's determination that its business interests will not be served by the licensing of this product." *Id.* at 1.

[77] *Id.* at 2.

[78] 2006 WL 2844400 (E.D.N.Y. Sept. 29, 2006).

[79] *Id.* at 5.

© 2007 by Bradley R. Larschan                                                    16

In *Visto Corp. v. Seven Networks, Inc.*,[80] the court granted Visto's motion for permanent injunction.[81] Three products were found to willfully infringe each of the three patents at issue.

The court noted that the parties are direct competitors in the mobile email market and, even though other companies also competed in the same market space, "this fact weighs heavily in the court's analysis. Intellectual property enjoys its highest value when it is asserted against a direct competitor in the plaintiff's market."[82]

Visto demonstrated the inadequacy of legal remedies, even though the jury made a large damage award. While "[t]hose damages . . . are designed to compensate Visto fairly and reasonably for its past injury . . . future damages may compensate Visto [only] for an *approximate* loss . . . ."[83] A royalty based on future sales is not "adequate in the sense that they are a suitable proxy for injunctive relief. What makes legal remedies inadequate under the circumstances of this case is the inability to calculate the plaintiff's future losses with precision. An injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement."[84] Thus, an injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement.

In *Smith & Nephew, Inc. v. Synthes (U.S.A.)*[85] the court issued a permanent injunction after finding infringement by two of Synthes' products used to treat orthopedic fractures. The court found that Smith & Nephew proved irreparable harm by showing flattening sales growth "attributable to a decreased ability to compete in the market",[86] significant sales of Synthes' infringing products,[87] competition between the two companies' products that inhibits the plaintiff's ability to develop customer relationships and new products, and loss of market share and brand recognition. The court held remedies at law were inadequate because of the inherent uncertainty in proving lost sales damages in a multiple-supplier market, because intangible damage to goodwill and brand

---

[80] 2006 WL 3741891 (Dec. 19, 2006).

[81] The court, however, stayed the injunction pending appeal because "Visto's attorneys violated the Protective Order in this case and then attempted to conceal those violations." *Id.* at 1.

[82] *Id.* at 4 (*citing Tivo* at 669).

[83] *Id.* at 4.

[84] *Id.*

[85] 466 F. Supp. 2d 978 (W.D. Tenn. 2006).

[86] *Id.* at 983.

[87] The court found no support for "Synthes' assertions that Smith & Nephew has not been irreparably harmed because of the limited competition between the primary Smith & Nephew product covered by the . . . [patents] and the infringing products made by Synthes." *Id.*

© 2007 by Bradley R. Larschan

recognition "can never be ascertained accurately," and because future damages would not adequately remedy against future infringement of the right to exclude.[88] The court held the balance of hardships favored an injunction because the only hardship Synthes showed was its inability to continue infringing. The court held the public interest in protecting patent rights favored an injunction because other sources of similar products exist, and because the court found no evidence of "undisputed and enormous public reliance on [the infringing] products."[89]

In *Sundance, Inc. v. DeMonte Fabricating Ltd.*,[90] the patentee relied on the harm to its non-exclusive licensees that directly competed with the infringer. The court denied the injunction and used the patentee's licenses as a basis for finding monetary damages were adequate compensation.

In *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*,[91] the court found that the structure on the Development Driller rigs infringed the apparatus claims of Transocean's patents, that Transocean makes and markets deep water drill rigs equipped with the patented structure, that the customer base for deep water drill rigs is small and that GSF has not only used the Development Driller rigs equipped with the infringing structure to compete for the same customers and contracts as Transocean, but also to win contracts over competing bids from Transocean.

In finding the plaintiff would be irreparably harmed, the court observed that "[s]ince a patent grants the right to exclude others from practicing the invention, the right to exclude remains a relevant issue for courts to consider when weighing the equities for and against an application for permanent injunction."[92] Here, the parties competed for the same customers in the deepwater rig market. In a clear indication of its reasoning, the court noted that "GSF has not cited any case in which a continuing infringer in direct competition with a patent holder has not been permanently enjoined from using the patented invention to compete against the patent holder."[93]

The court found that the infringement was "not small components of those rigs but, instead, structures that are related to the rigs' core functionality."[94] The court went on to state that this was not a case where

---

[88] "The loss of market share and the resulting lost profits and loss of brand name recognition which Smith & Nephew suffered because of Synthes' continued sale of the infringing products constitute injuries that are both incalculable and irreparable." *Id.*

[89] *Id.* at 985.

[90] 2007 WL 37742 (E.D. Mich. Jan. 4, 2007).

[91] 2006 WL 3813778 (S.D.Tex. Dec. 27, 2006).

[92] *Id.* at 3.

[93] *Id.*

[94] *Id.* at 5.

© 2007 by Bradley R. Larschan

# Exhibit A
# Part 4

monetary damages would be sufficient to compensate Transocean for GSF's future infringement because that infringement relates only to a "small component" of the Development Driller rigs. Nor is the court persuaded that the mere fact that Transocean is willing to consider licensing its invention to GSF and others on "fair grounds" [ ] sufficient to defeat Transocean's request for a permanent injunction.[95]

In *MPT, Inc v. Marathon Labels, Inc.*,[96] the court found that the patented invention "has broad patent protection that reads directly upon" the infringing product.[97] In its analysis of the four-factor test, the court found that

monetary damages are not adequate to compensate for MPT's injury. Royalties will not stop the erosion of [plaintiff's] market. Another market entrant is likely to lead to a drop in prices, thus reducing MPT's royalties from Defendants and . . . profits. Allowing Marathon to sell the Smart Surface Placard in the United States market will also damage MPT in that all placards have previously been provided by MPT. This implicates a significant impact on MPT's commercial reputation.[98]

In granting a permanent injunction, the court found irreparable injury because the plaintiff had "established a strong market position and customer goodwill" and that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."[99]

In *Verizon Services Corp. v. Vonage Holdings Corp.*, the court granted a permanent injunction where Vonage was found to infringe seven Verizon patents at issue cover several technologies that are essential for successfully implementing a commercial Voice over Internet Protocol ("VoIP") telephone service. The patents were in three general categories: (1) two network patents (commercial scale VoIP telephony), (2) a public wireless/cordless handset patent and (3) four feature patents (*e.g.*, voicemail in VoIP).

---

[95] *Id.*

[96] 2007 WL 184747 (N.D. Ohio Jan. 19, 2007).

[97] *Id.* at 14.

[98] *Id.* at 15.

[99] *Id.* at 14, *quoting Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992).

© 2007 by Bradley R. Larschan

### 3. Reading the Tea Leaves

In the post-*eBay* cases in which an injunction has been sought after a finding of willful infringement, the injunction has been issued in at least 10 cases. Although the four-factor test weighs facts specific to each case, in every instance where the plaintiff had a directly competitive product or service to that which was found to willfully infringe, the courts have issued an injunction; conversely, if the plaintiff did not have a directly competitive product or service, no injunction was issued. In the only case in which a self-made inventor was the plaintiff, he inexplicably failed to cite this as a basis for seeking a permanent injunction.[100] Thus, the district courts appear to believe that *eBay* requires that a patent owner must make, use or sell a directly competitive product or service in order to be eligible for the grant of a permanent injunction. Whether and under what circumstances 'good' plaintiffs such as "university researchers and self-made inventors"[101] may be granted permanent injunctions has not yet been settled.

## V.    PUBLIC POLICY CONCERNS

In rejecting the time-tested balance of intellectual property rights, the *eBay* decision is likely to have significant, long-lasting unintended consequences.

As a threshold matter, in determining whether a plaintiff is eligible for a permanent injunction, the district courts must consider the *owner* of a patent rather than the *right the patent confers*. District courts must now ascertain whether the plaintiff is 'good' or 'bad', with the result that the latter are no longer eligible to be granted permanent injunctions whereas the former may be. A corollary of this is that a broad swath of plaintiffs' economic rights have been diminished – perhaps greatly – as a consequence of *eBay*. It is also likely that *eBay* will encourage willful infringement, since permanent injunctions will no longer issue unless, at a minimum, the patent owner is either (1) 'good' *or* (2) not 'bad' *and* makes, uses or sells a directly competitive product or service. Further, this broad swath of plaintiffs have lost their right to decide whether or not to license their property, or to whom to grant a license.[102] Finally, *eBay*

---

[100] *Voda*, 2006 WL 2570614 at 5. The court rejected the plaintiff's argument that "irreparable harm is presumed whenever validity and continuing infringement have been established" noting that it "runs afoul of the court's reasoning in *eBay* where the Court clearly held the right to exclude does not, standing alone, justify a general rule in favor of injunctive relief." *Id.* Perhaps with *eBay* in mind, the court went on to note that "plaintiff identifies no harm to himself; rather, he relies on alleged harm to a non-party, Seimed." Perhaps critically to the case's outcome, this third party, who was the plaintiff's exclusive licensee, "elected not to sue to enforce the patent rights. As patents have 'the attributes of personal property', the person seeking a permanent injunction must demonstrate harm from infringement of those rights that is personal as well." *Id.*

[101] *eBay*, 126 Sup. Ct. at 1840.

[102] In this sense, patents have been carved out as a unique type of property. Consider, for example, the result if *eBay* were applied to real property. Instead of a willful trespasser being enjoined from further trespassing, the courts would limit a broad swath of land owners to money damages. In other words, the very notion of the exclusive use of real property would be substantially altered.

© 2007 by Bradley R. Larschan                                                      20

right owners,[108] turning U.S. patent law on its head. Consider the case of the university researcher who is granted a patent and the patent is willfully infringed by Company A. The Court suggests that this patent owner may be eligible to obtain a permanent injunction. However, rather than endure the distraction and bear the expense of protracted patent litigation, our university researcher exclusively assigns (for 50% of the royalties) the patent to an individual whose sole interest is to enforce the patent right. This patent owner brings the suit the university researcher could not afford. This new patent owner is probably not eligible to obtain a permanent injunction. Before the district court renders a decision, this individual sells the patent to Company B, which makes a directly competitive product to Company A. Company B obtains a judgment for damages and seeks a permanent injunction, which is granted. Company C, which is a patent troll, then purchases the patent from Company B, whereupon Company A appeals the permanent injunction. Does the Federal Circuit vacate the injunction?

Where does *eBay* leave the typical inventor, whom the patent law is meant to encourage and protect in his innovation? The Court clearly views "self-made inventors" as 'good' patent owners who could be entitled to permanent injunctions if they elect to prevent others from infringing their property rights.[109] 'Self-made' inventors are, by definition,[110] financially successful. But is it because they have sufficient funds to bring a very costly patent infringement suit that they are eligible for a permanent injunction? What of the vast majority of inventors who (in this author's experience) typically deplete whatever financial resources they had available to perfect and patent an invention? By definition, this inventor is not 'self-made', nor is he capable of financing a patent infringement suit. If this inventor assigns his patent to a patent troll to enforce his rights, it appears under *eBay* the patent troll may no longer be eligible for an injunction.[111] Does *eBay* mean that "self-made inventors" like Alexander Graham Bell, Thomas Edison, Henry Ford and others are eligible for permanent injunctions because of their wealth, but

---

[108] Query whether the Court will seek to distinguish between families that own land to farm and land speculators or investors who own stock in a company and those who own derivatives? Where does the Court's analysis take us if district courts are to examine who owns a property right rather than what the property right confers?

[109] These "self-made inventors[ ] might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test . . . ." 126 Sup. Ct. at 1840. *But cf. Voda* (where an apparently self-made inventor was denied a permanent injunction). As discussed previously, *eBay* and *Voda* can be reconciled because the plaintiff/inventor did not attempt to assert irreparable harm to himself but, rather, to his exclusive licensee; however, the licensee never asserted its claims to damages. *Voda*, 2006 WL 2570614 at 5. Nevertheless, the district court's reasoning does not appear to indicate the plaintiff/inventor would have prevailed had he pleaded personal irreparable injury.

[110] Self-made is defined as: "having achieved success or recognition by your own efforts; 'a self-made millionaire'". *WordNet® 2.1*, Princeton University (2005); "Having achieved success or recognition by one's own efforts: *a self-made millionaire*. THE AMERICAN HERITAGE® DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

[111] What if the patent troll merely finances the inventors patent infringement suit in exchange for 99% of the inventor's recovery? Would the inventor be eligible for a permanent injunction?

© 2007 by Bradley R. Larschan

the great main stream of inventors – the nameless *hoi polloi* who are the majority of inventors – are not?

By focusing on the *owner* of the patent rather than the *right the patent confers* the Court has opened up Pandora's box.

### The Economic Rights of Most Patent Owners Have Been Diminished

The *eBay* decision has diminished the economic rights of many – perhaps most – patent owners.

In its attempt to thwart patent trolls,[112] the Court altered the balance of rights between a broad swath of patent owners and patent infringers. Absent a permanent injunction, a willful infringer now has little motivation to enter into a license agreement with a patent owner. The more fundamental the nature of the invention, the more core it is to the willful infringer's product and the greater profit the infringer derives from the invention, after *eBay* the less motivation it has to settle. After all, the infringer's damages are limited to a "reasonable royalty" (under *Georgia Pacific*[113]). Why would a defendant pay a reasonable royalty if its downside risk is to pay the same royalty after an adverse decision, exhaustion of appeals and the passage of several years (during which the infringer might wear down the plaintiff sufficiently to settle for less than a reasonable royalty)?[114]

A corollary of this is that *eBay* will embolden companies to infringe patent rights of the poor, most of the middle class,[115] 'bad' and non-competitor patent owners because permanent injunctions are likely not to issue. Willful infringers can readily assume that poor and many middle class patent owners do not possess the financial means to engage in very costly patent litigation and appeals. Heretofore, these patent owners could have assigned their patents to individuals or companies with the means to enforce their rights (including patent trolls); however, these individuals and companies are now 'bad' patent

---

[112] "An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent." 126 Sup. Ct. at 1842 (Roberts, J., concurring).

[113] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971) (setting forth 15 historical factors which have been repeatedly invoked in subsequent cases to determine "supposititious" licenses).

[114] In reality, a large company will look at the cost of litigation and conclude it is cheaper to pay $1-$2 million a year to keep a patent suit going rather than pay the reasonable royalty.

[115] These patent owners typically do not have the financial wherewithal to enforce their rights through litigation – which, by all accounts, is among the most expensive civil litigation brought in the courts today – because of the defendants' ability to increase costs and drag out the appeals process. In practice, the less financially able a patent owner, the more motivated the defendant is to exhaust its legal options.

© 2007 by Bradley R. Larschan    23

owners and no longer eligible for permanent injunctions. Thus, poor and many middle class patent owners are at an even greater disadvantage.

Additionally, non-competitor patent owners' "absolute property" is no longer absolute.[116] Formerly, the Court observed that "an inventor receives from a patent the right to exclude others from its use for the time prescribed in the statute."[117] Until *eBay*, the right to "exclusion may be said to [be] the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, without question of motive."[118] The Court does not attempt to reconcile *eBay* with *Continental's* holding that "the Constitution and patent laws intended to provide for an exclusive right to inventors to make, use, and vend their inventions."[119]

Similarly, this broad swath of patent owners appear to have lost their right to refuse to license a patent or to license a patent right selectively. Under *eBay*, a third party can simply infringe and pay a reasonable royalty despite the wishes of the patent owner.[120] This is starkly at odds with the Court's previous holding that "[t]he franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."[121] Indeed, prior to *eBay* the Court has consistently held that should "[a patentee] see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own . . . his title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it."[122] Not so after *eBay*.

---

[116] Compare, for example, the district courts' decisions in *Z4* (where monetary damages were sufficient to compensate for any future infringement) and *Visto* (where A royalty based on future sales is not "adequate in the sense that they are a suitable proxy for injunctive relief. What makes legal remedies inadequate under the circumstances of this case is the inability to calculate the plaintiff's future losses with precision. An injunction against the continued use of the plaintiff's intellectual property is the proper remedy to prevent future infringement."). The principal distinction appears to be that in *Visto* the parties were direct competitors where they were not direct competitors in *Z4*.

[117] *Continental* at 425.

[118] *Id.*, citing *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540 (1902).

[119] *Id.* at 424.

[120] Unless, at a minimum, the patent owner is either (1) 'good' or (2) not 'bad' *and* makes, sells or uses a directly competitive product or service.

[121] *Bloomer v. McQuewan*, 14 How. at 549, 55 U.S. at 549 (Taney, C.J.).

[122] 210 U.S. at 425, quoting *Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co.*, 77 F. at 294-95.

© 2007 by Bradley R. Larschan                                                  24

*Encouraging Trade Law Remedies As A Substitute for Enforcing the Patent Law in Federal Courts*

Section 337[123] has long been available for U.S. patent holders to prevent importation of infringing imports through exclusion orders.[124] It is an Article II proceeding administered by the ITC, initiated upon the filing of a complaint alleging unfair acts (such as patent infringement[125]). The ITC's final determinations are subject to Presidential review for policy reasons and ultimately can be appealed to the United States Court of Appeals for the Federal Circuit. Since *eBay*, there has been an increase in the number of §337 complaints brought before the United States International Trade Commission (ITC).[126]

Section 337 was enacted to protect U.S. domestic industries from unfair competition in the importation of goods made by foreign companies. Although the ITC does not award damages in § 337 cases, in some cases it is an attractive option because of the remedy of exclusion[127] and the relative swiftness of obtaining a decision.[128] On the other hand, a § 337 complaint is typically more detailed than district court actions and "is typically more expensive and requires a greater commitment of resources than the preparation of a district court complaint."[129]

---

[123] Section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.

[124] For an overview of § 337, *see* Robert A. Caplen, *Recent Trends Underscoring International Trade Commission Review of Initial Determinations and Federal Circuit Appeals From Final Commission Determinations Under Section 337 of the Tariff Act of 1930*, 17 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 337 (2007).

[125] Over 90% of the cases brought under § 337 are based on alleged infringement of a U.S. patent.

[126] The number of § 337 patent-based proceedings as risen in recent Federal Government fiscal years: 2002 (11), 2003 (14), 2004 (22), 2005 (21) and 2006 (34). In the first five months of 2007, 14 proceedings were initiated.

[127] If the ITC finds that § 337 has been violated, two remedies are available. The first is an exclusion order barring infringing imports from entering the U.S. A limited exclusion order applies to goods manufactured, imported or sold by the respondents. A general exclusion order is also available and prevents any infringing articles from entering the U.S., regardless of origin. The exclusion orders are enforced by U.S. Customs and Border Protection, which has the power to inspect and deny entry of goods within the scope of the order. The second remedy is an order directing named respondents to "cease and desist from engaging in the unfair methods or acts involved."

[128] The ITC must conclude each investigation and make its determination "at the earliest practicable time." Moreover, the ITC rules of practice state that all investigations and related proceedings shall be conducted "expeditiously". To promote expeditious adjudication, § 337 directs the ITC to establish a target date for its final determination. ITC target dates are set shortly after publication of the *Federal Register* notice that the ITC has instituted a § 337 investigation. The typical target date is between 12 and 15 months. ITC target dates are rarely extended.

[129] William P. Atkins, *Appreciating 337 Actions at the ITC: A Primer on Intellectual Property Issues and Procedures at the U.S. International Trade Commission*, 5 U. BALT. INTELL. PROP. L.J. 103, 108 (1997).

Section 337 cases are independent of patent infringement suits in the Federal courts; thus, they may run in parallel (although the litigation cost would almost double). One consequence of *eBay* is that patent owners are likely to resort to § 337 to restore a balance in negotiations with non-U.S. infringers of their intellectual property rights. *eBay* can be seen to discourage plaintiffs' resort to the Federal courts to adjudicate certain types of patent infringement disputes, and to heighten both litigation and societal costs in others.

It is difficult to see how the public interest is served by depriving litigants of the remedy of a permanent injunction when the remedy of an exclusion order is available through the ITC.

VI.      CONCLUSION

The *eBay* decision has significantly altered the balance between willful infringers and a great many patent owners. In an effort to limit the rights of a class of patent owners (patent trolls), the Court has greatly limited the legal monopoly a patent grants. Now, only those patent owners who make or sell a directly competitive product are eligible for permanent injunctions. In so holding, the Court engaged in social engineering that is likely to have substantial unintended consequences for a broad swath of patent owners.

For more than a century the courts have consistently looked to the nature of the right a patent confers – that is, a legal monopoly with the right to exclude others – to determine whether or not a permanent injunction should issue, creating a presumption that an injunction should issue absent special circumstances. In a sweeping – and largely unreasoned – decision, the Court shifted the legal focus from the nature of the right to the nature of the patent owner. In so doing, the Court has implicitly overruled *Continental*, its predecessors (*Bloomer, E. Bement & Son*) and progeny, altering the balance of rights between patent owners and infringers to the material detriment of a broad swath of patent owners.

Henceforward, following a finding of willful infringement, to determine whether a permanent injunction should issue, *eBay* requires as a threshold matter that district courts examine whether a patent owner is 'good' or 'bad'. 'Bad' patent owners will no longer be eligible for permanent injunctions. 'Good' patent owners may be eligible for a permanent injunction, provided they make, use or sell a directly competitive product or service. Only then will courts apply the four-factor test. Although the Court appears to believe it straight forward to distinguish 'good' from 'bad' patent owners, the district courts have been and almost certainly will continue to struggle with shades of gray.

While the Court created the 'good'-'bad' distinction to thwart patent trolls, the unintended consequences are likely to be profound. To begin with, the balance of power has radically shifted in favor of willful infringers. Absent the possibility of an injunction, a willful infringer's downside is limited to paying a reasonable royalty. The more fundamental the invention and the greater profit generated from it, the more attractive it

© 2007 by Bradley R. Larschan

becomes to the infringer to prolong the litigation to wear down the plaintiff and settle for a less than reasonable royalty.

Next, *eBay* is likely to embolden companies to infringe patent rights of the poor, most of the middle class, 'bad' or non-competitor patent owners. Poor and middle-class patent owners (by definition, not "self-made inventors")[130] typically cannot afford to enforce their patent rights, even though they might be eligible for a permanent injunction; if they assign their patents to individuals or companies to enforce their patents, they are now no longer eligible for a permanent injunction because the patent owner is 'bad' or a non-competitor.

*eBay* also eviscerates the monopoly – the very essence of the property right the patent confers. No longer is "the purpose of the patent ... to protect him in this monopoly."[131] 'Bad' patent owners have largely lost their historic absolute right to refuse to license a patent, or to license a patent right to companies of its choice. Under *eBay*, a third party can simply infringe and, at worst, pay a reasonable royalty despite the patent owner's wishes. Compulsory licensing has replaced monopoly.

Finally, *eBay* has encouraged patent owners no longer eligible for a permanent injunction to seek exclusion orders through § 337 proceedings before the ITC, substituting Article II for Article III actions. If the aggrieved patent owner wishes to recover monetary damages, he must still file a patent infringement suit in the district court, needlessly doubling his costs and imposing societal inefficiencies.

It is difficult to imagine that *eBay* will be the last word on the nature of U.S. patent rights.

---

[130] 126 Sup. Ct. 1840.

[131] *Continental* at 424.

© 2007 by Bradley R. Larschan                                                                 27

From: Brad larschan [mailto:blarschan@comcast.net]
Sent: Friday, March 09, 2007 10:32 AM
To: jonathan_tunick@hotmail.com
Subject: RE: Follow Up to Meeting Yesterday

Jonathan,

This represents our understanding of the percentage split.

I look forward to hearing about John's conversation with Todd.

Thanks again to you and Peter for yesterday's meeting and a delicious lunch.

Brad

---

From: Jonathan Tunick [mailto:jonathan_tunick@hotmail.com]
Sent: Friday, March 09, 2007 10:21 AM
To: 'Brad larschan'
Subject: Follow Up to Meeting Yesterday

Brad–

I will report to you on John Hall's conversation with Todd Dickenson, but before
doing so I want to ensure that we have agreement on our own working
arrangement. As you and I agreed prior to our meeting, the waterfall splits will
be 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming
our prior understanding.

Best,

Jonathan

Jonathan L. Tunick
DigaComm, LLC
Principal
w: 312 222 0003
m: 415 828 3696
tunick@digacomm.com <mailto:tunick@digacomm.com>
im: jtunick2000

Page 2 of 3

EXH

Thu, Oct 25, 2007  11:06

**Subject:** RE: Letter Agreement
**Date:** Friday, March 30, 2007 14:14
**From:** Jonathan Tunick <jonathan_tunick@hotmail.com>
**Reply-To:** <jonathan_tunick@hotmail.com>
**To:** 'Ray Bilbao' <rbilbao@reportonboard.com>
**Cc:** 'Bradley Larschan' <blarschan@reportonboard.com>, <smith@digacomm.com>
**Conversation:** Letter Agreement

Ray-

One small change… I believe you inadvertently left out in the 4th paragraph to reference DigaComm or its designated assignee. Please make this change and we can fax over the final version for Brad's signature.

We are pleased to hear that Andrew is in accord of this basic understanding which gives us comfort to proceed.

Best,

Jonathan

**From:** Ray Bilbao [mailto:rbilbao@reportonboard.com]
**Sent:** Friday, March 30, 2007 11:21 AM
**To:** jonathan_tunick@hotmail.com
**Cc:** Bradley Larschan
**Subject:** Letter Agreement

Jonathan:

We have spoken with Andrew.  He is okay in principle with the fees and has given approval for VIP to execute the Letter Agreement. I have attached your agreement which I revised to tighten it up a bit. Please review and if appropriate present to Peter for execution.

If you have any questions, please do not hesitate to contact me. I am stepping out for lunch and will be back shortly.

Sincerely,

J. Raymond Bilbao
Vice President & General Counsel
Vehicle Safety & Compliance, LLC

3150 Lenox Park Blvd, Suite 108
Memphis, TN 38115
(901) 546-7676 Telephone
(901) 546-7677 Facsimile

CONFIDENTIALITY NOTICE: This Electronic Mail, and any attachments thereto, is intended only for use by the addressee(s) named therein. The Information contained in this e-mail, and any attachments thereto, is the confidential, proprietary information of Vehicle Safety and Compliance, LLC, its affiliates and/or subsidiaries (collectively, VSAC). If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and/or any attachments thereto, is strictly prohibited without the express written permission of VSAC. If you received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003   fax 312/222-0008
www.digacomm.com

March 30, 2007

Mr. Bradley Larschan
Chief Executive Officer
Vehicle IP, LLC
3150 Lenox Park Blvd., Suite 108
Memphis, TN 38115

Re: Asset Purchase of VIP's Patents ("Letter")

Dear Brad:

This Letter confirms the understanding of DigaComm, L.L.C. ("DigaComm") with Vehicle IP,
LLC ("VIP"), the holder of a portfolio of U.S. patents, foreign patents and foreign pending patent
applications. DigaComm is providing assistance to VIP in negotiating an asset purchase agreement under
which General Electric ("GE"), through a special purpose entity ("SPE"), would acquire the following
patents (the "Contemplated Transaction") in VIP's patent portfolio (the "Assigned Patents") as described
below herein:

1.  U.S. Patent No. 5,966,658 entitled "Automated Selection of a Communication Path"
2.  U.S. Patent No. 5,699,275 entitled "System and Method for Remote Patching of Operating Code
    Located in a Mobile Unit"
3.  U.S. Patent No. 5,983,108 entitled "Method and Apparatus for a Nationwide Cellular Telephone
    Network"
4.  U.S. Patent No. 6,018,657 entitled "System and Method for Communicating a Message Using a
    Cellular Telephone Network"
5.  U.S. Patent No. 6,148,202 entitled "Vehicle Locating and Communicating Method and
    Apparatus"
6.  Other VIP Patents to the extent GE requires (and VIP agrees) that any other patent from VIP's
    portfolio be included in the Contemplated Transaction

The Contemplated Transaction proposes that the GE-owned SPE would provide approximately
$25 million to the SPE to enforce the Assigned Patents either through licensing and/or litigation, and that
the SPE would distribute the proceeds recovered from enforcement of the Assigned Patents (the "Cash
Waterfall Proceeds") as follows:

Initially, it has been proposed that the Cash Waterfall Proceeds would be utilized to: (a) reimburse
the SPE for expenses advanced to fund the enforcement of the Assigned Patents (projected at $25 million);
(b) repay certain loans (approximately $1.8 million) made to VIP by the Preferred Membership Interest
Holder of Vehicle Safety and Compliance LLC ("VSAC Preferred Holders"), the sole member of VIP;
and (c) allow the Preferred Holders to recoup their invested capital of approximately $3.1 million (the
"Initial Distributions"). VIP and DigaComm acknowledge that the priority of payment of the Initial
Distributions out of the Cash Waterfall Proceeds have not yet been agreed between GE and VIP. It is
proposed that following the Initial Distributions, the SPE would retain 50% of Cash Waterfall Proceeds and
distribute the remaining 50% of the Cash Waterfall Proceeds to VIP.

In the event that VIP and GE finally consummate the Contemplated Transaction on substantially
the terms and conditions described above with such other commercially reasonable and customary terms

and conditions as may be negotiated between GE and VIP. VIP will instruct the SPE to distribute directly to DigaComm or its designated assignee such portions of VIP's 50% of the Cash Waterfall Proceeds as set forth in the Distribution Schedule attached hereto as Exhibit A.

DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.

VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

In the unlikely event any dispute should arise between us relating to this Letter such may only be resolved by a single arbitrator in accordance with the commercial arbitration rules of the American Arbitration Association in Wilmington, Delaware with the internal laws of that State applying. Injunctive relief, should such be required, may be obtained in any Court of competent jurisdiction.

This Letter contains the entire understanding between DigaComm and VIP with respect to this subject matter. In the event that GE and VIP fail to finally consummate the Contemplated Transaction, this Agreement shall be null and void.

We have enjoyed the working relationship we have developed with VIP and are confident that our efforts will be productive.

Sincerely,

Peter W. Smith
Managing Member

PWS/glb

Confirmed and Agreed
Signature
Bradley Larschan, Chief Executive Officer

Date     March 30, 2007

**Exhibit A**

| Tier | Cash Waterfall Amount | Percentage of Cash Waterfall Distributed to DigaComm | Dollar Amount of Percentage of Cash Waterfall Distributed to DigaComm |
|---|---|---|---|
| Tier 1 | $300,000,000 | 5.00% | $15,000,000 |
| Tier 2 (Additional) | $200,000,000 | 4.00% | $8,000,000 |
| Tier 3 (Additional) | $250,000,000 | 3.50% | $8,750,000 |
| Tier 4 (Additional) | $250,000,000 | 2.50% | $6,250,000 |
| Tier 5 (Additional) | $500,000,000 | 2.00% | $10,000,000 |
| Tier 6 (Additional) | $500,000,000 | 1.50% | $7,500,000 |
| Tier 7 (Additional) | $500,000,000 | 1.00% | $5,000,000 |

*Exhibit A above has been retyped for clarity.

Thu, Oct 25, 2007  15:47

**Subject: Digacomm Agreement with VIP**
**Date: Thursday, June 14, 2007 15:48**
**From:** Peter Smith <smith@digacomm.com>
**To:** John Hall <john.b.hall@ge.com>
**Cc:** Brad Larschan <blarschan@comcast.net>
**Conversation:** Digacomm Agreement with VIP

John,

Enclosed please find the documents as promised.  Best,
Peter

EX-5

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003   fax 312/222-0008
www.digacomm.com

June 13, 2007

Mr. John B. Hall
Senior Vice President, Technology Group
GE Commercial Finance
500 West Monroe
Chicago, Illinois 60661

RE:  DigaComm Agreement with Vehicle IP, LLC

Dear John,

Following our conversation with you this morning, I am sending you a copy of DigaComm LLC ("DigaComm") executed agreement with Vehicle IP, LLC ("VIP").

I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us.

All of us associated with the VIP opportunity greatly appreciate your lead role in initiating the highly productive collaborative working relationship which has evolved between your GE colleagues and Brad's team.

With best wishes.

Sincerely yours,

Peter W. Smith
Managing Member

Cc:  Brad Larscham, CEO
     Vehicle IP, LLC

DigaComm, L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611
312/222-0003    fax 312/222-0008
www.digacomm.com

March 30, 2007

Mr. Bradley Larschan
Chief Executive Officer
Vehicle IP, LLC
3150 Lenox Park Blvd., Suite 108
Memphis, TN 38115

Re:  Asset Purchase of VIP's Patents ("Letter")

Dear Brad:

This Letter confirms the understanding of DigaComm, L.L.C. ("DigaComm") with Vehicle IP, LLC ("VIP"), the holder of a portfolio of U.S. patents, foreign patents and foreign pending patent applications. DigaComm is providing assistance to VIP in negotiating an asset purchase agreement under which General Electric ("GE"), through a special purpose entity ("SPE"), would acquire the following patents (the "Contemplated Transaction") in VIP's patent portfolio (the "Assigned Patents") as described below herein:

1. U.S. Patent No. 5,966,658 entitled "Automated Selection of a Communication Path"
2. U.S. Patent No. 5,699,275 entitled "System and Method for Remote Patching of Operating Code Located in a Mobile Unit"
3. U.S. Patent No. 5,983,108 entitled "Method and Apparatus for a Nationwide Cellular Telephone Network"
4. U.S. Patent No. 6,018,657 entitled "System and Method for Communicating a Message Using a Cellular Telephone Network"
5. U.S. Patent No. 6,148,202 entitled "Vehicle Locating and Communicating Method and Apparatus"
6. Other VIP Patents to the extent GE requires (and VIP agrees) that any other patent from VIP's portfolio be included in the Contemplated Transaction

The Contemplated Transaction proposes that the GE-owned SPE would provide approximately $25 million to the SPE to enforce the Assigned Patents either through licensing and/or litigation, and that the SPE would distribute the proceeds recovered from enforcement of the Assigned Patents (the "Cash Waterfall Proceeds") as follows:

Initially, it has been proposed that the Cash Waterfall Proceeds would be utilized to: (a) reimburse the SPE for expenses advanced to fund the enforcement of the Assigned Patents (projected at $25 million); (b) repay certain loans (approximately $1.8 million) made to VIP by the Preferred Membership Interest Holders of Vehicle Safety and Compliance LLC ("VSAC Preferred Holders"), the sole member of VIP; and (c) allow the Preferred Holders to recoup their invested capital of approximately $3.1 million (the "Initial Distributions"). VIP and DigaComm acknowledge that the priority of payment of the Initial Distributions out of the Cash Waterfall Proceeds have not yet been agreed between GE and VIP. It is proposed that following the Initial Distributions, the SPE would retain 50% of Cash Waterfall Proceeds and distribute the remaining 50% of the Cash Waterfall Proceeds to VIP.

In the event that VIP and GE finally consummate the Contemplated Transaction on substantially the terms and conditions described above with such other commercially reasonable and customary terms

and conditions as may be negotiated between GE and VIP, VIP will instruct the SPE to distribute directly to DigaComm or its designated assignee such portions of VIP's 50% of the Cash Waterfall Proceeds as set forth in the Distribution Schedule attached hereto as Exhibit A.

DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.

VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

In the unlikely event any dispute should arise between us relating to this Letter such may only be resolved by a single arbitrator in accordance with the commercial arbitration rules of the American Arbitration Association in Wilmington, Delaware with the internal laws of that State applying. Injunctive relief, should such be required, may be obtained in any Court of competent jurisdiction.

This Letter contains the entire understanding between DigaComm and VIP with respect to this subject matter. In the event that GE and VIP fail to finally consummate the Contemplated Transaction, this Agreement shall be null and void.

We have enjoyed the working relationship we have developed with VIP and are confident that our efforts will be productive.

Sincerely,

Peter W. Smith
Managing Member

PWS/glb

Confirmed and Agreed
Signature

Bradley Laraghan, Chief Executive Officer

Date    March 30, 2007

**Exhibit A**

| Tier | Cash Waterfall Amount | Percentage of Cash Waterfall Distributed to DigaComm | Dollar Amount of Percentage of Cash Waterfall Distributed to DigaComm |
|---|---|---|---|
| Tier 1 | $300,000,000 | 5.00% | $15,000,000 |
| Tier 2 (Additional) | $200,000,000 | 4.00% | $8,000,000 |
| Tier 3 (Additional) | $250,000,000 | 3.50% | $8,750,000 |
| Tier 4 (Additional) | $250,000,000 | 2.50% | $6,250,000 |
| Tier 5 (Additional) | $500,000,000 | 2.00% | $10,000,000 |
| Tier 6 (Additional) | $500,000,000 | 1.50% | $7,500,000 |
| Tier 7 (Additional) | $500,000,000 | 1.00% | $5,000,000 |

*Exhibit A above has been retyped for clarity.

# VEHICLE IP, LLC

5101 WHEELIS DRIVE, SUITE 100
MEMPHIS, TN 38117
(901) 546-7676 TELEPHONE
(901) 546-7677 FACSIMILE

September 7, 2007

**VIA OVERNIGHT EXPRESS**

Mr. Peter W. Smith                          Mr. Peter W. Knuth
Managing Member                             Managing Member
DigaComm L.L.C.
400 North Michigan Avenue
Suite 520
Chicago, Illinois 60611

RE:    Letter Agreement between Vehicle IP, LLC ("VIP") and DigaComm
       L.L.C. ("DigaComm") dated March 30, 2007 (the "Letter
       Agreement")

Dear Peter:

As you are aware, the above-referenced Letter Agreement, as per its terms and conditions, was made expressly contingent upon approval by a majority of the holders of the Preferred Interests of VIP's sole member, Vehicle Safety & Compliance, LLC ("VSAC"). On August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee. At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein.

Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein. Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

If you have any questions, please do not hesitate to contact me to discuss.

Sincerely,

Bradley Larschan
Chief Executive Officer

cc:    J. Raymond Bilbao, Esq.
       Andrew Seamons
       Lee Piovarcy, Esq.

EX-6

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | Judge: _____ |
| Vehicle Safety and Compliance, LLC, | ) | |
| Pittco Capital Partners, LP, | ) | |
| Pittco Capital Partners II, LP, | ) | |
| J.R. "Pitt" Hyde III, and Andrew Seamons, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF BRADLEY LARSCHAN

I, Bradley Larschan, declare under penalty of perjury that the following is true and correct:

1.    I am the Chief Executive Officer for Vehicle IP, LLC ("VIP"), a Delaware limited liability company headquartered in Memphis, Tennessee.

2.    As the Chief Executive Officer, I am familiar with VIP's corporate structure and business operations.  The facts set forth herein are true to the best of my knowledge.  In preparing this declaration, I have also caused various corporate records to be searched relating to the statements contained herein.  I have personal knowledge of the matters stated herein and, if called as a witness, I could and would competently testify thereto.

3.    VIP was formed in 2005.

4.    Vehicle Safety and Compliance, LLC ("VSAC") owns 100% of the membership interest in VIP.

5.    VIP operate as a separate corporate entity from VSAC.

6.    VIP's day-to-day operations are conducted by VIP employees.

7.    VIP has its own limited liability company operating agreement.

8.     VIP has its own board of directors.

9.     VIP holds regular required meetings of its own board of directors, before which it makes its own agendas and during which it takes minutes. These meetings are separate and apart from VSAC's board of directors' meetings. Additionally, VIP's board of directors takes action by written consent separate and apart from VSAC's board of directors.

10.     All of VIP's officers and directors are properly functioning and are active participants in VIP's business activities.

11.     VIP maintains its own bank accounts and financial statements.

12.     VIP possesses and maintains its own corporate and bookkeeping records.

13.     VIP maintains its own assets.

14.     VIP establishes its own business plans.

15.     VIP's obligations are not paid from VSAC's bank accounts (or vice versa).

16.     VIP conducts business in, and enters into contracts under, its own corporate name.

17.     VIP is adequately capitalized and was adequately capitalized for all corporate undertakings during the entire time period of January 2007 to the present.

Executed this 15th date of January 2008 in Memphis, Tennessee.

_____
Bradley Larschan

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| | ) | |
| Vehicle Safety and Compliance, LLC, | ) | Judge: _____ |
| Pittco Capital Partners, LP, Pittco Capital | ) | |
| Partners II, LP, J.R. "Pitt" Hyde, III, and | ) | |
| Andrew Seamons, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF J. RAYMOND BILBAO**

I, J. Raymond Bilbao, declare under penalty of perjury that the following is true and correct:

1.  I am General Counsel and Vice President of Vehicle Safety and Compliance, LLC ("VSAC"), a Delaware limited liability company headquartered in Memphis, Tennessee.

2.  I have personal knowledge of the matters stated herein and, if called as a witness, I could and would competently testify thereto.

3.  VSAC was served with the First Amended Complaint, filed in the Circuit Court of Cook County, Illinois Law Division, Case No. 2007L013795, on December 17, 2007.

4.  VSAC was not served with the Original Complaint DigaComm, LLC filed in this case, which I understand was filed on December 10, 2007.

5.  Prior to December 17, 2007, VSAC had not received a copy of any pleadings in this lawsuit.

Executed this _15th_ date of January 2008 in Memphis, Tennessee.

_____
J. Raymond Bilbao

2

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DigaComm, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| Vehicle Safety and Compliance, LLC, | ) |
| Pittco Capital Partners, LP, Pittco Capital | ) |
| Partners II, LP, J.R. "Pitt" Hyde, III, and | ) |
| Andrew Seamons, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF ANDREW SEAMONS

I, Andrew Seamons, declare under penalty of perjury that the following is true and correct:

1.    I have personal knowledge of the matters stated herein and, if called as a witness, I could and would competently testify thereto.

2.    I am a citizen and resident of the State of Tennessee.

3.    I was served with the First Amended Complaint, filed in the Circuit Court of Cook County, Illinois Law Division, Case No. 2007L013795, on December 17, 2007.

4.    I was not notified or aware that this lawsuit had been filed until I received the First Amended Complaint on December 17, 2007.

5.    I am a limited partner in and Managing Member of Pittco Capital Partners, LP and Pittco Capital Partners II, LP (the "Pittco Entities"), which are both limited partnerships organized under the laws of the State of Tennessee.

6.     The Pittco Entities were served with the First Amended Complaint on December 18, 2007.  The Pittco Entities were not served with the Original Complaint DigaComm, LLC filed in this case, which I understand was filed on December 10, 2007.

Executed this 14th date of January 2008 in Memphis, Tennessee.

Andrew Seamons

08 C 338

JUDGE LINDBERG
MAGISTRATE JUDGE COLE

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DigaComm, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| Vehicle Safety and Compliance, LLC, | ) |
| Pittco Capital Partners, LP, Pittco Capital | ) |
| Partners II, LP, J.R. "Pitt" Hyde, III, and | ) |
| Andrew Seamons, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>DECLARATION OF J.R. HYDE, III</u>

I, J.R. Hyde, III, declare under penalty of perjury that the foregoing is true and correct:

1.    I am a citizen and resident of the State of Tennessee.

2.    I was served with the First Amended Complaint, filed in the Circuit Court of Cook County, Illinois Law Division, Case No. 2007L013795, on December 17, 2007.

3.    I was not notified or aware that this lawsuit had been filed until I received the First Amended Complaint on December 17, 2007.

Executed this <u>11</u> date of January 2008 in Memphis, Tennessee.

_____
J.R. Hyde, III

# EXHIBIT G

1910 - No Fee Paid
1919 - Fee Paid
Jury Demand                          CCG N067-10M-6/09/04 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### LAW DIVISION

DigaComm, LLC

        Plaintiff,

        v.

Vehicle Safety and Compliance, LLC, Pittco
Capital Partners, LP, Pittco Capital Partners
II, LP, J.R. "Pitt" Hyde III, Andrew Seamons,
and John Does 1 – 10

        Defendants.

No.

2007L013795
CALENDAR/ROOM
TIME 00:00
Fraud
CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
LAW DIVISION
07 DEC 10 PM 3:49
FILED-18
DOROTHY BROWN    CLERK

## JURY DEMAND

**The undersigned demands a jury trial.**

_(Signature)_

Dated: _____ December 10 _____, 2007

Atty. No.: 90443
Name: Kirkland & Ellis LLP
Atty. for: DigaComm, LLC
Address: 200 E. Randolph Drive
City/State/Zip: Chicago, IL 60601
Telephone: (312) 861-2000

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**



# 90443

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### LAW DIVISION

DigaComm, LLC,                                     )
                                                   )
            Plaintiff,                             )
                                                   )   No. 2007L013795
        v.                                         )
                                                   )   Hon. Daniel J. Kelley
Vehicle Safety and Compliance, LLC,                )
Pittco Capital Partners, LP,                       )
Pittco Capital Partners II, LP,                    )
J.R. "Pitt" Hyde III,                              )
Andrew Seamons, and John Does 1 - 10,              )
                                                   )
            Defendants.                            )

**FILED**
Law Div.-2304
DEC 13 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

### NOTICE OF ROUTINE MOTION

Please take notice that on December 13, 2007 at 8:45 a.m., the undersigned shall appear before the Honorable Daniel J. Kelley in Room 2304 and present DigaComm, LLC's Routine Motion for Leave to Amend Complaint, a copy of which, along with exhibits, is attached and hereby served upon you.

Dated: December 12, 2007                 Respectfully submitted,

                                         DigaComm, LLC

                                         _____
                                         One of its attorneys

                                         Reed S. Oslan, P.C.
                                         Stephen C. Hackney
                                         Matthew E. Nirider
                                         KIRKLAND & ELLIS, LLP
                                         200 East Randolph Drive
                                         Chicago, Illinois 60601

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
LAW DIVISION

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2007L013795 |
| v. | ) | |
| | ) | |
| Vehicle Safety and Compliance, LLC, | ) | Hon. Daniel J. Kelley |
| Pittco Capital Partners, LP, | ) | |
| Pittco Capital Partners II, LP, | ) | |
| J.R. "Pitt" Hyde III, | ) | |
| Andrew Seamons, and John Does 1 - 10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FILED**
Law Div.-2304
DEC 1 3 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## DIGACOMM, LLC'S ROUTINE MOTION FOR LEAVE TO AMEND COMPLAINT

DigaComm, LLC ("DigaComm") hereby moves under 735 ILCS 5/2-616 for leave to amend its complaint. In support of its motion, DigaComm states as follows:

1.     On December 10, 2007, DigaComm filed its Complaint for Fraud, Tortious Interference, and Unjust Enrichment. That complaint named Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, J.R. "Pitt" Hyde III, Andrew Seamons, and John Does 1 - 10 as defendants.

2.     Defendants John Doe 1 - 10 represent defendants who are presently unknown to DigaComm.

3.     DigaComm seeks leave to amend its complaint by dismissing John Does 1 - 10 from this action without prejudice to DigaComm's rights as to the unknown defendants represented by John Does 1 - 10. A copy of DigaComm's proposed First Amended Complaint, along with the exhibits to the proposed First Amended Complaint, is attached hereto as Exhibit A.

4.     No final judgment has issued in this action.

5.     None of the defendants, including John Does 1 - 10, will be prejudiced by the amendment.  No defendant has been served with process or has appeared in this action.  In addition, no defendant has incurred any statutory costs, such as appearance fees, in defending this action.

6.     In Illinois, amendments to pleadings should be freely and liberally granted.  *See In re Liquidation of Inter-American Insurance Co.*, 768 N.E.2d 182, 192 (Ill. App. Ct. 2002).

WHEREFORE, for the reasons set forth above, DigaComm respectfully requests that its Routine Motion for Leave to Amend Complaint be granted, and all other necessary and proper relief.

Dated:  December 12, 2007                         Respectfully submitted,

                                                                    DigaComm, LLC

                                                                    _____
                                                                    One of its attorneys

                                                                    Reed S. Oslan, P.C.
                                                                    Stephen C. Hackney
                                                                    Matthew E. Nirider
                                                                    KIRKLAND & ELLIS, LLP
                                                                    200 East Randolph Drive
                                                                    Chicago, Illinois 60601

2

Civil Action Cover Sheet - Case Initiation                                    (Rev. 2/8/06) CCL0520

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

DigaComm, LLC
            Plaintiff,    v.                      } No.   2007L013795
Vehicle Safety and Compliance, LLC,
Pittco Capital Partners, LP,
Pittco Capital Partners II, LP,
J.R. "Pitt" Hyde III, and Andrew Seamons,
            Defendants.

## CIVIL ACTION COVER SHEET - CASE INITITATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the
complaint in all civil actions.  The information contained herein is
for administrativepurposes only and cannot be introduced into
evidence.  Please check the box in front of the appropriate case type
which best characterizes your action.  ONLY ONE (1) CASE TYPE
MAY BE CHECKED WITH THIS COVER SHEET.

Jury Demand  ☑ Yes  ☐ No

                                                  (FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
☐  027  Motor Vehicle
☐  040  Medical Malpractice
☐  047  Asbestos
☐  048  Dram Shop
☐  049  Product Liability
☐  051  Construction Injuries
         (including  Structural Work Act, Road
         Construction Injuries Act and negligence)
☐  052  Railroad/FELA
☐  053  Pediatric Lead Exposure
☐  061  Other Personal Injury/Wrongful Death
☐  063  Intentional Tort
☐  064  Miscellaneous Statutory Action
         (Please Specify Below**)
☐  065  Premises Liability
☐  078  Fen-phen/Redux Litigation
☐  199  Silicone Implant

### COMMERCIAL LITIGATION
CASE TYPES:
☐  002  Breach of Contract
☐  070  Professional Malpractice
         (other than legal or medical)
☑  071  Fraud
☐  072  Consumer Fraud
☐  073  Breach of Warranty
☐  074  Statutory Action
         (Please Specify Below**)
☐  075  Other Commercial Litigation
         (Please Specify Below**)
☐  076  Retaliatory Discharge

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
☐  007  Confession of Judgment
☐  008  Replevin
☐  009  Tax
☐  015  Condemnation
☐  017  Detinue
☐  029  Unemployment Compensation
☐  036  Administrative Review Action
☐  085  Petition to Register Foreign Judgment
☐  099  All Other Extraordinary Remedies

### OTHER ACTIONS
CASE TYPES:
☐  062  Property Damage
☐  066  Legal Malpractice
☐  077  Libel/Slander
☐  079  Petition for Qualified Orders
☐  084  Petition to Issue Subpoena
☐  100  Petition for Discovery

** _____

_____

By: _____
        (Attorney)              (Pro Se)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

EX A

1910 - No Fee Paid
1919 – Fee Paid
Jury Demand                    CCG N067-10M-6/09/04 (                    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

DigaComm, LLC,

      Plaintiff,

          v.                    No.  2007L013795

Vehicle Safety and Compliance, LLC,
Pittco Capital Partners, LP,
Pittco Capital Partners, II, LP,
J.R. "Pitt" Hyde III, and Andrew Seamons,

      Defendants.

### JURY DEMAND

The undersigned demands a jury trial.

                                                          (Signature)

                         Dated:  _____December 12_____, 2007___

Atty. No.: 90443
Name: Kirkland & Ellis LLP
Atty. for: DigaComm, LLC
Address: 200 E. Randolph Drive
City/State/Zip: Chicago, IL 60601
Telephone: (312) 861-2000

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
LAW DIVISION

DigaComm, LLC,                                )
                                             )
            Plaintiff,                        )
                                             )      No. 2007L013795
      v.                                      )
                                             )
Vehicle Safety and Compliance, LLC,          )      Hon. Daniel J. Kelley
Pittco Capital Partners, LP,                 )
Pittco Capital Partners II, LP,              )
J.R. "Pitt" Hyde III, and Andrew Seamons,    )
                                             )
            Defendants.                       )

000009 8.0629

2007

## ORDER ON DIGACOMM, LLC'S ROUTINE MOTION
## FOR LEAVE TO AMEND COMPLAINT

    This matter coming before the Court on DigaComm, LLC's Routine Motion for Leave to

Amend Complaint, and the Court being advised in the premises:

    IT IS HEREBY ORDERED THAT:

4292

    1.    DigaComm, LLC's Routine Motion for Leave to Amend Complaint is



GRANTED.

    2.    DigaComm, LLC may file its proposed First Amended Complaint.

4288

    3.    This Court grants leave for summonses to issue to the remaining defendants.

4.    Unknown defendants John Doe 1 - 10 are dismissed without prejudice to

*4336*

DigaComm, LLC's rights as to any unknown defendants.

Dated:  December _____, 2007

*Daniel J. Kelley*    `0000098.0630`
`183`
Judge Daniel J. Kelley    `2007`

Respectfully submitted,

Reed S. Oslan, P.C.
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois  60601
Tel: 312/861-2157
Fac: 312/861-2200

Counsel to DigaComm, LLC

**ENTERED**
JUDGE DANIEL J. KELLEY-0183

DEC 1 3 2007

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK



EXHIBIT B

COLE, PROTO

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.1.3 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:08-cv-00338

| | |
|---|---|
| DigaComm, LLC v. Vehicle Safety and Compliance, LLC et al | Date Filed: 01/15/2008 |
| Assigned to: Honorable George W. Lindberg | Jury Demand: Both |
| Demand: $75,000 | Nature of Suit: 370 Personal Prop.: Fraud or Truth-In-Lending |
| Case in other court: Circuit Court of Cook County, 2007 L 013795 | Jurisdiction: Diversity |
| Cause: 28:1441 Petition for Removal | |

**Plaintiff**

**DigaComm, LLC**                    represented by    **Matthew Emrich Nirider**
Kirkland & Ellis LLP (Chicago)
200 East Randolph Drive
Suite 6100
Chicago, IL 60601
(312) 469-7110
Email: mnirider@kirkland.com
*ATTORNEY TO BE NOTICED*

**Stephen Charles Hackney**
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2157
Fax: (312) 861-2200
Email: shackney@kirkland.com
*ATTORNEY TO BE NOTICED*

**Timothy D. Elliott**
Rathje & Woodward
300 East Roosevelt Road
Suite 300
Wheaton, IL 60187
(630)668-8500
Fax: (630)668-7350
Email: telliott@rathjewoodward.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Vehicle Safety and Compliance, LLC**          represented by **Joseph L. Fogel**
Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312)360-6000
Email: jfogel@freebornpeters.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellye L Fabian**
Freeborn & Peters, LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312) 360-6417
Fax: (312) 360-6996
Email: kfabian@freebornpeters.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Freeborn**
Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312)360-6000
Email: mfreeborn@freebornpeters.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Z. Lee**
Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312)360-6000
Email: jlee@freebornpeters.com
*ATTORNEY TO BE NOTICED*

**Rachel Elisabeth Anne Atterberry**
Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312)360-6000
Email: ratterberry@freebornpeters.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pittco Capital Partners, LP**                    represented by    **Joseph L. Fogel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellye L Fabian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Freeborn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Z. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Elisabeth Anne Atterberry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pittco Capital Partners II, LP**                    represented by    **Joseph L. Fogel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellye L Fabian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Freeborn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Z. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Elisabeth Anne Atterberry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**J.R. "Pitt" Hyde, III**                    represented by    **Joseph L. Fogel**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellye L Fabian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Freeborn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Z. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Elisabeth Anne Atterberry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andrew Seamons**                    represented by   **Joseph L. Fogel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kellye L Fabian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Freeborn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Z. Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Elisabeth Anne Atterberry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Does**
*1 - 10*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/15/2008 | 1 | NOTICE of Removal from Circuit Court of Cook County with copy of complaint, case number (2007 L 013795) filed by J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP Filing fee $ 350. (Attachments: # 1 Exhibit A, Part 1 of 2; # 2 Exhibit A, Part 2 of 2; # 3 Exhibit B, Part 1 of 2; # 4 Exhibit B, Part 2 of 2; # 5 Exhibit C; # 6 Exhibit D; # 7 Exhibit E; # 8 Exhibit F; # 9 Exhibit G). (gmr, ) (Entered: 01/16/2008) |
| 01/15/2008 | 2 | CIVIL Cover Sheet. (gmr, ) (Entered: 01/16/2008) |
| 01/15/2008 | 3 | ATTORNEY Appearance for Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP by Kellye L Fabian. (gmr, ) (Entered: 01/16/2008) |
| 01/16/2008 | | MAILED Notice of Removal letter to Plaintiff's counsel. (gmr, ) (Entered: 01/16/2008) |
| 01/16/2008 | 5 | ATTORNEY Appearance for Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP by John Z. Lee (Lee, John) (Entered: 01/16/2008) |
| 01/17/2008 | 6 | MINUTE entry before Judge George W. Lindberg :The Court, sua sponte, strikes Defendants' Notice of Removal 1 . Defendants' removal notice fails to allege federal subject matter jurisdiction. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (""Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'...The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (citations omitted). Mailed notice (slb, ) (Entered: 01/17/2008) |
| 01/30/2008 | 9 | ATTORNEY Appearance for Plaintiff DigaComm, LLC by Stephen Charles Hackney. (rp, ) (Entered: 02/04/2008) |
| 01/30/2008 | 10 | ATTORNEY Appearance for Plaintiff DigaComm, LLC by Matthew Emrich Nirider. (rp, ) (Entered: 02/04/2008) |
| 01/31/2008 | 7 | AMENDED notice of removal,, 1 by J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP (Attachments: # 1 Exhibit A (Part 1 of 2)# 2 Exhibit A (Part 2 of 2)# 3 Exhibit B (Part 1 of 2)# 4 Exhibit B (Part 2 of 2)# 5 Exhibit C# 6 Exhibit D# 7 Exhibit E# 8 Exhibit F)(Fabian, Kellye) (Entered: 01/31/2008) |
| 02/04/2008 | 8 | ATTORNEY Appearance for Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, |

| | | LP, Pittco Capital Partners II, LP by Michael D. Freeborn (Freeborn, Michael) (Entered: 02/04/2008) |
|---|---|---|
| 02/05/2008 | 11 | ATTORNEY Appearance for Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP by Joseph L. Fogel (Fogel, Joseph) (Entered: 02/05/2008) |
| 02/07/2008 | 12 | MOTION by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to file instanter *Memorandum in Support of Defendants' Combined Motion to Dismiss in Excess of Fifteen Pages* (Fabian, Kellye) (Entered: 02/07/2008) |
| 02/07/2008 | 13 | NOTICE of Motion by Kellye L Fabian for presentment of motion to file instanter, 12 before Honorable George W. Lindberg on 2/13/2008 at 09:30 AM. (Fabian, Kellye) (Entered: 02/07/2008) |
| 02/07/2008 | 14 | MOTION by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to dismiss *pursuant to Rules 12(b)(2) and 12(b)(6), or, in the Alternative, to Transfer under 28 U.S.C. section 1404* (Fabian, Kellye) (Entered: 02/07/2008) |
| 02/07/2008 | 15 | MEMORANDUM by J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP in support of motion to dismiss, 14 (Attachments: # 1 Exhibit Exhibits A-E# 2 Exhibit Exhibit F Part 1# 3 Exhibit Exhibit F Part 2)(Fabian, Kellye) (Entered: 02/07/2008) |
| 02/07/2008 | 16 | NOTICE of Motion by Kellye L Fabian for presentment of motion to dismiss, 14 before Honorable George W. Lindberg on 2/13/2008 at 09:30 AM. (Fabian, Kellye) (Entered: 02/07/2008) |
| 02/08/2008 | 17 | MINUTE entry before Judge George W. Lindberg :Defendants' Uncontested Motion for Leave to File, Instanter, Memorandum in Support of Defendants' Combined Motion to Dismiss in Excess of Fifteen Pages 12 is granted. Plaintiff's response to Defendants' Combined Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(6), or, in the Alternative, to Transfer Under 28 U.S.C. § 1404 14 must be filed on or before 3/5/08. Defendants' reply, if any, must be filed on or before 3/14/08. A ruling date is scheduled for 4/10/08 at 9:30 a.m. The parties are advised that any future requests to exceed the 15-page limit must be brought by motion in advance of filing the brief. A status hearing is scheduled for 2/21/08 at 9:30 a.m. Mailed notice (gmr, ) (Entered: 02/08/2008) |
| 02/21/2008 | 18 | MINUTE entry before Judge George W. Lindberg :Status hearing held and continued to 4/23/2008 at 9:30a.m. Discovery cutoff set 7/9/2008. Discovery hearing set for 6/11/2008 at 9:30a.m. Motion for summary judgment to be filed on or before 7/30/2008. Response to the motion for summary judgment to be filed on or before 8/13/2008. Reply due 8/20/2008. Ruling set for 9/17/2008 at 9:30a.m. Proposed final pretrial order to be submitted to chambers by 2pm on 9/17/2008. Trial set for |

| | | 10/14/2008 at 10:00a.m.Mailed notice (slb, ) (Entered: 02/21/2008) |
|---|---|---|
| 02/25/2008 | 19 | MOTION by Plaintiff DigaComm, LLC for leave to file excess pages *in Response to Motion to Dismiss* (Nirider, Matthew) (Entered: 02/25/2008) |
| 02/25/2008 | 20 | NOTICE of Motion by Matthew Emrich Nirider for presentment of motion for leave to file excess pages 19 before Honorable George W. Lindberg on 3/5/2008 at 09:30 AM. (Nirider, Matthew) (Entered: 02/25/2008) |
| 02/25/2008 | 21 | MINUTE entry before Judge George W. Lindberg :Plaintiff's Uncontested Motion for Leave to File Response to Defendants' Combined Motion to Dismiss in Excess of 15 Pages is granted. Mailed notice (slb, ) (Entered: 02/25/2008) |
| 02/25/2008 | 22 | MINUTE entry before Judge George W. Lindberg :The Court, sua sponte, advises the parties that discovery commenced on February 21, 2008. The parties need not wait until completion of their Rule 26(f) conference or submission of their Rule 26(f) report to serve or take discovery in this case.Mailed notice (slb, ) (Entered: 02/25/2008) |
| 03/05/2008 | 23 | RESPONSE by DigaComm, LLCin Opposition to MOTION by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to dismiss *pursuant to Rules 12(b)(2) and 12(b)(6), or, in the Alternative, to TransfMOTION by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to dismiss pursuant to Rules 12(b)(2) and 12(b)(6), or, in the Alternative, to Transf 14 (Attachments: # 1 Exhibit Affidavit# 2 Exhibit Part 2 to Ex 1# 3 Exhibit Affidavit# 4 Exhibit Unpublished Opinions# 5 Exhibit Part 2 of Ex 3# 6 Exhibit Part 3 of Ex 3# 7 Exhibit Part 4 of Ex 3)(Nirider, Matthew) (Entered: 03/05/2008)* |
| 03/11/2008 | 24 | MOTION by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP for extension of time to file response/reply *and for leave to file reply brief in excess of fifteen pages in support of combined motion to dismiss or transfer* (Fabian, Kellye) (Entered: 03/11/2008) |
| 03/11/2008 | 25 | NOTICE of Motion by Kellye L Fabian for presentment of motion for extension of time to file response/reply, 24 before Honorable George W. Lindberg on 3/19/2008 at 09:30 AM. (Fabian, Kellye) (Entered: 03/11/2008) |
| 03/11/2008 | 26 | MINUTE entry before Judge George W. Lindberg :Defendants' Motion for Five Day Extension of Time to File Reply and Leave to File Reply Brief in Excess of Fifteen Pages in Support of Combined Motion to Dismiss or Transfer 24 is granted. The ruling date is rescheduled to April 23, 2008 at 9:30 a.m. Mailed notice (gmr, ) (Entered: 03/12/2008) |
| 03/14/2008 | 27 | MOTION by Plaintiff DigaComm, LLC for protective order (Attachments: # 1 Text of Proposed Order)(Nirider, Matthew) (Entered: |

| | | 03/14/2008) |
|---|---|---|
| 03/14/2008 | 28 | NOTICE of Motion by Matthew Emrich Nirider for presentment of motion for protective order 27 before Honorable George W. Lindberg on 3/19/2008 at 09:30 AM. (Nirider, Matthew) (Entered: 03/14/2008) |
| 03/17/2008 | 29 | RESPONSE by J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to MOTION by Plaintiff DigaComm, LLC for protective order 27 (Attachments: # 1 Exhibit A)(Fabian, Kellye) (Entered: 03/17/2008) |
| 03/18/2008 | 30 | MINUTE entry before Judge Honorable George W. Lindberg:Plaintiff's Motion for entry of protective order 27 is granted. No Court appearance is required on 3/19/2008.Mailed notice (dl, ) (Entered: 03/18/2008) |
| 03/18/2008 | 31 | ATTORNEY Appearance for Plaintiff DigaComm, LLC by Timothy D. Elliott (Elliott, Timothy) (Entered: 03/18/2008) |
| 03/18/2008 | 33 | PROTECTIVE Order Signed by Judge George W. Lindberg on 3/18/2008.(rp, ) (Entered: 03/21/2008) |
| 03/19/2008 | 32 | REPLY by Defendant Vehicle Safety and Compliance, LLC to motion to dismiss, 14 or in the alternative, to transfer venue (Attachments: # 1 Exhibit Exhibits A-C, # 2 Unpublished Cases Cited in Brief)(Lee, John) (Entered: 03/19/2008) |
| 03/21/2008 | 34 | MOTION by Defendant Vehicle Safety and Compliance, LLCUncontested Motion to Schedule Settlement Conference After April 23, 2008 Ruling on Motion to Dismiss (Lee, John) (Entered: 03/21/2008) |
| 03/21/2008 | 35 | NOTICE of Motion by John Z. Lee for presentment of motion for miscellaneous relief 34 before Honorable George W. Lindberg on 3/26/2008 at 09:30 AM. (Lee, John) (Entered: 03/21/2008) |
| 03/24/2008 | 36 | MINUTE entry before Judge Honorable George W. Lindberg: Defendants' Uncontested Motion to Schedule Settlement Conference After 4/23/08. Ruling on Motion to Dismiss 34 is denied. Upon further consideration, the Court finds that deferring the face-to-face settlement conference undermines one purpose of the conference the resolution of disputes, if possible, at the outset of litigation. The parties are ordered to hold their conference prior to 4/23/08 and appear on that date at 9:30 a.m. to report the results of the same. If the parties settle the case or if there is unanimous consent to transfer the case to Magistrate Judge Cole for all purposes (including trial and entry of final judgment), they may report the same to the Court's Courtroom Deputy and need not appear on 4/23/08. Otherwise, the parties must submit a Rule 26(f) report on 4/23/08. Status hearing set for 4/23/2008 at 9:30 a.m. Mailed notice (hp, ) Modified on 3/25/2008 (hp, ). (Entered: 03/25/2008) |
| 03/31/2008 | 37 | MOTION by Plaintiff DigaComm, LLC to strike reply 32 in Support of Motion to Dismiss or Transfer (Nirider, Matthew) (Entered: 03/31/2008) |
| 03/31/2008 | 38 | NOTICE of Motion by Matthew Emrich Nirider for presentment of |

| | | |
|---|---|---|
| | | motion to strike, motion for relief 37 before Honorable George W. Lindberg on 4/9/2008 at 09:30 AM. (Nirider, Matthew) (Entered: 03/31/2008) |
| 04/01/2008 | 39 | MINUTE entry before Judge Honorable George W. Lindberg: Defendants are ordered to respond to Plaintiff's Motion to Strike New Evidence by 4/7/2008. No reply ordered. Ruling by mail. No court appearance required.Mailed notice (slb, ) (Entered: 04/01/2008) |
| 04/04/2008 | 40 | MOTION by Plaintiff DigaComm, LLC to compel *production of documents from Defendants* (Attachments: # 1 Exhibit DigaComm's Motion to Compel Ex A, # 2 Exhibit DigaComm's Motion to Compel Ex B, # 3 Exhibit DigaComm's Motion to Compel Ex C, # 4 Exhibit DigaComm's Motion to Compel Ex D, # 5 Exhibit DigaComm's Motion to Compel Ex E, # 6 Exhibit DigaComm's Motion to Compel Ex F, # 7 Exhibit DigaComm's Motion to Compel Ex G)(Nirider, Matthew) (Entered: 04/04/2008) |
| 04/04/2008 | 41 | NOTICE of Motion by Matthew Emrich Nirider for presentment of motion to compel, 40 before Honorable George W. Lindberg on 4/9/2008 at 09:30 AM. (Nirider, Matthew) (Entered: 04/04/2008) |
| 04/04/2008 | 42 | MINUTE entry before Judge Honorable George W. Lindberg: Defendants are ordered to respond to plaintiff's motion to compel by 4/8/2008. Hearing on the motion to compel set for 4/10/2008 at 11:30a.m. No court appearance required on 4/9/2008.Mailed notice (slb, ) (Entered: 04/04/2008) |
| 04/07/2008 | 43 | RESPONSE by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to motion to strike, motion for relief 37 (Attachments: # 1 Exhibit A)(Fabian, Kellye) (Entered: 04/07/2008) |
| 04/08/2008 | 44 | RESPONSE by Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP to motion to compel, 40 (Fabian, Kellye) (Entered: 04/08/2008) |
| 04/09/2008 | 45 | ATTORNEY Appearance for Defendants J.R. "Pitt" Hyde, III, Andrew Seamons, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP by Rachel Elisabeth Anne Atterberry (Atterberry, Rachel) (Entered: 04/09/2008) |
| 04/09/2008 | 46 | MINUTE entry before Judge Honorable George W. Lindberg:Ruling on the motion to compel will be made by mail. The motion hearing date of 4/10/2008 is stricken. No court appearance required on 4/10/2008.Mailed notice (slb, ) (Entered: 04/09/2008) |
| 04/09/2008 | 47 | MINUTE entry before Judge Honorable George W. Lindberg: Plaintiff's Motion to Strike New Evidence Attached to Defendants' Reply in Support of Motion to Dismiss orTransfer 37 is granted in part. Plaintiff is granted leave to file a surreply of no more than ten pages on or before April 21, 2008. The ruling date on Defendants' motion to dismiss or |

| | | transfer 14 is rescheduled to May 21, 2008 at 9:30 a.m. Mailed notice (cdy, ) (Entered: 04/10/2008) |
|---|---|---|
| 04/09/2008 | 48 | MINUTE entry before Judge Honorable George W. Lindberg: Plaintiff's Motion to Compel 40 is granted in part. Defendants are ordered to produce documents on a rollingbasis and complete their production by no later than April 21, 2008. Mailed notice (cdy, ) (Entered: 04/10/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/14/2008 15:09:54 | | | |
| **PACER Login:** | fr1519 | **Client Code:** | 23605/001LL1/petition |
| **Description:** | Docket Report | **Search Criteria:** | 1:08-cv-00338 |
| **Billable Pages:** | 6 | **Cost:** | 0.48 |

EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION

Wilmington, Delaware

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | No. _____ |
| v. | ) | |
| | ) | |
| Vehicle IP, LLC, | ) | |
| Bradley Larschan, | ) | |
| | ) | |
| Respondents. | ) | |

### Demand for Arbitration

In support of its Demand for Arbitration, Claimant DigaComm, LLC ("DigaComm")

states as follows:

1.      In March 2007, Respondent Vehicle IP, LLC ("VIP") requested that DigaComm

facilitate a patent joint venture with General Electric ("GE").  After the parties negotiated an

agreement to pay DigaComm a portion of the proceeds generated by the joint venture,

DigaComm set to work.  The patents in question are valued by VIP at $4 billion dollars.

2.      DigaComm's efforts on behalf of VIP paid off.  In August 2007, GE and VIP

closed on their joint venture agreement.  Shortly thereafter, VIP repudiated its promise to pay

DigaComm its compensation for having procured the deal.  On September 7, 2007, VIP Chief

Executive Officer Brad Larschan informed DigaComm's Managing Member Peter Smith that

VIP's promise to pay DigaComm for procuring the GE joint venture was null and void.

3.      DigaComm brings this arbitration pursuant to the parties' arbitration agreement.

It seeks a declaration that VIP is bound by principles of both law and equity to live up to the

bargain it made in exchange for DigaComm's efforts in procuring a $4 billion joint venture. In the alternative, DigaComm seeks damages equal to 5% of the patents in question.

## PARTIES

4.      Claimant DigaComm is a Delaware limited liability company headquartered in Chicago, Illinois. Its address is 400 North Michigan Avenue, Suite 520, Chicago, Illinois, 60611. DigaComm was founded in 1997 and is a Chicago private investment firm specializing in early stage venture capital rounds. DigaComm's managing members are Peter Smith and Robert Spillane.

5.      Respondent VIP is a Delaware limited liability company headquartered in Memphis, Tennessee. Its address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117.

6.      Respondent Bradley Larschan is a resident of Tennessee. Mr. Larschan is the chief executive officer of VIP. His business address is 5101 Wheelis Drive, Suite 100, Memphis, Tennessee, 38117.

7.      Related party Vehicle Safety & Compliance, LLC ("VSAC") is a Delaware limited liability company also headquartered in Memphis, Tennessee. Its address is believed to be the same as VIP's. VSAC's largest holder of membership units is Pitt Hyde, a prominent Memphis businessman and the founder of AutoZone, a chain of automobile parts stores.

2

## ARBITRATION AGREEMENT

8.    DigaComm's and VIP's arbitration agreement can be found in a March 30, 2007
Letter Agreement between the parties.  A copy of this Letter Agreement is attached as Exhibit 1.
The arbitration agreement provides:

> In the unlikely event any dispute should arise between us relating to this Letter
> such may only be resolved by a single arbitrator in accordance with the
> commercial arbitration rules of the American Arbitration Association in
> Wilmington, Delaware with the internal laws of that State applying.

(Ex. 1 at p.2.)

9.    The parties' arbitration agreement calls for the arbitration to take place in
Wilmington, Delaware.

10.    Pursuant to Del. Code Ann. tit. 10, § 5703(c), this Demand for Arbitration shall
serve as notice of DigaComm's intention to arbitrate and notice that VIP and Mr. Larschan may
not object to the validity of the agreement to arbitrate or assert the bar of a limitation of time
unless they apply to enjoin arbitration within 20 days after the service of this Demand.

## STATEMENT OF FACTS

11.    VIP is a patent "troll" — an entity whose principal assets are intellectual property
but which does not otherwise operate an active business.  The patents at the center of this lawsuit
involve motor vehicle communication technology.  VIP and VSAC value these patents at $4
billion.

12.    The patents in question were acquired during the bankruptcy of then-holder
Remote Dynamics, Inc. in 2004.  Raymond Bilbao, formerly General Counsel to Remote
Dynamics, Inc., followed the patents to VIP and now serves as VIP's General Counsel.

3

13.     The capital used to acquire the patents and develop them was provided to VIP by VSAC, its sole member.  VSAC is believed to have invested approximately $5 million in capital, by way of loans or capital contributions.

14.     After acquiring the patents, VIP set about its efforts to monetize those patents. The principal method for a patent troll to monetize intellectual property is to sue patent infringers for damages.  Alternatively, a patent troll can monetize a patent by entering into licensing agreements with businesses interested in utilizing the technology.

15.     In 2006, VIP entered into discussions regarding its patent portfolio with the Boston intellectual property firm Fish & Richardson.  Under the proposals, Fish & Richardson agreed to invest between 30 and 100% of its fee in return for participation in any damages or licensing fees received through its suits against infringers of certain patents.

16.     In December 2006, an attorney at Fish & Richardson named Michael Bunis contacted DigaComm Principal Jonathan Tunick and encouraged DigaComm to investigate the VIP portfolio.  Fish & Richardson believed that the patents in question were incredibly valuable and believed that DigaComm might be interested in either investing in VIP or in facilitating such an investment.

17.     DigaComm was well-positioned to assist VIP.  In July 2005, it had entered into an agreement with SightSound Technologies, Inc. ("SightSound") under which it had agreed to assist SightSound to form a joint venture with General Electric.  The GE joint venture was structured as follows: (a) SightSound would contribute its patents to a special purpose entity; and (b) GE would contribute necessary capital and would use its experience and sophistication to

4

monetize the patents, either by negotiating license agreements or by enforcing SightSound's patents against infringers.

18.    In return for facilitating this joint venture, DigaComm was to receive 5% of any amounts generated by the joint venture after certain amounts (such as GE's capital investment) were repaid.

19.    The SightSound/GE joint venture closed successfully in mid-2005.  Though the patents in that matter are currently under re-examination by the Patent and Trademark Office, DigaComm will receive the 5% owed to it for facilitating the transaction once the patents emerge from the re-examination process.

20.    Though DigaComm would normally consider investing in an early stage business such as VIP, Mr. Tunick and DigaComm's Managing Member Peter Smith thought that the VIP technology might be a good candidate for a joint venture with GE similar to the SightSound deal.

21.    In January 2007, Mr. Smith contacted Mr. Larschan in order to explore the possibility of facilitating a joint venture between VIP and GE.  Mr. Larschan had been waiting for Mr. Tunick's call and was receptive to the idea.

22.    Mr. Larschan eagerly embraced the idea of a joint venture with GE because GE was a market participant in the very fields encompassed by the VIP patents.  Because of GE's status as a market participant, Mr. Larschan believed that GE had a stronger legal footing for enforcing the patents and that GE could do so without being perceived as a patent troll.  In fact, Mr. Larschan had previously authored an article in which he explained how a recent intellectual property decision by the United States Supreme Court made a market participant like GE a

valuable, if not indispensable, ally in enforcing patents. (A copy of Mr. Larschan's article is attached as Exhibit 2.)

23.    On February 6, DigaComm hosted Mr. Larschan and Mr. Bilbao at its offices in Chicago. During this meeting, DigaComm again raised the idea of working with VIP to secure an agreement with GE similar to the SightSound transaction. Mr. Larschan reiterated his interest in the idea. The next day, Mr. Larschan called from the airport and told Mr. Tunick that VIP "really liked" the idea of pursuing a deal with GE and inquired about the next steps. Mr. Tunick promised to coordinate with John Hall of GE, the executive involved in the SightSound transaction.

24.    On February 13, 2007, Mr. Larschan emailed to Mr. Hall of GE a set of financial projections for each of VIP's three intellectual property groups. Acknowledging DigaComm's role as the facilitator of the transaction, on February 16, 2007, Mr. Larschan asked whether Mr. Tunick would follow up with General Electric. Mr. Tunick agreed to do so the same day.

25.    On February 17, 2007, Mr. Larschan thanked Mr. Tunick for his continued efforts with respect to GE and requested a copy of the SightSound transaction so that he could "advocate for it" with his Board. DigaComm complied with Mr. Larschan's request.

26.    On February 27, 2007, Mr. Larschan again thanked Mr. Smith and Mr. Tunick for "pushing along the GE deal," noting that it "could be a great opportunity."

27.    On March 7, Mr. Tunick and Mr. Larschan spoke by telephone regarding DigaComm's compensation. By this time, a meeting had been scheduled with John Hall of GE that was to take place the following day. Mr. Tunick said that DigaComm was looking for a

10% piece of any transaction in return for bringing the transaction to VIP's attention. Mr.
Tunick emphasized that if VIP and DigaComm were not able to agree on DigaComm's
compensation, the March 8 meeting with GE would be cancelled.

28.    Mr. Larschan pushed back. He said that 10% was not acceptable, but that 5% was
"not a problem" and was the "market rate." Mr. Tunick agreed that DigaComm would accept
5%.

29.    On March 8, 2007, John Hall of General Electric met with Larschan and others of
VIP and made a power-point presentation reflecting GE's view of how best to monetize the
patents in question.

30.    At the conclusion of the meeting, Mr. Hall asked what VIP wanted from GE. Mr.
Larschan said "we want what you did on the SightSound deal." The meeting ended on a positive
note. Mr. Hall agreed to speak with Todd Dickinson, GE's head of intellectual property.

31.    On March 9, Mr. Tunick emailed Mr. Larschan to report on a conversation he had
had with John Hall of GE. In his email, he noted the parties agreement with respect to
DigaComm's 5% compensation:

> Brad — I will report to you on John Hall's conversation with Todd Dickenson,
> but before doing so I want to ensure that we have agreement on our own working
> arrangement. As you and I agreed prior to our meeting, the waterfall splits will be
> 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming
> our prior understanding.

32.    Eager to learn of the new development and keep the deal on track, Mr. Larschan
confirmed Mr. Tunick's understanding of the parties' agreement as to DigaComm's
compensation:

Jonathan, This represents our understanding of the percentage split. I look
forward to hearing about John's conversation with Todd.

(A copy of this email chain is attached as Exhibit 3.)

33.    In late March, DigaComm asked that it and VIP reduce their agreement to a
formal writing. On March 20, 2007, DigaComm sent VIP a letter reflecting the parties'
agreement that DigaComm would receive 5% of the GE/VIP joint venture.

34.    With the GE deal progressing smoothly and with VIP having established direct
contacts with GE, VIP apparently felt free to repudiate its prior promise to pay DigaComm 5%.
On March 29, 2007, Mr. Bilbao informed Mr. Tunick during a telephone call that VIP was no
longer willing to pay DigaComm 5%. Mr. Bilbao said that 5% "did not work optically" and that
Mr. Larschan was no longer willing to pay the 5% he had previously promised.

35.    DigaComm viewed Mr. Larschan's position as a radical change from his prior
agreement to pay 5%. Rather than allow a complete breakdown in the relationship that might
threaten the GE deal, Mr. Smith and Mr. Tunick proposed a tiered fee schedule. On March 30,
2007, DigaComm and VIP agreed to a tiered fee agreement under which DigaComm would
receive the following percentages of amounts generated by the GE/VIP joint venture (less the
VSAC and GE capital contributions):

| Amounts generated by the joint venture | DigaComm's share |
| --- | --- |
| Up to $300 million | 5% |
| Between $300 and $500 million | 4% |
| Between $500 and $750 million | 3.5% |
| Between $750 million and 1 billion | 2.5% |
| Between $1 billion and $1.5 billion | 2.0% |

8

| Between $1.5 billion and $2 billion | 1.5% |
| Over $2 billion | 1% |

36.     Under the agreed upon compensation schedule, DigaComm stands to earn up to $76 million for bringing the GE opportunity to VIP's $4 billion patent portfolio.

37.     As Friday, March 30, 2007 wound to a close, VIP insisted for the first time that the letter agreement be "subject to the approval of a majority of the VSAC Preferred Holders." DigaComm objected to this change. Mr. Larschan assured Mr. Smith, however, that the approval process was a mere formality. VIP promised to recommend to the VSAC Preferred Holders that they approve the DigaComm letter agreement "as soon as practicable."

38.     As a further sign that the approval process was nothing to be concerned about, VIP communicated with Andrew Seamons, a representative of VSAC Preferred Holder Pitt Hyde. VIP represented in an email of the same day that Mr. Hyde and his 30% Preferred Holding approved of the deal. (A copy of this email is attached as Exhibit 4.)

39.     In addition, Mr. Larschan told Mr. Tunick that the other VSAC Preferred Holders would "follow the lead" of Mr. Seamons. Mr. Larschan emphasized that the approval provision was not a problem because "you already have the votes."

40.     At all relevant times, GE approved of and was grateful for DigaComm's efforts in bringing to its attention the VIP opportunity and understood that DigaComm would receive a participation percentage for its efforts.

41.     On April 2, DigaComm coordinated a meeting in Memphis so that VSAC's Preferred Holders could meet Mr. Hall of GE in person. Because of flight delays, Mr. Smith of

9

DigaComm was not able to make the initial meeting. Mr. Hall reported to him that the meeting had gone well. The VSAC Preferred Holders had believed GE to be too good to be true. Mr. Hall's understanding was that the VSAC Preferred Holders were very receptive to a deal between VIP and GE, but wanted to first meet with the GE licensing personnel who would also be involved in the joint venture.

42.     Mr. Smith's flight arrived in time for dinner in Memphis. That dinner was attended by Smith, Mr. Hall, Mr. Larschan, and Pitt Hyde's representative Mr. Seamons. At no time did anyone question DigaComm's participation or inform DigaComm that the VSAC Preferred Holders had not yet approved the DigaComm letter agreement. Mr. Hall also told Mr. Smith that he had informed the VSAC Preferred Holders of the importance of DigaComm to the effort and had received no objections.

43.     On May 8, a second meeting was held in Memphis so that the VSAC Preferred Holders could meet the GE licensing people. Jonathan Tunick attended this meeting on behalf of DigaComm. The meeting was a success — the VSAC Preferred Holders decided to proceed with the GE joint venture.

44.     On June 12, 2007, John Hall contacted Mr. Smith and informed him that GE's law firm, Latham & Watkins, needed a copy of the DigaComm letter agreement so that they could write in DigaComm's compensation to the joint venture agreement. Mr. Smith obliged by sending Mr. Hall a copy of the DigaComm letter agreement with VIP. Mr. Smith's letter states "I am sending a copy of this letter to Brad Larschan in the event that you or your associates need additional information from either of us." (A copy of Mr. Smith's letter is attached as Exhibit 5.)

10

45.     At no time did Mr. Larschan object or inform Mr. Smith that the DigaComm letter agreement was invalid or that it had not yet been approved.

46.     Mr. Larschan did take action, however. Mr. Larschan directed VIP's lawyers to object to any inclusion of DigaComm in the joint venture documents. At no point did anyone inform DigaComm that VIP was once again reneging on its promise to pay DigaComm.

47.     As far as DigaComm knew, the GE/VIP negotiations were proceeding smoothly. On several occasions, Mr. Smith contacted Mr. Larschan to check in. At no time did Mr. Larschan inform Mr. Smith that there was any problem with either DigaComm's contract or the GE deal as a whole.

48.     By mid-August, DigaComm was of the belief that the GE/VIP deal closing was imminent. On August 21, 2007, Mr. Smith wrote Mr. Larschan and Mr. Bilbao to congratulate them on closing the GE deal.

49.     On August 27, 2007, Mr. Smith again wrote Mr. Larschan to congratulate him on closing the GE deal.

50.     Mr. Smith received no response to his emails until September 6, 2007. On that day, Mr. Larschan dropped a bombshell: VIP was refusing to pay DigaComm because "a majority of the VSAC Preferred Holders had not approved the deal." He offered to pay DigaComm $250,000 for its efforts in securing a $4 billion opportunity with one of the world's largest companies.

51.     An angered Mr. Smith informed Mr. Larschan that he would contact GE and his litigation counsel about this unfortunate development.

11

52.    On September 7, 2007, VIP officially reneged on its obligations to DigaComm. In a letter of that day, Mr. Larschan informed Mr. Smith that,

> [o]n August 10, 2007, a joint meeting of the Board of Directors of VSAC and VSAC's Preferred Interest Holders was held at VSAC's corporate offices in Memphis, Tennessee.  At such meeting, the management of VIP recommended to VSAC's Preferred Interest Holders that they should approve the terms of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth therein.  Unfortunately, despite management's recommendation, a majority of VSAC's Preferred Interest Holders voted against the approval of the Letter Agreement including the distribution of Cash Waterfall Proceeds as set forth herein.  Thus, as the Letter Agreement was contingent upon the approval of VSAC's Preferred Interest Holders, VIP's failure to obtain such approval renders the Letter Agreement null and void.

(A copy of this letter is attached as Exhibit 6.)

53.    At no time prior to September 6, 2007, did anyone from VIP inform anyone from DigaComm that the VSAC Preferred Holders had not approved the DigaComm letter agreement. To the contrary, VIP and VSAC took pains to give DigaComm the illusion that everything was on track.

54.    DigaComm brings this action to either (a) enforce the March 30, 2007 letter agreement; or, in the alternative, (b) recover damages equal to a percentage of the GE/VIP patent portfolio's value.

## COUNT I
## (BREACH OF THE MARCH 30, 2007 LETTER AGREEMENT)

55.    The March 30, 2007 Letter Agreement was a valid and enforceable contract between DigaComm and VIP.

56.    DigaComm performed all of its obligations under the March 30, 2007 Letter Agreement.

12

57.    VIP has repudiated its obligations to pay under the Letter Agreement and is in material breach of the Letter Agreement.

58.    VIP breached its obligations under the Letter Agreement by failing to recommend that the VSAC Preferred Holders approve the Letter Agreement "as soon as practicable."

59.    VIP breached the Letter Agreement by failing to direct the special purpose entity created in its joint venture with GE to "distribute directly to DigaComm . . . such portion of VIP's 50% of the Cash Waterfall Proceeds as set forth in . . . Exhibit A."

60.    VIP will argue that the VSAC Preferred Holders' approval was a condition precedent to the Letter Agreement.  However, the proposed condition precedent is not a valid condition under Delaware law because it would render VIP's obligations under the Letter Agreement illusory.

61.    In any event, VIP breached the condition precedent by failing to move swiftly to obtain the approval of the VSAC Preferred Holders "as soon as practicable."

62.    In addition, VIP waived the condition precedent by allowing DigaComm to continue performance and by failing to inform DigaComm that the Letter Agreement's validity was disputed.

63.    DigaComm seeks a declaration (a) that the Letter Agreement is valid and enforceable; (b) that it has performed its obligations under the Letter Agreement; and (c) that it is entitled to distributions from the GE/VIP joint venture equal to those set forth on Exhibit A to the Letter Agreement.

13

64.    In the alternative, DigaComm seeks damages in the amount of $76 million. DigaComm reserves the right to elect its contractual remedies.

## COUNT II
### (BREACH OF THE MARCH 9, 2007 AGREEMENT)

65.    Brad Larschan's March 9, 2007 agreement to pay DigaComm 5% of the proceeds of the GE/VIP joint venture also represents a valid and enforceable contract.

66.    DigaComm has performed under the March 9, 2007 agreement.

67.    VIP has breached the March 9, 2007 agreement by repudiating its obligation to pay DigaComm 5% of the proceeds.

68.    DigaComm seeks a declaration that the March 9, 2007 agreement is a valid and enforceable contract, that it has performed under that contract, and that it is entitled to 5% of the proceeds generated.

69.    In the alternative, DigaComm seeks damages in the amount of 5% of the GE/VIP patent portfolio. DigaComm reserves the right to elect its contractual remedies.

## COUNT III
### (PROMISSORY ESTOPPEL)

70.    DigaComm believes it has valid contractual claims against VIP. VIP, however, has asserted that the contracts between the two parties are "null and void." DigaComm brings this equitable claim in the alternative to its claim for breach of contract.

71.    VIP promised to pay DigaComm 5% in the event VIP closed on a transaction with GE.

14

72.     VIP promised to "as soon as practicable" seek the approval of a majority of the Preferred Holders.

73.     VIP reasonably expected DigaComm to act in reliance on these promises by continuing its efforts to procure an agreement with GE.

74.     DigaComm in fact relied upon these promises.

75.     If VIP's promises are not enforced, DigaComm will suffer an injustice.

76.     DigaComm seeks a declaration that it is entitled to 5% of the proceeds of the GE/VIP joint venture.

77.     In the alternative, DigaComm seeks damages equal to 5% of the value of the GE/VIP patent portfolio.

## COUNT IV
### (UNJUST ENRICHMENT)

78.     DigaComm believes it has valid contractual claims against VIP.  VIP, however, has asserted that the contracts between the two parties are "null and void."  DigaComm brings this equitable claim in the alternative to its claim for breach of contract.

79.     DigaComm has conferred a benefit on VIP by alerting it to the possibility of a transaction with GE and by facilitating that transaction.

80.     Instead of paying DigaComm its fair share of this windfall, VIP seeks to retain the benefits of the GE transaction for itself.

81.     VIP's retention of these benefits will result in an injustice.

15

82.    DigaComm seeks damages equal to 5% of the value of the GE/VIP patent portfolio.

## COUNT V
## (QUANTUM MERUIT)

83.    DigaComm believes it has valid contractual claims against VIP. VIP, however, has asserted that the contracts between the two parties are "null and void." DigaComm brings this quantum meruit claim in the alternative to its claim for breach of contract.

84.    DigaComm provided services to VIP.

85.    DigaComm performed the services with the expectation that it would be paid 5% for its efforts.

86.    The circumstances of DigaComm's and VIP's relationship were such that VIP was on notice that DigaComm expected to be paid.

87.    DigaComm seeks damages equal to 5% of the GE/VIP patent portfolio.

## COUNT VI
## (FRAUD)

88.    VIP and Mr. Larschan made misrepresentations to DigaComm regarding the VSAC Preferred Holders approval provision.

89.    VIP and Mr. Larschan knew their statements were false at the time they made them.

90.    VIP and Mr. Larschan intended that DigaComm would rely on these misrepresentations.

16

91.    DigaComm relied on these representations.

92.    DigaComm has suffered damages as a result of VIP's and Mr. Larschan's fraudulent conduct.

93.    DigaComm seeks compensatory and punitive damages.

17

Respectfully submitted,

DigaComm, LLC

By: _____
    One of its attorneys

Reed S. Oslan
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois  60601
Tel: 312/861-2157
Fac: 312/861-2200

18

EXHIBIT D

RECEIVED MAR 0 4 2008

## CT CORPORATION
A WoltersKluwer Company

**Service of Process Transmittal**
02/29/2008
CT Log Number 513142413

TO: Jane Smith
Fish & Richardson P.C.
3300 Dain Rauscher Plaza, 60 South Sixth Street
Minneapolis, MN 55402-

RE: **Process Served in Delaware**

FOR: Fish & Richardson P.C. (Domestic State: MA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DigaComm, LLC, Pltf. vs. Vehicle Safety and Compliance, LLC, et al., Dfts. // To: Fish & Richardson P.C. |
| **DOCUMENT(S) SERVED:** | Subpoena, Proof of Service Form, Attachment |
| **COURT/AGENCY:** | United States District Court, DE<br>Case # 08 C 338 |
| **NATURE OF ACTION:** | Subpoena - Business records - All documents relating the acquisition of the patents that constitute the VIP Patent Portfolio and the GE Deal, including emails, correspondence, drafts, closing sets, negotiations, exhibits, budgets, side agreements, approvals and/or memorandum (Please see attachment for additional requests) |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/29/2008 at 14:00 |
| **APPEARANCE OR ANSWER DUE:** | March 18, 2008 at 10:00 a.m. |
| **ATTORNEY(S) / SENDER(S):** | Matthew E. Nirider<br>Kirkland & Ellis LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601<br>312-861-2000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 790950934087 |
| **SIGNED:** | The Corporation Trust Company |
| **PER:** | Scott LaScala |
| **ADDRESS:** | 1209 Orange Street<br>Wilmington, DE 19801 |
| **TELEPHONE:** | 302-658-7581 |

Page 1 of 1 / AC

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

AO88 (DE Rev. 01/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

### DISTRICT OF DELAWARE

| | |
|---|---|
| DigaComm, LLC | **SUBPOENA IN A CIVIL CASE** |
| V. | |
| Vehicle Safety and Compliance, LLC, et al. | Case Number:[1] 08 C 338 (N.D. Ill.) |

TO:  Fish & Richardson P.C., The Corporation Trust Company,
Corporation Trust Center, 1209 Orange Street, Wilmington,
DE 19801

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE      919 N. Market Street, 17th Floor, Wilmington, DE 19899 | DATE AND TIME
3/18/2008 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _(signature)_  Attorney for Plaintiff DigComm, LLC | 2/26/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Matthew E. Nirider, Kirkland & Ellis LLP, 200 E. Randolph Drive, Chicago, IL 60601
(312) 861-2000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (DE Rev.  01/07) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                          DATE                                SIGNATURE OF SERVER

                                            _____
                                            ADDRESS OF SERVER

                                            _____

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises— or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**ATTACHMENT A**

**SUBPOENA DUCES TECUM**

**DEFINITIONS**

1.     "Document" means every writing or record of every type and description, including letters, correspondence, calendars, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, voice recordings, reports, financial statements, applications, emails, tests, and includes all copies of every writing or record when the copy is not identical to the original.

2.     Requests for communications or correspondence with legal entities shall extend to communications with employees, officers, directors, members, preferred interest holders, shareholders, or agents of the legal entity in question.

3.     "DigaComm" shall mean Plaintiff DigaComm, LLC, Peter Smith, and/or Jonathan Tunick.

4.     "Fish & Richardson," "you," or "your" shall mean Fish & Richardson, P.C. and any partners, members, shareholders, associates, staff, agents, consultants, employees, representatives, and any other person(s) who are, or were, acting under your control or at your direction.  These terms shall also include business organizations (including, but not limited to corporations, professional corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) or trusts that you control or that are controlled, directly or indirectly, by entities that you control.

5.     "VIP" shall mean Vehicle IP, LLC and any agents, consultants, employees, representatives, members, officers, directors, and any other person(s) (including, but not limited to, Bradley Larschan, Ericka Wojack, J. Raymond Bilbao, and Andrew Seamons) who are, or were, acting under its control or at its direction.  These terms shall also include business

organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

6.    "VSAC" shall mean Vehicle Safety and Compliance, LLC and any agents, consultants, employees, representatives, officers, directors, members, preferred interest holders (including, but not limited to, Pittco Capital Partners, LP and Pittco Capital Partners II, LP), and any other person(s) who are, or were, acting under its control or at its direction.  These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

7.    "GE" shall mean General Electric Co. and any subsidiaries, (including, but not limited to, the GE Intellectual Property Licensing division or subsidiary, whichever the case may be), affiliates, consultants agents, employees, (including, but not limited to, Jimmy Goo, Michael Petracci, and Jim DiGeorgio) representatives, officers, directors, members, and any other person(s) or entities who are, or were, acting under your control or at your direction.  These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

8.    "GE SPE" shall mean the entity that acquired a portfolio of patents from VIP as part of the GE Deal.

2

9.      "GE Deal" shall mean the transaction involving GE and VIP in which VIP contributed a portfolio of patents to the GE SPE.

10.     "VIP Patent Portfolio" shall mean those patents contributed by VIP to the GE SPE, and shall include, but not be limited to, U.S. Patent Nos. 6,405,033; 6,301,480; 6,295,449; 6,240,295; 6,167,255; 6,148,202; 6,018,657; 6,009,330; 5,983,108; 5,966,658; 5,918,172; 5,884,221; 5,832,394; 5,826,195; 5,771,455; 5,734,981; 5,699,275; 5,652,707; 5,544,225; 5,539,810; 5,519,621; 5,513,111; 5,398,190; 5,299,132; and/or 5,155,689.

11.     "Economic Interest" shall mean a right, claim, legal share, membership unit, preferred interest, or other thing of value.

12.     "Monetize," "Monetization," or "Monetizing," with respect to the VIP Patent Portfolio, shall mean any proposed or actual syndication efforts, any proposed or actual licensing efforts, any proposed or actual cross-licensing efforts, any proposed or actual litigation, or other proposed or actual efforts to obtain a thing of value relating to the VIP Patent Portfolio.

13.     "Complaint" shall mean DigaComm's First Amended Complaint in this action.

14.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

15.     As used herein, "referring," "regarding," "relating," "relates," or "respecting," any given subject matter means, in addition to the plain meaning of those words, responding to, describing, analyzing, embodying, assessing, discussing, identifying, or otherwise referring directly or indirectly to, in any way, the particular subject matter identified.

16.     The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

## INSTRUCTIONS

1.      Subject to Instruction No. 2 below, with respect to any documents or information withheld on a claim of attorney/client privilege, attorney work product privilege, or any other privilege, provide the author(s), the recipient(s), the date of the communications, and an express statement of the privilege that describes the nature of the documents, communications, or things not produced or disclosed in a manner that will enable DigaComm to assess the applicability of the privilege or protection.

2.      DigaComm understands that Fish & Richardson also serves as litigation counsel in the above-captioned matter.  These requests should not be construed to include Fish & Richardson's litigation files relating to this matter.  Thus, DigaComm does not expect Fish & Richardson to log privileged communications or attorney work-product that are located in its litigation files for this matter.

3.      These requests are continuing in nature.  Supplemental responses are required if you obtain further information after your responses.

## DOCUMENT REQUESTS

**REQUEST NO. 1:**  All documents relating to the acquisition of the patents that constitute the VIP Patent Portfolio, including, but not limited to, communications with employees of the seller, notes, analyses or projections of current or future value.

**RESPONSE TO REQUEST NO. 1:**


**REQUEST NO. 2:**  All documents relating to the GE Deal, including, but not limited to email, correspondence, drafts, closing sets, negotiations, exhibits, budgets, side agreements, approvals, and/or memoranda.

**RESPONSE TO REQUEST NO. 2:**

4

**REQUEST NO. 3:**  All documents relating to DigaComm.

**RESPONSE TO REQUEST NO. 3:**


**REQUEST NO. 4:**  All documents relating to John Hall.

**RESPONSE TO REQUEST NO. 4:**


**REQUEST NO. 5:**  All correspondence or other communications to or from GE relating to the GE SPE or the VIP Patent Portfolio.

**RESPONSE TO REQUEST NO. 5:**


**REQUEST NO. 6:**  All documents relating to Fundamental Wireless, LLC.

**RESPONSE TO REQUEST NO. 6:**


**REQUEST NO. 7:**  All documents relating to the validity of the VIP Patent Portfolio, including, but not limited to, patent file histories, patent books, opinion letters, notes, analyses, and/or claims charts.

**RESPONSE TO REQUEST NO. 7:**


**REQUEST NO. 8:**  All estimates, projections, appraisal reports, valuation analyses, budgets, market studies, next-best-alternative analyses, design-around analyses, studies, reports, and/or any other documents relating to the current or future value of the VIP Patent Portfolio or the GE SPE.

**RESPONSE TO REQUEST NO. 8:**

**REQUEST NO. 9:** All correspondence or other communications between you and any third parties, auditors, accountants, tax professionals, and/or government authorities, including the Internal Revenue Service, relating to the current or future value of the VIP Patent Portfolio, the GE SPE, and/or Economic Interests in VIP or VSAC.

**RESPONSE TO REQUEST NO. 9:**


**REQUEST NO. 10:** All documents relating to efforts to Monetize the VIP Patent Portfolio, including, but not limited to, third-party communications, third-party solicitations, third-party investments, third-party negotiations, private placement memoranda, marketing materials, licensing memoranda, presentations, demands, suits, contemplated suits, analyses, budgets, projections, claims charts, decks, and/or other estimates of current, future, and/or potential revenue.

**RESPONSE TO REQUEST NO. 10:**


**REQUEST NO. 11:** All corporate documents relating to the GE SPE, including, but not limited to, meeting minutes, member consents, LLC operating agreements, membership agreements, corporate resolutions, fairness opinions, private placement memoranda, shareholder agreements, partnership agreements, by-laws, and/or articles of organization.

**RESPONSE TO REQUEST NO. 11:**


**REQUEST NO. 12:** All corporate documents relating to Fundamental Wireless, LLC, including, but not limited to, meeting minutes, member consents, LLC operating agreements, membership agreements, corporate resolutions, fairness opinions, private placement memoranda, shareholder agreements, partnership agreements, by-laws, and/or articles of organization.

**RESPONSE TO REQUEST NO. 12:**

**REQUEST NO. 13:**  All documents relating to efforts to Monetize any VIP patents prior to the GE Deal, including, but not limited to, discussions or negotiations between you and VIP and/or VSAC.

**RESPONSE TO REQUEST NO. 13:**

**REQUEST NO. 14:**  All documents relating to SightSound Technologies or its transaction with GE and/or DigaComm.

**RESPONSE TO REQUEST NO. 14:**

**REQUEST NO. 15:**  All documents relating to any internal GE process involving the decision to approve the GE Deal, including, but not limited to, due diligence documents, analyses, reports, recommendations, decks, memoranda, and/or decisions.

**RESPONSE TO REQUEST NO. 15:**

**REQUEST NO. 16:**  Any opinion letters regarding any of the VIP patents.

**RESPONSE TO REQUEST NO. 16:**

**REQUEST NO. 17:**  All documents relating to any Economic Interest you have in the GE SPE or the VIP Patent Portfolio.

**RESPONSE TO REQUEST NO. 17:**

**REQUEST NO. 18:**  All documents relating to any Economic Interest you have in Fundamental Wireless, LLC.

**RESPONSE TO REQUEST NO. 18:**

7

RECEIVED MAR 0 4 2008

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process Transmittal**
02/29/2008
CT Log Number 513142131

||||||||||||||||||||||||||||||||||||||||||||||||||||||

TO:    Jane Smith
       Fish & Richardson P.C.
       3300 Dain Rauscher Plaza, 60 South Sixth Street
       Minneapolis, MN 55402-

RE:    **Process Served in Delaware**

FOR:   Fish & Richardson P.C. (Domestic State: MA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| TITLE OF ACTION: | In the Matter of the Arbitration between DigaComm, LLC, Claimant vs. Vehicle IP, LLC and Bradley Larschan, Respondents // To: Fish & Richardson P.C. |
| DOCUMENT(S) SERVED: | Subpoena Duces Tecum, Attachment |
| COURT/AGENCY: | The Arbitration Tribunals of the American Arbitration Association, - Case # None Specified |
| NATURE OF ACTION: | Subpoena - Business records - All documents relating to the acquisition of the patents that constitute the VIP Patent Portfolio, including, communications with employees of the seller, notes, analyses or projections of current or future value, all documents relating to the GE Deal, including, but not limited to emal, correspondence, drafts, closing sets, negotiations, exhibits, budgets, side agreements, approvals, and/or memoranda (See Document Requests for additional requests) |
| ON WHOM PROCESS WAS SERVED: | The Corporation Trust Company, Wilmington, DE |
| DATE AND HOUR OF SERVICE: | By Process Server on 02/29/2008 at 14:00 |
| APPEARANCE OR ANSWER DUE: | March 21, 2008 at 12:00 p.m. |
| ATTORNEY(S) / SENDER(S): | Matthew E. Nirider Kirkland & Ellis LLP 200 E. Randolph Drive Chicago, IL 60601 312-861-2000 |
| ACTION ITEMS: | SOP Papers with Transmittal, via  Fed Ex 2 Day , 790950934087 |
| SIGNED: | The Corporation Trust Company |
| PER: | Scott LaScala |
| ADDRESS: | 1209 Orange Street Wilmington, DE 19801 |
| TELEPHONE: | 302-658-7581 |

Page 1 of  1 / AS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# The Arbitration Tribunals of the
# American Arbitration Association

| | |
|---|---|
| In the Matter of the Arbitration between | ) |
| DigaComm, LLC, Claimant | ) |
| | ) |
| and | )  **Subpoena Duces Tecum** |
| | )  **(Documents)** |
| Vehicle IP, LLC and Bradley Larschan, Respondents. | ) |
| | ) |

FROM THE PEOPLE OF THE STATE OF DELAWARE

to

Fish & Richardson P.C.; The Corporation Trust Company; Corporation Trust Center; 1209 Orange Street; Wilmington, DE 19801

GREETING:

    WE COMMAND YOU, pursuant to 10 Del. Code § 5708(a), to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below.

    Documents or Objects:    See Attachment A.

    Place:    919 N. Market Street, 17th Floor, Wilmington, DE 19899

    Date and Time: March 21, 2008 at 12:00 P.M. E.S.T.

---

10 Del. Code § 5708(a): "The arbitrators may compel the attendance of witnesses and the production of books, records, contracts, papers, accounts, and all other documents and evidence, and shall have the power to administer oaths. An arbitrator and any attorney of record in any arbitration proceeding shall have the power to issue subpoenas in his or her own name. Subpoenas so issued shall be served by any sheriff, deputy sheriff, constable, or other person, in the manner provided by law for the service and enforcement of subpoenas in a civil action and in accordance with the provisions of Chapter 21 of this title."

Signed: _____

Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, IL 60601
Tel.: (312) 861-2000
Fac.: (312) 861-2200

*Counsel for Claimant DigaComm, LLC*

# ATTACHMENT A

## SUBPOENA DUCES TECUM

### DEFINITIONS

1.      "Document" means every writing or record of every type and description, including letters, correspondence, calendars, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, films, voice recordings, reports, financial statements, applications, emails, tests, and includes all copies of every writing or record when the copy is not identical to the original.

2.      Requests for communications or correspondence with legal entities shall extend to communications with employees, officers, directors, members, preferred interest holders, shareholders, or agents of the legal entity in question.

3.      "DigaComm" shall mean Claimant DigaComm, LLC, Peter Smith, and/or Jonathan Tunick.

4.      "Fish & Richardson," "you," or "your" shall mean Fish & Richardson, P.C. and any partners, members, shareholders, associates, staff, agents, consultants, employees, representatives, and any other person(s) who are, or were, acting under your control or at your direction. These terms shall also include business organizations (including, but not limited to corporations, professional corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) or trusts that you control or that are controlled, directly or indirectly, by entities that you control.

5.      "VIP" shall mean Vehicle IP, LLC and any agents, consultants, employees, representatives, members, officers, directors, and any other person(s) (including, but not limited to, Bradley Larschan, Ericka Wojack, J. Raymond Bilbao, and Andrew Seamons) who are, or were, acting under its control or at its direction. These terms shall also include business

organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

6.    "VSAC" shall mean Vehicle Safety and Compliance, LLC and any agents, consultants, employees, representatives, officers, directors, members, preferred interest holders (including, but not limited to, Pittco Capital Partners, LP and Pittco Capital Partners II, LP), and any other person(s) who are, or were, acting under its control or at its direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

7.    "GE" shall mean General Electric Co. and any subsidiaries, (including, but not limited to, the GE Intellectual Property Licensing division or subsidiary, whichever the case may be), affiliates, consultants agents, employees, (including, but not limited to, Jimmy Goo, Michael Petracci, and Jim DiGeorgio) representatives, officers, directors, members, and any other person(s) or entities who are, or were, acting under your control or at your direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

8.    "GE SPE" shall mean the entity that acquired a portfolio of patents from VIP as part of the GE Deal.

2

9.    "GE Deal" shall mean the transaction involving GE and VIP in which VIP contributed a portfolio of patents to the GE SPE.

10.    "VIP Patent Portfolio" shall mean those patents contributed by VIP to the GE SPE, and shall include, but not be limited to, U.S. Patent Nos. 6,405,033; 6,301,480; 6,295,449; 6,240,295; 6,167,255; 6,148,202; 6,018,657; 6,009,330; 5,983,108; 5,966,658; 5,918,172; 5,884,221; 5,832,394; 5,826,195; 5,771,455; 5,734,981; 5,699,275; 5,652,707; 5,544,225; 5,539,810; 5,519,621; 5,513,111; 5,398,190; 5,299,132; and/or 5,155,689.

11.    "Economic Interest" shall mean a right, claim, legal share, membership unit, preferred interest, or other thing of value.

12.    "Monetize," "Monetization," or "Monetizing," with respect to the VIP Patent Portfolio, shall mean any proposed or actual syndication efforts, any proposed or actual licensing efforts, any proposed or actual cross-licensing efforts, any proposed or actual litigation, or other proposed or actual efforts to obtain a thing of value relating to the VIP Patent Portfolio.

13.    "Demand" shall mean DigaComm's Demand for Arbitration, a copy of which is attached as Exhibit 1.

14.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

15.    As used herein, "referring," "regarding," "relating," "relates," or "respecting," any given subject matter means, in addition to the plain meaning of those words, responding to, describing, analyzing, embodying, assessing, discussing, identifying, or otherwise referring directly or indirectly to, in any way, the particular subject matter identified.

16.    The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

## INSTRUCTIONS

1.    Subject to Instruction No. 2 below, with respect to any documents or information withheld on a claim of attorney/client privilege, attorney work product privilege, or any other privilege, provide the author(s), the recipient(s), the date of the communications, and an express statement of the privilege that describes the nature of the documents, communications, or things not produced or disclosed in a manner that will enable DigaComm to assess the applicability of the privilege or protection.

2.    DigaComm understands that Fish & Richardson also serves as litigation counsel in the above-captioned matter. These requests should not be construed to include Fish & Richardson's litigation files relating to this matter. Thus, DigaComm does not expect Fish & Richardson to log privileged communications or attorney work-product that are located in its litigation files for this matter.

3.    These requests are continuing in nature. Supplemental responses are required if you obtain further information after your responses.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All documents relating to the acquisition of the patents that constitute the VIP Patent Portfolio, including, but not limited to, communications with employees of the seller, notes, analyses or projections of current or future value.

**RESPONSE TO REQUEST NO. 1:**

**REQUEST NO. 2:**  All documents relating to the GE Deal, including, but not limited to email, correspondence, drafts, closing sets, negotiations, exhibits, budgets, side agreements, approvals, and/or memoranda.

**RESPONSE TO REQUEST NO. 2:**

**REQUEST NO. 3:**  All documents relating to DigaComm.

**RESPONSE TO REQUEST NO. 3:**

**REQUEST NO. 4:**  All documents relating to John Hall.

**RESPONSE TO REQUEST NO. 4:**

**REQUEST NO. 5:**  All correspondence or other communications to or from GE relating to the GE SPE or the VIP Patent Portfolio.

**RESPONSE TO REQUEST NO. 5:**

**REQUEST NO. 6:**  All documents relating to Fundamental Wireless, LLC.

**RESPONSE TO REQUEST NO. 6:**

**REQUEST NO. 7:**  All documents relating to the validity of the VIP Patent Portfolio, including, but not limited to, patent file histories, patent books, opinion letters, notes, analyses, and/or claims charts.

**RESPONSE TO REQUEST NO. 7:**

**REQUEST NO. 8:**  All estimates, projections, appraisal reports, valuation analyses, budgets, market studies, next-best-alternative analyses, design-around analyses, studies, reports, and/or

any other documents relating to the current or future value of the VIP Patent Portfolio or the GE SPE.

**RESPONSE TO REQUEST NO. 8:**

**REQUEST NO. 9:** All correspondence or other communications between you and any third parties, auditors, accountants, tax professionals, and/or government authorities, including the Internal Revenue Service, relating to the current or future value of the VIP Patent Portfolio, the GE SPE, and/or Economic Interests in VIP or VSAC.

**RESPONSE TO REQUEST NO. 9:**

**REQUEST NO. 10:** All documents relating to efforts to Monetize the VIP Patent Portfolio, including, but not limited to, third-party communications, third-party solicitations, third-party investments, third-party negotiations, private placement memoranda, marketing materials, licensing memoranda, presentations, demands, suits, contemplated suits, analyses, budgets, projections, claims charts, decks, and/or other estimates of current, future, and/or potential revenue.

**RESPONSE TO REQUEST NO. 10:**

**REQUEST NO. 11:** All corporate documents relating to the GE SPE, including, but not limited to, meeting minutes, member consents, LLC operating agreements, membership agreements, corporate resolutions, fairness opinions, private placement memoranda, shareholder agreements, partnership agreements, by-laws, and/or articles of organization.

**RESPONSE TO REQUEST NO. 11:**

**REQUEST NO. 12:** All corporate documents relating to Fundamental Wireless, LLC, including, but not limited to, meeting minutes, member consents, LLC operating agreements, membership agreements, corporate resolutions, fairness opinions, private placement memoranda, shareholder agreements, partnership agreements, by-laws, and/or articles of organization.

**RESPONSE TO REQUEST NO. 12:**

6

**REQUEST NO. 13:**  All documents relating to efforts to Monetize any VIP patents prior to the GE Deal, including, but not limited to, discussions or negotiations between you and VIP and/or VSAC.

**RESPONSE TO REQUEST NO. 13:**


**REQUEST NO. 14:**  All documents relating to SightSound Technologies or its transaction with GE and/or DigaComm.

**RESPONSE TO REQUEST NO. 14:**


**REQUEST NO. 15:**  All documents relating to any internal GE process involving the decision to approve the GE Deal, including, but not limited to, due diligence documents, analyses, reports, recommendations, decks, memoranda, and/or decisions.

**RESPONSE TO REQUEST NO. 15:**


**REQUEST NO. 16:**  Any opinion letters regarding any of the VIP patents.

**RESPONSE TO REQUEST NO. 16:**


**REQUEST NO. 17:**  All documents relating to any Economic Interest you have in the GE SPE or the VIP Patent Portfolio.

**RESPONSE TO REQUEST NO. 17:**


**REQUEST NO. 18:**  All documents relating to any Economic Interest you have in Fundamental Wireless, LLC.

**RESPONSE TO REQUEST NO. 18:**

7

EXHIBIT E

## Brian Rostocki

| | |
|---|---|
| **From:** | Stephen Hackney [shackney@kirkland.com] |
| **Sent:** | Sunday, March 23, 2008 12:35 PM |
| **To:** | Patricia Blazer; Brian Rostocki |
| **Cc:** | mnirider@kirkland.com |
| **Subject:** | Fw: Fish & Richardson subpoena |

Cathy's email account returned a reply suggesting she is out of the office until tomorrow. Out of an excess of caution, I am forwarding you my message to her below, as directed by her email reply.

Stephen Hackney
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, Illinois 60601
312/861-2157
312/660-0540
----- Forwarded by Stephen Hackney/Chicago/Kirkland-Ellis on 03/23/2008 11:33 AM -----

| | | |
|---|---|---|
| Stephen Hackney/Chicago/Kirkland-Ellis | | |
| | reese@fr.com | To |
| | mnirider@kirkland.com | cc |
| 03/23/2008 11:32 AM | Fish & Richardson subpoena | Subject |

Cathy,

DigaComm served your firm with subpoenas for production of documents on February 29, 2008. Those subpoenas were returnable on March 18, 2008. To date, Fish & Richardson has simply ignored them. I wanted to take one last pass by you seeking Fish's immediate compliance with the subpoenas. If we are unable to arrive at an appropriate resolution by the end of the day tomorrow, I will seek appropriate relief with the Court. Please call me to discuss.

Steve

Stephen Hackney
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, Illinois 60601
312/861-2157
312/660-0540

*********************************************************
The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International

1

LLP.
Unauthorized use, disclosure or copying of this communication or any part thereof is
strictly prohibited and may be unlawful. If you have received this communication in error,
please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof, including all attachments.
***********************************************************

EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 338 |
| v. | ) | |
| | ) | |
| Vehicle Safety and Compliance, LLC, | ) | Hon. George W. Lindberg |
| Pittco Capital Partners, LP, | ) | |
| Pittco Capital Partners II, LP, | ) | |
| J.R. "Pitt" Hyde III, and Andrew Seamons, | ) | |
| | ) | |
| Defendants. | ) | |

**DIGACOMM, LLC'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO
VEHICLE SAFETY & COMPLIANCE, LLC**

DigaComm, LLC requests that Defendant Vehicle Safety and Compliance, LLC produce

the following materials within 25 days of service of these requests at the offices of Kirkland &

Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601.

**DEFINITIONS**

1. "Document" means every writing or record of every type and description,

including letters, correspondence, calendars, diaries, memoranda, tapes, electronic data or

storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures,

films, voice recordings, reports, financial statements, applications, emails, tests, and includes all

copies of every writing or record when the copy is not identical to the original.

2. Requests for communications or correspondence with legal entities shall extend to

communications with employees, officers, directors, members, preferred interest holders,

shareholders, and/or agents of the legal entity in question.

3.       "DigaComm" shall mean Plaintiff DigaComm, LLC, Peter Smith, and/or Jonathan Tunick.

4.       "VSAC," "Defendant," "you," or "your" shall mean Vehicle Safety and Compliance, LLC and any agents, consultants, employees, representatives, officers, directors, members, preferred interest holders (including, but not limited to, Pittco Capital Partners, LP and Pittco Capital Partners II, LP), and any other person(s) who are, or were, acting under your control or at your direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that you control or that are controlled, directly or indirectly, by entities that you control.

5.       "VIP" shall mean Vehicle IP, LLC and any agents, consultants, employees, representatives, members, officers, directors, and any other person(s) (including, but not limited to, Bradley Larschan, Ericka Wojack, J. Raymond Bilbao, and Andrew Seamons) who are, or were, acting under its control or at its direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

6.       "GE" shall mean General Electric Co. and any subsidiaries, affiliates, consultants agents, employees, (including, but not limited to, Jimmy Goo, Michael Petracci, and Jim DeGeorgio) representatives, officers, directors, members, subsidiaries (including, but not limited to, the GE Intellectual Property and Licensing), and any other person(s) or entities who are, or were, acting under its control or at its direction. These terms shall also include business

2

organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

7.    "GE SPE" shall mean the entity that acquired a portfolio of patents from VIP as part of the GE Deal.

8.    "Fish & Richardson" shall mean Fish & Richardson, P.C. and any partners, members, shareholders, associates, staff, agents, consultants, employees, representatives, and any other person(s) who are, or were, acting under its control or at its direction. These terms shall also include business organizations (including, but not limited to corporations, professional corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

9.    "GE Deal" shall mean the transaction involving GE and VIP in which VIP contributed a portfolio of patents to the GE SPE.

10.    "VIP Patent Portfolio" shall mean those patents contributed by VIP to the GE SPE, and shall include, but not be limited to, U.S. Patent Nos. 6,405,033; 6,301,480; 6,295,449; 6,240,295; 6,167,255; 6,148,202; 6,018,657; 6,009,330; 5,983,108; 5,966,658; 5,918,172; 5,884,221; 5,832,394; 5,826,195; 5,771,455; 5,734,981; 5,699,275; 5,652,707; 5,544,225; 5,539,810; 5,519,621; 5,513,111; 5,398,190; 5,299,132; and/or 5,155,689.

11.    "Economic Interest" shall mean a right, claim, legal share, membership unit, preferred interest, or other thing of value.

12.    "Monetize," "Monetization," or "Monetizing," with respect to the VIP Patent Portfolio, shall mean any proposed or actual syndication efforts, any proposed or actual licensing efforts, any proposed or actual cross-licensing efforts, any proposed or actual litigation, or other proposed or actual efforts to obtain a thing of value relating to the VIP Patent Portfolio.

13.    "Complaint" shall mean DigaComm's First Amended Complaint.

14.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

15.    As used herein, "referring," "regarding," "relating," "relates," or "respecting," any given subject matter means, in addition to the plain meaning of those words, responding to, describing, analyzing, embodying, assessing, discussing, identifying, or otherwise referring directly or indirectly to, in any way, the particular subject matter identified.

16.    The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

## INSTRUCTIONS

1.    With respect to any documents or information withheld on a claim of attorney/client privilege, attorney work product privilege, or any other privilege, provide the author(s), the recipient(s), the date of the communications, and an express statement of the privilege that describes the nature of the documents, communications, or things not produced or disclosed in a manner that will enable DigaComm to assess the applicability of the privilege or protection.

2.    These requests are continuing in nature.  Supplemental responses are required if you obtain further information after your responses.

## DOCUMENT REQUESTS

**REQUEST NO. 1:**  All corporate documents relating to VSAC and/or VIP, including, but not limited to, LLC operating agreements, membership agreements, articles of organization, board charters, corporate resolutions, member consents, by-laws, and/or meeting minutes.

**RESPONSE TO REQUEST NO. 1:**

**REQUEST NO. 2:**  All documents relating to the acquisition of the patents that constitute the VIP Patent Portfolio, including, but not limited to, communications with employees of the seller, notes, analyses, or projections of current or future value.

**RESPONSE TO REQUEST NO. 2:**

**REQUEST NO. 3:**  All documents relating to the GE Deal, including, but not limited to email, correspondence, drafts, closing sets, negotiations, exhibits, budgets, side agreements, approvals, and/or memoranda.

**RESPONSE TO REQUEST NO. 3:**

**REQUEST NO. 4:**  All employment documents relating to any employee of VSAC or VIP, including, but not limited to, employment agreements, employment-related Economic Interest documents, personnel files, and/or business cards.

**RESPONSE TO REQUEST NO. 4:**

**REQUEST NO. 5:**  All correspondence or other communications with VIP, the VSAC Preferred Interest Holders, DigaComm, John Hall, Fish & Richardson, GE, and/or the GE SPE.

**RESPONSE TO REQUEST NO. 5:**

**REQUEST NO. 6:**  All documents relating to DigaComm.

**RESPONSE TO REQUEST NO. 6:**



**REQUEST NO. 7:**  All contracts to which VSAC or VIP is a party.

**RESPONSE TO REQUEST NO. 7:**



**REQUEST NO. 8:**  All documents relating to the validity of the VIP Patent Portfolio, including, but not limited to, patent file histories, patent books, opinion letters, notes, analyses, and/or claims charts.

**RESPONSE TO REQUEST NO. 8:**



**REQUEST NO. 9:**  All documents relating to the current or future value of the VIP Patent Portfolio or the GE SPE, including, but not limited to, estimates, projections, appraisal reports, valuation analyses, budgets, market studies, next-best-alternative analyses, design-around analyses, studies, and/or reports.

**RESPONSE TO REQUEST NO. 9:**



**REQUEST NO. 10:**  All correspondence or other communications between VSAC or VIP and any third parties, auditors, accountants, tax professionals, and/or government authorities, including the Internal Revenue Service, relating to the current or future value of the VIP Patent Portfolio, the GE SPE, and/or Economic Interests in VSAC or VIP.

**RESPONSE TO REQUEST NO. 10:**

**REQUEST NO. 11:**  All documents relating to efforts to Monetize the VIP Patent Portfolio, including, but not limited to, third-party communications, third-party solicitations, third-party investments, third-party negotiations, private placement memoranda, marketing materials, licensing memoranda, presentations, demands, suits, contemplated suits, analyses, budgets, projections, claims charts, business plans, decks, and/or other estimates of current, future, and/or potential revenue.

**RESPONSE TO REQUEST NO. 11:**

**REQUEST NO. 12:**  All documents relating to any payments, licenses, cross-licenses, investments, promises to pay, securities, and/or other things of value received by VSAC, the VSAC Preferred Interest Holders, VIP, and/or the GE SPE relating to the VIP Patent Portfolio.

**RESPONSE TO REQUEST NO. 12:**

**REQUEST NO. 13:**  All corporate documents relating to the GE SPE, including, but not limited to, meeting minutes, member consents, LLC operating agreements, membership agreements, corporate resolutions, fairness opinions, private placement memoranda, shareholder agreements, partnership agreements, by-laws, and/or articles of organization.

**RESPONSE TO REQUEST NO. 13:**

**REQUEST NO. 14:**  All documents relating to efforts to Monetize any VIP patents prior to the GE Deal, including, but not limited to, discussions or negotiations with Fish & Richardson.

**RESPONSE TO REQUEST NO. 14:**

**REQUEST NO. 15:**  All financial documents relating to VSAC or VIP, including but not limited to bank account records, brokerage account records, general ledgers, business plans, balance sheets, inter-company agreements, invoices, and/or financial statements.

**RESPONSE TO REQUEST NO. 15:**

7

**REQUEST NO. 16:**  All documents relating to any proposed or actual investment in VSAC and/or VIP, including, but not limited to, offering memoranda, term sheets, presentations, calendar entries, correspondence, and/or investment agreements.

**RESPONSE TO REQUEST NO. 16:**

**REQUEST NO. 17:**  All documents relating to SightSound Technologies or its transaction with GE and/or DigaComm.

**RESPONSE TO REQUEST NO. 17:**

**REQUEST NO. 18:**  All documents relating to Fundamental Wireless, LLC.

**RESPONSE TO REQUEST NO. 18:**

**REQUEST NO. 19:**  All documents relating to financial dealings between VSAC and VIP, including but not limited to equity contributions, capital contributions, loans, pledges, Economic Interests, and/or secured interests.

**RESPONSE TO REQUEST NO. 19:**

**REQUEST NO. 20:**  All documents relating to any member or Preferred Interest Holder of VSAC.

**RESPONSE TO REQUEST NO. 20:**

February 26, 2008

Kirkland & Ellis LLP

By: _____

Reed S. Oslan, P.C.
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois  60601
Tel: 312/861-2157
Fac: 312/861-2200

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been sent by email and Federal Express on February 26, 2008 to the following:

Joseph L. Fogel
John Z. Lee
Kellye L. Fabian
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel.: 312/360-6000
Fac.: 312/360-6520

An attorney for DigaComm, LLC

10

AMERICAN ARBITRATION ASSOCIATION

Wilmington, Delaware

| | | |
|---|---|---|
| DigaComm, LLC, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | No. 14 180 01850 07 |
| v. | ) | |
| | ) | |
| Vehicle IP, LLC, | ) | |
| Bradley Larschan, | ) | |
| | ) | |
| Respondents. | ) | |

### DIGACOMM, LLC'S FIRST REQUEST FOR
### PRODUCTION OF DOCUMENTS TO VEHICLE IP, LLC

DigaComm, LLC requests that Respondent Vehicle IP, LLC produce the following

materials on or before March 20, 2008 at the offices of Kirkland & Ellis LLP, 200 East Randolph

Drive, Chicago, Illinois 60601.

### DEFINITIONS

1.    "Document" means every writing or record of every type and description,

including letters, correspondence, calendars, diaries, memoranda, tapes, electronic data or

storage, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures,

films, voice recordings, reports, financial statements, applications, emails, tests, and includes all

copies of every writing or record when the copy is not identical to the original.

2.    Requests for communications or correspondence with legal entities shall extend to

communications with employees, officers, directors, members, preferred interest holders,

shareholders, and/or agents of the legal entity in question.

3.    "DigaComm" shall mean Claimant DigaComm, LLC, Peter Smith, and/or

Jonathan Tunick.

4.      "Respondent," "VIP," "you," or "your" shall mean Vehicle IP, LLC and any agents, consultants, employees, representatives, members, officers, directors, and any other person(s) (including, but not limited to, Bradley Larschan, Ericka Wojack, J. Raymond Bilbao, and Andrew Seamons) who are, or were, acting under your control or at your direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that you control or that are controlled, directly or indirectly, by entities that you control.

5.      "VSAC" shall mean Vehicle Safety and Compliance, LLC and any agents, consultants, employees, representatives, officers, directors, members, preferred interest holders (including, but not limited to, Pittco Capital Partners, LP and Pittco Capital Partners II, LP), and any other person(s) who are, or were, acting under its control or at its direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

6.      "GE" shall mean General Electric Co. and any subsidiaries (including, but not limited to, the GE Intellectual Property Licensing division or subsidiary, whichever the case may be), affiliates, consultants agents, employees, (including, but not limited to, Jimmy Goo, Michael Petracci, and Jim DiGeorgio) representatives, officers, directors, members, and any other person(s) or entities who are, or were, acting under its control or at its direction. These terms shall also include business organizations (including, but not limited to corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and

unincorporated associations) and/or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

7.    "GE SPE" shall mean the entity that acquired a portfolio of patents from VIP as part of the GE Deal.

8.    "Fish & Richardson" shall mean Fish & Richardson, P.C. and any partners, members, shareholders, associates, staff, agents, consultants, employees, representatives, and any other person(s) who are, or were, acting under its control or at its direction.  These terms shall also include business organizations (including, but not limited to corporations, professional corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and unincorporated associations) or trusts that it controls or that are controlled, directly or indirectly, by entities that it controls.

9.    "GE Deal" shall mean the transaction involving GE and VIP in which VIP contributed a portfolio of patents to the GE SPE.

10.    "VIP Patent Portfolio" shall mean those patents contributed by VIP to the GE SPE, and shall include, but not be limited to, U.S. Patent Nos. 6,405,033; 6,301,480; 6,295,449; 6,240,295; 6,167,255; 6,148,202; 6,018,657; 6,009,330; 5,983,108; 5,966,658; 5,918,172; 5,884,221; 5,832,394; 5,826,195; 5,771,455; 5,734,981; 5,699,275; 5,652,707; 5,544,225; 5,539,810; 5,519,621; 5,513,111; 5,398,190; 5,299,132; and/or 5,155,689.

11.    "Economic Interest" shall mean a right, claim, legal share, membership unit, preferred interest, or other thing of value.

12.    "Monetize," "Monetization," or "Monetizing," with respect to the VIP Patent Portfolio, shall mean any proposed or actual syndication efforts, any proposed or actual licensing

efforts, any proposed or actual cross-licensing efforts, any proposed or actual litigation, or other proposed or actual efforts to obtain a thing of value relating to the VIP Patent Portfolio.

13.    "Demand" shall mean DigaComm's Demand for Arbitration before the American Arbitration Association that was served on you on October 26, 2007.

14.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

15.    As used herein, "referring," "regarding," "relating," "relates," or "respecting," any given subject matter means, in addition to the plain meaning of those words, responding to, describing, analyzing, embodying, assessing, discussing, identifying, or otherwise referring directly or indirectly to, in any way, the particular subject matter identified.

16.    The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

## INSTRUCTIONS

1.    With respect to any documents or information withheld on a claim of attorney/client privilege, attorney work product privilege, or any other privilege, provide the author(s), the recipient(s), the date of the communications, and an express statement of the privilege that describes the nature of the documents, communications, or things not produced or disclosed in a manner that will enable DigaComm to assess the applicability of the privilege or protection.

2.    These requests are continuing in nature. Supplemental responses are required if you obtain further information after your responses.

4

## DOCUMENT REQUESTS

**REQUEST NO. 1:**  All corporate documents relating to VIP and/or VSAC, including, but not limited to, LLC operating agreements, membership agreements, articles of organization, board charters, corporate resolutions, member consents, by-laws, and/or meeting minutes.

**RESPONSE TO REQUEST NO. 1:**

**REQUEST NO. 2:**  All documents relating to the acquisition of the patents that constitute the VIP Patent Portfolio, including, but not limited to, communications with the seller or its employees, notes, analyses, or projections of current or future value.

**RESPONSE TO REQUEST NO. 2:**

**REQUEST NO. 3:**  All documents relating to the GE Deal, including, but not limited to email, correspondence, drafts, closing sets, negotiations, exhibits, budgets, side agreements, approvals, and/or memoranda.

**RESPONSE TO REQUEST NO. 3:**

**REQUEST NO. 4:**  All employment documents relating to any employee of VIP or VSAC, including, but not limited to, employment agreements, employment-related Economic Interest documents, personnel files, and/or business cards.

**RESPONSE TO REQUEST NO. 4:**

**REQUEST NO. 5:**  All correspondence or other communications with VSAC, DigaComm, John Hall, Fish & Richardson, GE, and/or the GE SPE.

**RESPONSE TO REQUEST NO. 5:**

**REQUEST NO. 6:**  All documents relating to DigaComm.

**RESPONSE TO REQUEST NO. 6:**


**REQUEST NO. 7:**  All contracts to which VIP or VSAC is a party.

**RESPONSE TO REQUEST NO. 7:**


**REQUEST NO. 8:**  All documents relating to the validity of the VIP Patent Portfolio, including, but not limited to, patent file histories, patent books, opinion letters, notes, analyses, and/or claims charts.

**RESPONSE TO REQUEST NO. 8:**


**REQUEST NO. 9:**  All estimates, projections, appraisal reports, valuation analyses, budgets, market studies, next-best-alternative analyses, design-around analyses, studies, and/or reports, including, but not limited to, documents relating to the current or future value of the VIP Patent Portfolio or the GE SPE.

**RESPONSE TO REQUEST NO. 9:**


**REQUEST NO. 10:**  All correspondence or other communications between VIP or VSAC and any third parties, auditors, accountants, tax professionals, and/or government authorities, including the Internal Revenue Service, relating to the current or future value of the VIP Patent Portfolio, the GE SPE, and/or Economic Interests in VIP or VSAC.

**RESPONSE TO REQUEST NO. 10:**

**REQUEST NO. 11:**  All documents relating to efforts to Monetize the VIP Patent Portfolio, including, but not limited to, third-party communications, third-party solicitations, third-party investments, third-party negotiations, private placement memoranda, marketing materials, licensing memoranda, presentations, demands, suits, contemplated suits, analyses, budgets, projections, claims charts, decks, and/or other estimates of current, future, and/or potential revenue from any Monetization efforts.

**RESPONSE TO REQUEST NO. 11:**

**REQUEST NO. 12:**  All documents relating to any payments, licenses, cross-licenses, investments, promises to pay, securities, and/or other things of value received by VIP, VSAC, and/or the GE SPE relating to the VIP Patent Portfolio.

**RESPONSE TO REQUEST NO. 12:**

**REQUEST NO. 13:**  All corporate documents relating to the GE SPE, including, but not limited to, meeting minutes, member consents, LLC operating agreements, membership agreements, corporate resolutions, fairness opinions, private placement memoranda, shareholder agreements, partnership agreements, by-laws, and/or articles of organization.

**RESPONSE TO REQUEST NO. 13:**

**REQUEST NO. 14:**  All documents relating to efforts to Monetize any VIP patents prior to the GE Deal, including, but not limited to, discussions or negotiations with Fish & Richardson.

**RESPONSE TO REQUEST NO. 14:**

**REQUEST NO. 15:**  All financial documents relating to VIP or VSAC, including but not limited to bank account records, brokerage account records, tax returns, general ledgers, balance sheets, inter-company agreements, invoices, and/or financial statements.

**RESPONSE TO REQUEST NO. 15:**

**REQUEST NO. 16:**  All documents relating to any proposed or actual investment in VIP and/or VSAC, including, but not limited to, offering memoranda, private placement memoranda, term sheets, presentations, calendar entries, correspondence, and/or investment agreements.

**RESPONSE TO REQUEST NO. 16:**

**REQUEST NO. 17:**  All documents relating to SightSound Technologies or its transaction with GE and/or DigaComm.

**RESPONSE TO REQUEST NO. 17:**

**REQUEST NO. 18:**  All documents relating to Fundamental Wireless, LLC.

**RESPONSE TO REQUEST NO. 18:**

**REQUEST NO. 19:**  All documents utilized or referred to in responding to DigaComm's First Request for Admissions and/or First Set of Interrogatories.

**RESPONSE TO REQUEST NO. 19:**

February 21, 2008

Kirkland & Ellis LLP

By: _____

Reed S. Oslan, P.C.
Stephen C. Hackney
Matthew E. Nirider
Kirkland & Ellis LLP
200 E. Randolph Drive

8

Chicago, Illinois  60601
Tel: 312/861-2157
Fac: 312/861-2200

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on February 21, 2008, a true and correct copy of the foregoing has been served on the following individuals via email and Federal Express:

Joseph L. Fogel
John Z. Lee
Kellye L. Fabian
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
Tel.: 312/360-6000
Fac.: 312/360-6520

Cathy L. Reese, Esq,
Brian M. Rostocki, Esq.
Fish & Richardson, P.C.
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: 302/652-5070
Fac: 302/652-0607

An attorney for DigaComm, LLC

10

EXHIBIT G

Order Form (01/2005)    Case 1:08-cv-00338    Document 48    Filed 04/09/2008    Page 1 of 1

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 338 | **DATE** | April 9, 2008 |
| **CASE TITLE** | DigaComm, LLC vs. Vehicle Safety and Compliance, LLC, *et al.* | | |

**DOCKET ENTRY TEXT**

Plaintiff's Motion to Compel [40] is granted in part. Defendants are ordered to produce documents on a rolling basis and complete their production by no later than April 21, 2008.

Docketing to mail notices.

| | Courtroom Deputy Initials: | SLB |
|---|---|---|